**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| LILLIAN ANAYA and MEL ANAYA, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| vs. | § | |
| | § | |
| CBS BROADCASTING INC., SHARYL | § | Case No. CIV-06-476-JB-KBM |
| ATTKISSON, EMMIS | § | |
| COMMUNICATIONS, CORP., AMP | § | |
| PARTS AND PERFORMANCE, a | § | |
| division of TRI-CITY AUTO SALES, | § | |
| INC., and THOMAS THOMPSON in his | § | |
| official and individual capacities, | § | |
| | § | |
| **Defendants.** | § | |

**MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CBS
BROADCASTING INC.'S MOTION TO COMPEL**

Defendant CBS Broadcasting Inc. ("CBS") moves the Court for an order compelling Los Alamos National Security, LLC and Regents of the University of California to produce documents that have been improperly withheld or redacted.

## I. INTRODUCTION

This motion seeks to compel the production of documents from two entities that manage Los Alamos National Laboratory ("the Lab"), a former defendant in this lawsuit and plaintiff Lillian Anaya's former employer. In August 2002, Lillian Anaya ("Anaya") was placed on administrative leave after being implicated in numerous alleged purchasing improprieties. One of the accusations against her involved the apparent purchase of a custom Ford Mustang on her government credit card. Other allegations related to approximately $1.5 million in improper tool purchases, as well as numerous other suspect purchases such as bicycles, a gas grill, and clothing. From 2002 through 2004, CBS News reported on these allegations and other Lab controversies and the various investigations into them.

In June 2003, the Lab invited Anaya back to work, claiming that an exhaustive investigation had uncovered evidence suggesting that the Mustang charges were incurred to Anaya's card after she mistakenly dialed an outdated telephone number for a legitimate Lab vendor.  The Lab also decided not to discipline Anaya for her other suspect and improper purchases, as the Lab claimed that her transgressions were not fundamentally different than those of other purchasers.  Based on the Lab's so-called "exoneration" of her, Anaya sued the Lab, several former Lab employees, CBS, CBS reporter Sharyl Attkisson, and the Mustang auto dealer who charged her card.  The Lab and former Lab employees settled with Anaya in May 2006.  After the Lab defendants were dismissed and this case was removed to federal court, Anaya filed an amended complaint, which broadened her claims against CBS to include several additional reports and statements unrelated to the Mustang charges.

Despite the settlement, the Lab remains at the epicenter of lawsuit.  As Anaya's former employer and the originator of the "wrong number" theory, the Lab possesses the vast majority of documents that the parties will use to support their respective positions.  Anaya recognizes this fact; as part of her settlement with the Lab, she negotiated a cooperation agreement that gives her access to Lab documents and employees.  CBS, however, is forced to rely on formal procedures such as the document requests and two subpoenas it now seeks to enforce.  Without full compliance from the Lab, CBS will be deprived of documents and information relevant to plaintiffs' claims.

## II.  BACKGROUND

**A.    The Underlying Purchasing Controversies**

1.      Initial Allegations Prompt Charges of Management Cover-up

The public first learned about the allegations against Anaya and other Lab purchasers in November 2002, when the Lab fired its own internal investigators, Glenn Walp and Steve Doran.

Walp and Doran publicly accused the Lab of covering up ongoing theft problems and interfering with law enforcement investigations into the alleged thefts.  In a letter to University of California President Richard C. Atkinson, Walp and Doran described several examples of alleged theft by Lab purchasers, including Anaya's alleged attempt to purchase a Mustang.  *See* Ex. A.  Walp and Doran also accused Lab management of repeatedly undermining law enforcement investigations into these allegations and covering up wrongdoing.  At first, the Lab publicly attempted to defend its firings of Walp and Doran.  But in the face of overwhelming evidence that the terminations were an extension of the alleged cover-up, the Lab soon admitted its wrongdoing and rehired both of them.

At about the same time, an anonymous memorandum was leaked to the public, alluding to several of the same purchasing scandals and alleging that Lab management had repeatedly interfered with FBI investigations:

> The reason this was done was because Laboratory high officials to include [Lab Chief Counsel Frank] Dickson, want to clear the record at the Laboratory before a major DOE audit that is coming up shortly, and before the University of California contract becomes an issue.  They want to make sure it appears that the Laboratory is functioning properly and is properly administrated when in fact it is in total disarray.  High officials within the Laboratory are especially afraid that the University of Texas will get the contract.

*See* Ex. B.  Each of these alleged cover-ups involved the same Lab management officials and a similar pattern of secrecy and obstruction of law enforcement investigations.  Moreover, the underlying allegations all involved a similar pattern of theft through the misuse of Lab Purchase Cards or other Lab purchasing procedures.

2.      Mustang Charges

Although by no means the only purchasing controversy brought to light in November 2002 – or even the only such controversy involving Lillian Anaya – the alleged Mustang

purchase became a topic of numerous local and national press reports.  The Mustang charges came to the Lab's attention when a Bank of America representative called Purchase Card administrator Arlene Roybal to report that Anaya had incurred nearly $30,000 in charges on her Lab Purchase Card.  The charges had been disputed by Anaya, but Roybal and the Purchase Card Office had not been notified.  After some initial inquiries to Anaya's supervisor, Roybal reported the suspicious charges to Lab management, beginning one of what would be several investigations.  Early on, investigators with the Lab's Office of Security Inquiries ("OSI"), including Walp and Doran, worked with the FBI to uncover records of several phone calls and faxes between Anaya's office and All Mustang Parts and Performance ("AMP"), a Phoenix-area performance auto shop.  When the OSI and FBI asked Anaya about these calls and faxes, she failed to offer any explanation, "reasonable or not," according to an FBI interview summary. Anaya was placed on investigative leave, where she remained for ten months.

During this time, the Mustang charges were investigated by the OSI, the FBI, the Department of Energy, the Lab's human resources department, and the Lab's legal department. After 8 months of investigations, as of April 7, 2003, the Lab had no answer for who was responsible for the Mustang charges, if not Anaya.  Over the next two months, however, Lab lawyers continued to investigate the Mustang case, and in June of 2003, the Lab came up with a controversial "hypothesis" purporting to explain the Mustang charges:  Anaya was tricked by AMP salesperson Thomas Thompson into providing her Purchase Card number after mistakenly dialing AMP in an ill-fated attempt to purchase high tech devices called "transducers" from an established Lab vendor.  According to the Lab, its vendor, Fluid Conditioning, had previously used the telephone number that Anaya called to reach the Mustang shop on May 1, 2002.  The next day, the Lab's PR department published the "hypothesis" as fact.  The Lab's then-interim

director, Pete Nanos, trumpeted the "wrong number" theory as a "validation of the University of California and Laboratory system for investigation of allegations of fraud." *See* Ex. C.

From the outset, however, the "wrong number" theory was controversial, even within the Lab and University of California. Steve Doran, who was still working as a security officer for the University of California, refused to endorse the theory. And Glenn Walp publicly questioned the likelihood that events could transpire as the Lab claimed. Public watchdogs and Congressional investigators were also highly suspicious of the theory. *See* Ex. D. These doubts were based in part on the perception that the Lab had a demonstrated track record of responding to purchasing controversies like this one by publicizing unsubstantiated claims and covering up damaging information.

    3.    G&G Tools and Anaya's Other Suspicious Purchases

Although the "wrong number" theory purported to exonerate Anaya for the Mustang charges, it did not clear her of the numerous other alleged purchasing improprieties, such as the purchase of $1.5 million in tools from an unauthorized vendor, G&G Industrial Supply. The overwhelming majority of Anaya's G&G purchases were requested by Anaya's colleague, Orlando Smith, who was friends with G&G's owner.[1] The G&G allegations were considered extremely serious, and were a prominent focus of external and internal investigations. Ultimately, the Lab concluded that purchases were so problematic that it severed its relationship with G&G. But Anaya received no discipline, because, as the Lab publicly claimed, "the

---

[1] The allegations against Orlando Smith were also mentioned in the November 2002 anonymous memorandum:

> In another situation a Laboratory employee has a "deal" with a vendor in Albuquerque where he has purchased over 1 million dollars in about 12 months – a total violation of Laboratory policy but Laboratory officials won't do anything about it.

*See* Ex. B.

conduct of Ms. Anaya, frankly, was no different than many other employees.  We don't wish to single her out."  *See* Ex. E.  Other documents, however, suggest that Anaya may have escaped discipline for other reasons, as expressed by the Lab lawyer responsible for the "wrong number" theory of the Mustang charges:

> If the Laboratory imposes discipline because of the G&G matter, it may lose the expressed good will of Ms. Anaya and her attorney, which may be extremely helpful on the Mustang matter.  It seems a minor price to forego discipline on G&G in return for the greater good of cooperation on the Mustang matter … Imposing discipline for the G&G matter might appear inappropriate because similar proportionate discipline is not being considered for others who engaged in similar activity.

*See* Ex. F.

In addition to the Mustang and G&G tools allegations, Anaya was implicated in literally thousands of suspect purchases.  Lab investigators were never able to locate some of the "suspect" items, such as computers and mountain bikes.  According to one congressional document, the University of California had to reimburse the Lab for several thousands of dollars as a result of Anaya's improper purchases.  *See* Ex. G.  And when Anaya was invited back to her job at the Lab, she was not given any Purchase Card authority.  Still, Anaya received no discipline for any of these improper purchases.

   4.  <u>Congressional Investigations And The Lab Contract</u>

Through the Winter and Spring of 2003, Congress held hearings on the various Lab purchasing controversies.  One of the subjects of these and other investigations was the Mustang charges, but the scope of the hearings and investigations was much broader, as they concerned purchasing improprieties by other Lab employees, accusations of management cover-up, and the controversial firings of Walp and Doran.  Congress investigated all of them at the same time.  It did not distinguish between the Lab's handling of the Anaya allegations and the Lab's handling of other, similar allegations.

In late-April 2003, as the purchasing controversies remained subjects of intense interest in Congress, the Department of Energy announced that the Lab contract would be put up for competitive bid for the first time in sixty years. According to Lab critics like Walp and Doran, the University of California's desire to hold onto the Lab contract had guided Lab's management's handling of the purchasing controversies. Indeed, during the Fall of 2005, as plaintiffs and the Lab were negotiating a settlement in this lawsuit, the contract continued to hang in the balance.

**B.      Plaintiffs' Claims**

This lawsuit was formally commenced in August 2005, although it is now clear from the documents that Anaya had been negotiating with the Lab for much longer. When the Lab announced its "wrong number" theory, Anaya apparently demanded that it pay the legal expenses she had incurred in hiring criminal defense counsel. It also appears from some of the documents that Anaya never intended to return to work after the Lab announced this theory, opting instead to take advantage of disability or retirement benefits. Moreover, documents suggest that the UC legal department may have been intimately involved in securing benefits for her. In September 2004, Lillian Anaya sent a formal demand letter to the Lab. Based on the Lab's privilege log, it appears that negotiations between plaintiffs and the Lab lasted throughout the next year, before this suit was even filed.

The August 2005 complaint included claims by Lillian Anaya and her husband, Mel, against the Lab, Glenn Walp, Steve Doran, former Lab Deputy Director Joseph Salgado, CBS, Emmis Communications Corp., AMP, and Thomas Thompson. In that complaint, Lillian Anaya adopted the Lab's "wrong number" theory, accusing AMP and Thompson of fraud and CBS of defamation and related torts arising from their coverage of the purchasing controversies. From the inception of the lawsuit, it was clear that the Lab and the Anayas were cooperating. For

example, the Lab did not even enter an appearance until January 2006 (four months after plaintiffs filed their case), with the obvious blessing of plaintiffs.  Moreover, the Lab apparently obtained plaintiffs' consent not to file any answers for Glenn Walp and Steve Doran.  In May 2006, the parties deposed Bruce Herr, the in-house attorney involved in the Mustang investigation, who was retiring from the Lab.  On the eve of Mr. Herr's deposition, the Lab and the Anayas announced that they had settled their claims.  After the dismissal of the nondiverse Lab defendants, CBS and AMP removed the case to this Court.  Plaintiffs then filed an amended complaint, adding CBS reporter Sharyl Attkisson as a defendant and claims related to several additional broadcasts and reports from 2002 through 2004.

## C.    The Challenged News Reports

The CBS news reports challenged by Lillian Anaya were part of CBS' coverage of the various investigations and allegations concerning fraud, mismanagement, and abuse at national laboratories, including Los Alamos.  Most of these reports did not mention Anaya by name, referring instead to the alleged Mustang purchase as representative of the broader purchasing and cover-up scandals that engulfed the Lab during that time.  Those that did mention Anaya discussed the various allegations against her and the investigations into those allegations.  For example, the challenged December 20, 2002 broadcast reported on findings by auditors that Anaya and other purchasers had engaged in "thousands" of suspect transactions.  Furthermore, the challenged April 27, 2004 broadcast discussed a Department of Energy finding that Anaya had repeatedly violated established purchasing procedures, separate from her alleged Mustang purchase.  Moreover, the reports covered the Lab's handling of the allegations against Anaya and others.

**D.     Status of Discovery**

The requests for production at issue on this motion were originally served on LANL on February 8, 2006, when the Lab was still a party to this case.  On April 21, 2006, the Lab served its responses and objections to CBS' document requests.  But at the time of the Lab's dismissal from this case in June 2006, the Lab had not completed its promised production.  After representing to CBS counsel that it would finish the production, Lab counsel requested that CBS re-issue its document requests by subpoena under Federal Rule of Civil Procedure 45.  Out of an abundance of caution, CBS agreed to this request.  The Lab has now produced approximately six additional boxes of documents; it claims that its document production is complete and the privilege log is in final form.

### III.  ARGUMENT

In order to investigate plaintiffs' claims fully, CBS sent the Lab document requests concerning the Mustang controversy, other purchasing controversies involving Anaya, and closely related controversies involving Lab management and other Lab purchasers.  For the reasons discussed below, the Lab's responses to CBS' requests, although substantial in terms of the number of pages produced, are deficient is certain key respects.

**A.     The Lab's Responses Make It Impossible To Determine The Extent To Which The Lab Has Withheld Responsive Documents.**

The Lab's written responses make it impossible for CBS to determine whether the Lab has withheld important documents.  First, the Lab never states whether *all* responsive, nonprivileged documents are being produced.  Instead, its responses merely list a few specific documents that the Lab has chosen to produce.  For example, in its responses and objections to Request Nos. 1, 3, 4, 5, and 6, the Lab states: "Without waiving its objections, the [Lab] states that responsive documents are included within the current document production for this request."

*See* Request No. 1; Ex. H.  It then proceeds to identify specific documents that are being produced.  The Lab does not agree to produce *all* responsive documents or even *all* responsive documents falling within relevant categories.  This approach is repeated in virtually all of the Lab's responses and objections.  Based on such responses, CBS has no way to determine whether the Lab is withholding relevant documents.  In other words, based on the written responses, CBS cannot determine whether there are responsive documents the Lab has *not* produced or even attempted to gather.  Second, the Lab repeatedly responds to requests by stating generally that "such material, unless protected from discovery, has been produced."  *See, e.g.*, Request Nos. 17, 20-25, 45, 50, 51, 58, 61; Ex. H.  This response also fails to state whether all responsive, nonprivileged documents have been produced.  Without such a statement, CBS has no way to determine whether the Lab is withholding responsive, nonprivileged documents that do not fall within one of its objections.

**B.    The Lab Has Improperly Objected To The Scope Of The Requests.**

The Lab's responses and objections to CBS' requests include a "Prefatory Explanation" in which the Lab describes its approach to the requests.  *See* Ex. H.  In this section, the Lab unilaterally attempts to define what it characterizes as the so-called "material underlying events" of this lawsuit.  It claims that only documents directly related to the All Mustang charges or other purchasing activity by Anaya are relevant.  As a result, it refuses to produce documents related to other investigations into similar alleged purchasing improprieties or into the alleged management cover-up of these allegations.  But, as shown below, information related to other Lab purchasing controversies in 2003 and 2003, as well as the alleged management cover-up of those controversies, is relevant to understanding the Anaya situation.

1.    <u>The Lab's Is Withholding Anaya-Related Documents.</u>

a.    *The Lab's search ignores several key figures in this case.*

The Lab states that it searched the files of certain individuals, who are listed in the Lab's "Prefatory Explanation." *See* Response at p. 4, 15-16; Ex. H.  But this list of individuals omits many important Lab personnel who have already been identified by plaintiffs or in Lab documents.   For example, plaintiffs' discovery responses have identified the following individuals as persons likely to have relevant information, none of whom appear on the list of names of Lab employees whose files were searched:  Orlando Smith; Donna Peterson; Donna Schneider; Tino Ortiz; Elena Galvez; Bob Shuch; Fred Algerra; Jody Niessen; Robert Zimmerman; Henry Anaya; Jean Elson; Vivian Martinez; and Joan Williams.[2]  Moreover, the Lab's search apparently ignored several other individuals who played a significant role in the underlying events, and whose names appear in the documents produced by the Lab: Pete Nanos; Gene Tucker; Richard Atkinson; Kathleen Garcia; Scott Richmond; Richard Naranjo; Carla "Ruby" O'Rear; and R. Nelson.  At a minimum, the Lab should be ordered to search the files of these individuals.  Moreover, because CBS cannot be expected to identify all Lab personnel who may have responsive, relevant documents, the Lab should be ordered to search all documents within the appropriate Lab divisions.

b.    *The Lab refuses to produce certain documents related to the Mustang charges.*

The Lab has withheld documents even when they are directly related to the Lab's own Mustang investigation.  For example, Request No. 35 seeks badge-reader data showing when Donna Schneider entered the area where she and Lillian Anaya worked.  *See* Ex. H at 83-84.  As background, the Lab claims that Anaya was out to lunch during several of the critical Mustang

---

[2] CBS is not familiar with a few of these names, and assumes that they are Lab personnel.

calls on May 1, 2002. As support for this proposition, the Lab has produced Anaya's badge reader data, as well as statements from Schneider (Anaya's best friend) that she and Anaya often ate lunch together. Nevertheless, the Lab has refused to produce the badge reader data that would support such as assertion (as to May 1, 2002 or her practice around that time frame), based on the following objection:

> The Regents objects to this request on the grounds that it is overly broad and/or is not reasonably calculated to lead to the discovery of admissible evidence. The allegations of the Complaint, as they related to CBS News and Emmis, and in general, do not allude to Ms. Schneider. The Regents further states that the files reviewed for the current production do not reflect that the Regents pulled badge reader data for Ms. Schneider during the investigations into All Mustang charges. Information relating to Ms. Schneider's location at the Laboratory in between the dates of January 1, 2002 and August 31, 2002, therefore does not appear to have any probative value.

*See* Ex. H. This objection is clearly improper. The badge reader data is directly relevant to the Mustang investigation and the validity of the Lab's "wrong number" theory, and therefore should be produced, regardless of whether it was originally collected by the Lab's investigators.[3] Similarly, the Lab's refusal to produce documents related to other purchasers leads it to withhold documents related to other Lab purchasers' dealings with Fluid Conditioning. *See* Request No. 42; Ex. H. Such documents are relevant to the likelihood of the Lab's conclusion that Anaya somehow processed an order from Fluid Conditioning in such a way that she was charged for a Ford Mustang by a Phoenix body shop. Whether other Lab employees made any mistakes in processing their own Fluid Conditioning orders during the same time frame is relevant to the validity of the Lab's theory and to Anaya's claims.

---

[3] The suggestion that the Lab's production should be limited to information that was actually gathered by Lab investigators is itself indefensible, as it would deprive CBS of relevant evidence that the Lab investigators overlooked.

c.      *The Lab refuses to produce documents relevant to the G&G investigation.*

As discussed above, the G&G scandal was a major purchasing controversy involving Anaya.  The G&G allegations were very serious.  The anonymous November 2002 memo alleged that Anaya's colleague, Orlando Smith, had a "deal" with the G&G owners.  Indeed, the vast majority of G&G purchases were made by Anaya through requests from Smith.  And, after looking into the situation, the Lab obviously found something that caused it to sever its relationship with G&G.  Anaya's ability to avoid discipline on the G&G scandal is therefore no small matter.

But in response to CBS' requests relating to G&G, *see* Request Nos. 84-89, the Lab only produced records of Anaya's G&G purchases and documents related to Bruce Herr's investigation into Anaya's role in the G&G scandal.  This production is insufficient for several reasons.  First, Herr's investigation into Anaya's purchases appears to have been extremely limited, as Herr testified that the G&G allegations were not a central focus of his investigation.  Second, records of Anaya's actual purchases shed no light on any allegation or investigation that Anaya participated in or knew about the alleged "deal" between Smith and G&G's owner.  This is a relevant topic of discovery, but the Lab refuses to produce documents showing the extent to which the Lab examined other employees' G&G purchases, the alleged relationship between George and Smith, or any other aspect of the G&G scandal.  The Lab even refuses to produce documents related to its decision to terminate its relationship with G&G, so there is no indication of what allegations or findings led it to conclude that its G&G relationship was problematic.  In short, documents concerning the Lab's investigations of G&G and other G&G purchasers and requestors are relevant to examining the Lab's handling of the G&G allegations against Anaya.

2.     The Lab refuses to produce documents concerning related purchasing controversies and accusations of cover-up by Lab management.

The Lab has also refused to produce documents relating to investigations of other purchasing controversies and management's alleged cover-up of those controversies. Notably, CBS is not seeking documents concerning controversies unrelated to the Anaya allegations; its requests, reasonably construed, relate solely to controversies that are similar in subject matter (*i.e.*, the alleged misuse of Lab purchasing procedures) and timeframe (2002-2003) to the controversies directly involving Anaya. These similar controversies, which inform the investigation into the Lab's handling of the Anaya allegations, include investigations into other purchase cardholders, the terminations of Glenn Walp and Steve Doran, accusations that Lab management engaged in a cover-up of these controversies, and various outside investigations into all of these Lab controversies. For the following reasons, these subjects are within the appropriate scope of discovery in this case.

First, information related to allegedly improper purchases by other Lab personnel is relevant to determining whether the Lab had a practice of investigating and punishing such alleged wrongdoing, or, as Lab critics have asserted, merely covering it up. Moreover, the Lab has defended Anaya's acknowledged violations of procedures by claiming that those violations were not fundamentally different those of other purchasers: *Everyone was doing it.* Documents related to these other purchases are therefore relevant to the Lab's defense of its handling of the Anaya allegations as well as suggestions that Anaya avoided discipline because the Lab wanted to secure Anaya's cooperation with the Mustang matter.

Second, documents related to the terminations of Glenn Walp and Steve Doran are also relevant to investigating the Lab's response to purchasing controversies like Anaya's. Walp and Doran were illegally fired after investigating allegations into purchasing fraud like Anaya's.

They publicly charged the Lab with concealing and covering up alleged purchasing fraud like Anaya's, and have been critical of the Lab's handling of the Anaya situation since then. The Lab's documents related to its handling of the Walp and Doran situation likely contain relevant information that bears directly upon the Anaya allegations, related purchasing controversies, and accusations of management cover-up in 2002-2003.

Third, for the same reasons, documents related to allegations of management cover-up in 2002 and 2003 are relevant to examining the Lab's handling of the Anaya controversies. The Lab contends that its investigation "exonerating" Anaya was complete and unbiased, not the cover-up that several observers have claimed. The Lab also contends that it was not allowed to conduct a full investigation of the Mustang and G&G charges until February 2003, in deference to the FBI's investigation into these allegations. But others, including Walp, Doran, and the author of the anonymous November 2002 memo, have alleged that during the Fall of 2002, the Lab's senior management (including Lab in-house counsel) actively worked to cover-up embarrassing information and thwart the FBI's investigations of Anaya, just as it had with other investigations into purchasing controversies. Investigations into these allegations of management cover-up in 2002 and 2003, as well as the Lab's response to them, are therefore relevant to this case.

Finally, because the Mustang charges were such an integral part of the outside investigations by Congress and other entities such as the External Review Team, and because the other alleged purchasing improprieties were so similar to Anaya's, it is impossible to separate the Lab response to these investigations in general from its response to investigations about the Mustang charges. Accordingly, the lab should produce all documents related to these outside investigations of the 2002-2003 purchasing controversies and cover-up allegations.

**C.      The Lab Has Improperly Tried to Limit its Privilege Waiver.**

The Lab states in its discovery responses that it "has chosen to waive attorney-client and work-product protections for documents that reflect the [Lab's] investigation of the All Mustang charges and other alleged improper purchasing activity by Lillian P. Anaya." Resp. at 6. The Lab claims that in "effecting this waiver, it is not the intent of the [Lab] to waive any attorney-client, work product or other discovery protections that apply to inquiries and analyses not directed at Lillian P. Anaya." *Id.* It appears both from this express statement of waiver and from a review of the Lab's document production that the Lab is attempting to use these privileges as a sword and a shield, brandishing privileged documents as a sword to prop up its own arguments while also hoisting the privilege as a shield to protect documents that might either directly undermine the Lab's (or Anaya's) claims or lead to the discovery of evidence that could do so.

Under Federal Rule of Evidence 501, New Mexico law supplies the rule of decision on attorney-client privilege issues in this diversity case. *See also Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 699 (10th Cir. 1998). However, "'the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed. R. Civ. P. 26(b)(3).'" *Id.* at 702 n.10 (quoting *United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir. 1988)). Accordingly, federal law governs the Lab's waiver of the work product privilege in this case. Under both New Mexico and federal law, the burden is on the Lab to establish the applicability of the privileges it asserts and to prove that it has not waived those privileges with respect to the documents it has withheld or redacted. *See, e.g., Hartman v. El Paso Natural Gas Co.*, 107 N.M. 679, 687, 763 P.2d 1144, 1152 (N.M. 1988); *Kovacs v. Hershey Co.*, 2006 WL 2781591, *10 (D. Colo. Sept. 26, 2006) ("Under Tenth Circuit law, [the party resisting discovery] has the burden of showing both that the communications at issue are privileged and that the privilege has not been waived.").

-16-

Both New Mexico's attorney-client privilege and the federal work-product privilege may be waived by voluntary disclosure and offensive use of protected materials during discovery. *United States v. Nobles*, 422 U.S. 225, 239-40 (1975) ("Respondent, by electing to present the investigator as a witness, waived the [work-product] privilege with respect to matters covered in his testimony," including the investigator's written report); *In re Qwest Commc'ns. Int'l Inc.*, 450 F.3d 1179, 1186 (10th Cir. 2006) ("production of work-product material during discovery waives a work-product objection"), cert. pet. filed, 75 U.S.L.W. 3106 (U.S. Sept. 6, 2006) (No. 06-343); *see also* NMRA 11-503, 11-511 (waiver occurs when "the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication."). It is undisputed that the Lab has voluntarily waived its privilege as to all documents reflecting the Lab's investigation of Anaya's purchasing. Three disputed issues remain, however.

First, even under the Lab's own definition of the scope of its privilege waiver, the Lab has failed to produce all responsive documents. The Lab's own privilege log shows that it has not produced all documents relating to the investigation of Anaya's purchases. Second, the law does not allow a party to selectively waive the privilege for certain documents while asserting the privilege for other documents that relate to the same subject matter. It is well-settled that production of privileged materials waives the privilege for all other materials on the same "subject matter" as the produced documents. *See, e.g., Bowles v. National Ass'n of Home Builders*, 224 F.R.D. 246, 257 (D.D.C. 2004) ("a waiver of the attorney-client privilege for a document is not confined to that document alone, but extends to all other documents involving the same subject matter as well"); *Sinclair Oil Corp. v. Texaco, Inc.*, 208 F.R.D. 329, 335 (N.D. Okla. 2002) ("a party that produces work product documents waives the work product doctrine

with regard to the subject matter of the documents produced").[4]   Third, aside from the Lab's express waiver of privilege in this case, the Lab waived any privileges that might have existed in many of the documents on its privilege log by producing those documents to Congress.   The Tenth Circuit recently addressed this issue, holding holding that a party who produces documents to the Government waives any privilege that might have attached to those documents and must produce those documents in a subsequent civil proceeding.   See *In re Qwest*, 450 F.3d at 1192. Accordingly, the Court should compel the Lab to turn over all documents regarding the purchasing controversy (and alleged management cover-up of that controversy) that were produced to Congress or any other government agency.

     1.     The Lab has failed to produce all documents within its own definition of waiver.

Even if the Lab could unilaterally choose to limit its disclosure of privileged documents to those that are likely to support its position in this litigation (which it cannot), it must still produce all documents that fall within its defined waiver of privilege.   The Lab has expressly waived privilege for any documents relating to its investigation of Anaya's purchasing, yet its privilege logs describe numerous redacted or withheld documents that apparently relate to the Mustang charges and Anaya investigation.[5]   CBS respectfully requests that the Court compel the Lab to produce all documents concerning the investigation of Lillian Anaya.

---

[4] Because New Mexico law does not explicitly address this question of "subject-matter waiver," "'other state-court decisions, well-reasoned decisions from other jurisdictions, and any other available authority to determine the applicable state law.'"  *Frontier*, 136 F.3d at 700.

[5] For example, the Lab has withheld documents described as follows: "More Lillian Anaya" (PCI07147); "IG Reports on Purchase Cards and Lillian Anaya" (PCI08054); "Lillian Anaya Matters" (PCI08102); "Pwc Report on Lillian Anaya Purchase Card Investigation" (PCI08117); and "Charlie Murphy Requested Interview with Someone at Lab Re Credit Card Abuse in Anaya Case" (PCI08158).

2.    <u>The Lab's waiver extends to the entire subject matter of the produced documents.</u>

As the Tenth Circuit has recognized, "a litigant cannot use the work product doctrine as both a sword and shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion." *Frontier,* 136 F.3d at 704. The Supreme Court has explained that this prohibition on selective waiver prevents a party from presenting a "partial view" or "truncated portion" of the evidence that is favorable to the party asserting the privilege and thereafter refusing to disclose materials that might offer additional insights into that evidence. *See* 422 U.S. at 241. To avoid the "distortion of the judicial process that may be caused by the privilege-holder's selective disclosure," *In re von Bulow*, 828 F.2d at 101, courts have established the doctrine of subject-matter waiver, which provides that the scope of a waiver of privilege extends to "all communications on the same subject matter," *Board of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 2006 WL 2192111, *7 (N.D. Cal. Aug. 1, 2006). "The rationale for such a broad mandate has been justified so that a party is prevented from disclosing communications that support its position while simultaneously concealing communications that do not." *Id.*

Contrary to the Lab's apparent position in this case, the party that voluntarily waives privilege is not allowed to define the scope of its own waiver. Instead, the "'scope of the waiver turns on the scope of the . . . disclosure . . . .'" *Kovacs*, 2006 WL 2781591, *6 (quoting *Sedillos v. Bd. of Educ.*, 313 F. Supp.2d 1091, 1094 (D. Colo. 2004)). In determining what constitutes the "subject matter" of a waiver, courts weigh the nature of the disclosure and the prejudice to the parties of permitting or prohibiting further disclosures. *Id.* As the *Kovacs* recognizes, a court properly balances these considerations by compelling the production of materials related to the topics in the disclosed materials while allowing examination of "the whole picture" concerning those subject areas. *Kovacs*, 2006 WL 2781591, *6 (emphasis added).

-19-

In this case, the Lab has produced some (but not all) privileged documents relating to its own investigation of Anaya's purchasing activity while withholding documents concerning external investigations of Anaya and the overall purchasing controversy.[6]  Specifically, based on the Lab's privilege log, and discussions with Lab counsel, it appears that the Lab has withheld privileged documents that generally fall into five categories:  (1) documents related to the 2002-2003 Congressional investigation of purchasing controversies at the Lab, including Congress's investigation of Anaya's allegedly improper purchases;[7] (2) documents related to Lillian Anaya's employment status, such as information about Anaya's salary and disability status; (3) documents related to allegations by Doran and Walp and the Lab's handling of those allegations; (4) documents related to the Anaya controversy generated after August 2004 (based on the Lab's claim that these are settlement communications, which is discussed more fully in Section III.D, *infra*); and (5) documents related to purchasing improprieties by Lab employees other than Anaya.  *See* Ex. I.  All of these documents are within the same "subject matter" as documents for which the Lab has expressly waived its attorney-client and work product privileges and therefore should be produced.[8]

---

[6] During a telephone conference on October 23, 2006, Lab counsel posited that the Lab's privilege waiver only applies to the Lab's "direct investigation" of Lillian Anaya's purchasing activity and does not include documents regarding other investigations of Anaya, such as the Congressional investigation, or documents regarding Anaya's employment status.

[7] The documents the Lab has withheld regarding the Congressional investigation include documents arising out of Covington & Burling L.L.P's representation of the Lab in connection with the Congressional inquiry.  Lab counsel has informed CBS's counsel that the Lab withheld the entire Covington & Burling file, even those documents that specifically mentioned the Anaya purchasing allegations.  The Lab has provided no coherent explanation for this limitation.

[8] In addition to the documents it has withheld, the Lab has redacted numerous documents on privilege grounds; however, the Lab's log of redacted documents describes the general content of each document instead of the specific content of the redacted material, making it impossible to determine whether the redactions are within the scope of the Lab's privilege waiver.

The Lab's selective disclosure of privileged documents to support its position in this case presents the classic scenario for subject-matter waiver.  By limiting its production to privileged documents related only to the Lab's internal investigation of Lillian Anaya's purchasing activity, the Lab is attempting to avoid producing evidence that is relevant to providing a context for that investigation, and likely trying to avoid producing potentially embarrassing documents regarding mismanagement and cover-up.  This Court should not countenance the Lab's attempt to skew the evidence in its favor.  *See, e.g., Bank Brussels*, 1995 WL 598971, *6 (rejecting defendant's attempted partial waiver because such limitation "would result in a one-sided account and prejudice the plaintiffs' ability to litigate their claim").  In short, CBS should be allowed to take discovery on the "whole picture" concerning the purchasing controversy at the Lab, not just the part the Lab chooses to reveal.  CBS therefore asks the Court to order the Lab to produce all privileged documents that concern the allegations against Anaya, similar allegations against other Lab purchasers during 2003-2003, and allegations (including by Walp and Doran) of Lab management cover-up of those allegations.[9]

3.    <u>The Lab has also waived privilege as to any documents produced to Congress.</u>

As discussed, the Lab has withheld scores of documents that it produced to Congress during Congressional hearings on the purchasing controversies at the Lab.  The Lab's discovery

---

[9] Numerous cases support CBS's position that the Lab's privilege waiver should be construed more broadly than the Lab defines it.  *See, e.g., Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 486-87 (3d Cir. 1995) (holding that defendant's production of outside law firm's opinion letter on the tax aspects of a stock transaction waived privilege "as to all communications, both written and oral, to or from counsel as to the entire transaction," including "back-up documents to the Opinion Letter, which include the [firm's] internal research and other file memoranda"); *Kovacs*, 2006 WL 2781591, * 5-6 (rejecting defendant's argument for narrow scope of privilege waiver and holding that plaintiffs should be allowed to review additional privileged documents in order to "get the whole picture"); *Gemplus*, 217 F.R.D. at 366-67 (by producing only those privileged negotiation documents "that are most beneficial to its defense," defendant waived the privilege for all documents related to the negotiations).

responses claim that it has not waived privilege for these documents because the Lab "was required to respond to requests made by Congress." Resp. at 7; Ex. H. But the Tenth Circuit roundly rejected such reliance the doctrine of "selective waiver" in *Qwest*, declining to adopt an exception to the general rule that production of privileged material to a third party waives the privilege as to all other parties.[10] 450 F.3d at 1192. The Tenth Circuit reached this result despite the fact that Qwest had produced the documents at issue under "no waiver" confidentiality agreements and pursuant to a government subpoena. *Id.* at 1181. Similarly, the Lab has made no showing that its production was any more "involuntary" than Qwest's. Thus, the Lab should be compelled to produce in this case all documents it produced to Congress or any other government agency regarding the purchasing controversies.

**D.    The Lab Has Improperly Withheld Responsive Documents Reflecting Settlement Communications And Negotiations With Plaintiffs.**

CBS has requested that the Lab produce drafts of its settlement agreement with plaintiffs as well as communication relating to the settlement negotiation process. *See* Req. Nos. 94-95. The Lab objects to these requests, claiming that Federal Rule of Evidence 408 somehow protects these settlement communications from discovery. These objections are legally and factually unsupported, and should therefore be overruled.

Federal Rule of Civil Procedure 26(b) defines the scope of discovery broadly: As long as information is not privileged and relevant, it is discoverable, regardless of whether it would be

---

[10] The doctrine of "selective waiver" that would allow a party to disclose documents to the Government without waiving privilege as to other adversaries is distinct from the "selective waiver" discussed in Parts B.1. and B.2, *supra*, which address a party's attempt to waive privilege for some documents while continuing to assert privilege for other documents on the same subject. Unfortunately, most courts refer to "selective waiver" in both contexts, causing some confusion in the case law. Courts in the Third Circuit have attempted to bring clarity to this issue by referring to the former as "selective waiver" and the latter as "partial waiver." *See, e.g., Harding v. Dana Transport*, 914 F. Supp. 1084, 1092 (D.N.J. 1996).

admissible under the Federal Rules of Evidence. *See Bennett v. La Pere*, 112 F.R.D. 136, 138 (D.R.I. 1986) (stating that Rule 26(b) "does not condition the availability of discovery upon the likely admissibility of the information sought"). The requested settlement communications satisfy both of these requirements. First, the requested settlement communications are not privileged. Courts have overwhelmingly declined to recognize a privilege for settlement communications. *See, e.g., Newman & Assoc. v. J.K. Harris & Co.*, LLC, No. 04Civ.9264(RJH)(MHD), 2005 WL 3610140 (S.D.N.Y. Dec. 15, 2005) (collecting federal cases declining to recognize a settlement communications privilege). No Tenth Circuit case has recognized a settlement communications privilege. *See Qwest* 450 F.3d at 1185 (discussing the high standard for creation of new privileges because privileges are "in derogation of the search for the truth" and "contravene the fundamental principle that the public . . . has a right to every man's evidence").

Here, the requested settlement communications are obviously relevant.[11] They are communications about *this case* between plaintiffs in *this case* and co-defendants in *this case*. The final settlement agreement contains self-serving language about contribution issues, and also endorses plaintiffs' theory of the case. Accordingly, the settlement communications and drafts of the settlement agreement are highly relevant to the credibility issues, such as the bias and motive of Lab witnesses, and the viability of the Lab's "wrong number" theory itself. *See, e.g.,*

---

[11] In one case, this Court recognized a split in authority on the issue of whether Rule 408 considerations required application of a "particularized" showing of relevance. *See The Servants of the Paraclete, Inc. v. Great American Ins. Co.*, 866 F. Supp. 1560, 1576 (D.N.M. 1994). No court in the Tenth Circuit has found it necessary to adopt the "particularized showing" standard. And one has been explicitly rejected that standard. *See City of Wichita*, 192 F.R.D. at 300, 302 (D. Kan. 2000) ("Courts, absent *obvious* requests for irrelevant discovery, are in no position at the discovery stage of litigation to make uninformed conclusions on what is or is not relevant to a case and instead, must rely on the party opposing discovery to explain why the information sought will not lead to otherwise admissible evidence.") (emphasis in original).

*In re CFS-Related Securities Fraud Litigation*, 2003 WL 24136089, *1 (N.D. Okla. July 31, 2003) (finding settlement agreements relevant to the issue of witness bias and credibility because "[t]he fact that an employer was an unnamed but potential co-defendant in an action and has settled with the plaintiff in the action could color the testimony of the current and former employees with regard to the other named defendants"); *Ramirez v. Nabil's, Inc.*, Civ. A. No. 94-2396-GTV, 1995 WL 609415, *2 (D. Kan. Oct. 5, 1995) (allowing discovery of settlement agreement as relevant to witness credibility and bias).  The Court should therefore order production of these documents.[12]

**E.    The Lab Has Improperly Withheld Responsive Documents It Obtained From The FBI.**

The allegedly improper purchases by Lab employees like Anaya were the focus of various law enforcement investigations from 2002-2004.  At the beginning of these investigations, the Lab's OSI division worked together with the FBI agents, often jointly interviewing individuals and sharing documents.  Accordingly, it is not surprising that documents from those investigations are responsive to several of CBS' requests (the "FBI Documents"). [13]  The Lab, however, refuses to produce such documents on the following grounds:

> Certain documents within the possession, custody and control of the Regents relating to Lillian P. Anaya were provided by the FBI to the Regents.  The documents were located by and/or created by the FBI in connection with its investigation of the All Mustang charges.  As these are FBI materials, the FBI was advised of the requests for production. The FBI asked the Regents to not produce such documents in response to these requests for production.  The Regents assented.  Consequently, documents that the Regents

---

[12] CBS also moves to compel production of settlement communications in plaintiffs' possession. Plaintiffs' counsel has represented that he will support the Lab's position.  But, if the Lab is ordered to produce such documents within its possession, plaintiffs will produce such documents within their possession.

[13]  *See* Responses to Requests Nos. 1, 2, 6, 8, 10, 11, 16, 26, 34, 37, 51, 52, 66, 67, 69, 70, 74, and 82; Ex. H.

received from the FBI related to the All Mustang charges, or that quote directly from any such materials, will not be produced by the Regents.

*See* Responses at p. 7-8; Ex. H.[14]   The Lab lists these documents on its privilege log with the notation, "FBI" and provides no explanation, other than the one quoted above, justifying their withholding.   Under Rule 26(b), CBS is entitled to these documents and moves the Court to compel their production.

First, there is no dispute that these documents are relevant.  Second, the Lab identifies no privilege protecting the FBI documents.   It merely claims that the FBI requested that it not produce these documents.   But the FBI, for its part, has not asserted any privilege with respect to these documents, and it is difficult to imagine what privilege would protect documents that it already produced voluntarily to a third party under investigation.  *See O'Keefe v. Boeing Co.*, 38 F.R.D. 329, 335 (S.D.N.Y. 1965) ("[E]ven if there were a privilege covering all the papers had they remained . . . in the possession of the Air Force, the significant fact in the case at bar is that they are not in the possession of the Air Force but in the possession of the defendant in this action, the Air Force having voluntarily turned them over to defendant.");  *Fireman's Fund Indemnity Co. v. United States*, 103 F. Supp. 915, 916 (N.D. Fla. 1952) ("To furnish these records to proctor for respondent for use by him in defending these cases and declining to make them available to proctor for libellant for use by him in preparation of the cases for trial would be an act on the part of the Secretary of the Navy that would obstruct the administration of justice under law and should not be countenanced by any court.").  And even assuming that the FBI can identify a legitimate privilege that has not already been waived, cases are clear that it must be the

---

[14] Curiously, the Lab claims that it has obtained the FBI's permission to produce certain of these documents, including the AMP Mustang invoice and AMP telephone records.   It does not explain, however, why the FBI acceded to production of these documents but not other, similar documents.

FBI – not the Lab – who asserts the privilege.  *See, e.g.*, *Overby v. United States Fidelity and Guaranty Co.*, 224 F.2d 158, 163 (5th Cir. 1955).  Because the Lab cannot assert any privilege appropriate to these relevant documents, the Court should order their production.

## IV.  RELIEF REQUESTED

Based on the above arguments and in light of the other improper objections, CBS respectfully requests that the Court compel the Lab to produce all documents responsive to the following discovery requests:

- Requests relating to the investigations of Anaya, the Mustang charges, and Anaya's purchasing activities:  Nos 1, 5-19, 20-28, 30, 32-35, 37-41 42-46, 47-51;

- Requests relating to investigations of purchase card activity and the Purchase Card Program at the Lab:  Nos. 3, 4, 96-98;

- Additional requests relating to Anaya's purchasing activities:  Nos. 29, 31;

- Requests relating to Anaya's employment status, compensation, and disability/retirement status at the Lab:  Nos. 52-55, 75, 81-83;

- Requests relating to CBS and communications with CBS:  Nos. 56, 58, 59, 61, 63;

- Requests relating to affirmative defenses and the assertions contained in the Lab's answer in this case:  Nos. 64-75, 76-80;

- Requests relating to G&G Tools and Second Source:  Nos. 84-91;

- Requests relating to the claims in this lawsuit and press reports mentioning Anaya:  Nos. 92-93;

- Requests relating to settlement communications and negotiations between Anaya and the Lab: Nos. 94-95;

- Requests relating to Glenn Walp and Steve Doran:  Nos. 101-102; and

- Requests relating to Lab purchasing policies:  Nos. 99-100.

With respect to all of the above requests, CBS respectfully requests the Court to overrule the Lab's improper objections and compel the production of all responsive documents.

Respectfully submitted,


*Electronically filed*

John B. Pound
Long, Pound & Komer, P.A.
2200 Brothers Road
P.O. Box 5098
Santa Fe, NM  87502-5098
505-982-8405

Michael L. Raiff
Thomas S. Leatherbury
Marc A. Fuller
Vinson & Elkins L.L.P.
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
214-220-7705

**ATTORNEYS FOR DEFENDANTS
CBS BROADCASTING INC.**


**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule 7.4(a), counsel for the Lab and CBS have conferred telephonically regarding this motion.  Counsel were unable to reach concurrence on the issues presented in this motion, but will continue to work together on these disputed issues

-28-

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October, 2006, a true and correct copy of the

Motion and Memorandum of Law in Support of Defendant CBS Broadcasting Inc.'s Motion to

Compel was served on the following counsel of record:

John W. Boyd, Mike Goldberg
Friedman, Boyd, Daniels, et al.
20 First Plaza, Suite 700
Albuquerque, NM 87102

Todd M. Lopez, Jesse A. Boyd
Lopez, Sakura & Boyd LLP
P.O. Box 2246
Santa Fe, NM 87504-224

Kirk Allen
Miller Stratvert P.A.
P.O. Box 25687
Albuquerque, NM  87125-5687

Bruce D. Hall, Esq.
Theresa Parrish, Esq.
Rodey, Dickason, Sloan,
 Akin & Robb, PA
201 Third Street NW, #2200
P. O. Box 1888
Albuquerque, NM  87103-1888

*Electronically filed*
JOHN B. POUND

1178516_1.DOC