# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LILLIAN ANAYA and MEL ANAYA,

      Plaintiffs,

vs.                                                                                  No. CIV 06-0476 JB/LCS

CBS BROADCASTING INC., EMMIS
COMMUNICATIONS, CORP.,
SHARYL ATTKISSON, TRI-CITY
AUTO SALES, INC. d/b/a ALL
MUSTANG PERFORMANCE or AMP
PERFORMANCE, and THOMAS
THOMPSON in his official and
individual capacities,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on CBS's Initial Motion for Summary Judgment,

filed May 13, 2008 (Doc. 150)("Motion").  The Court held a hearing on September 18, 2008.  The

primary issues are: (i) whether Plaintiff Lillian Anaya was a public official under the law of

defamation; (ii) whether Lillian Anaya was a "limited-purpose public figure" under the law of

defamation; and (iii) whether, if she was either or both, there is sufficient evidence of Defendant

CBS Broadcasting Inc.'s actual malice to go to a jury.  The Court determines that Lillian Anaya was

not a public official, and that she was not a public figure during the time period encompassing the

first three broadcasts.  The Court will therefore deny the motion for summary judgment in part and

require the Plaintiffs to show only negligence to recover actual damages for those broadcasts.

Additionally, because Lillian Anaya became a public figure by the time of the October 8, 2003 and

April 27, 2004 broadcasts, the Court will evaluate claims arising out of those broadcasts under the

actual-malice standard.  Because the Court believes that the Plaintiffs have not shown a genuine issue of material fact on certain statements, but have on others, the Court will grant the motion for summary judgment in part and deny it in part, and allow the Plaintiffs to seek punitive damages on certain statements.

**FACTUAL BACKGROUND**

In 2002, Los Alamos National Laboratory ("LANL") became the focus of a controversy involving mismanagement, and purchasing and property control.  This controversy threatened to end the University of California's sixty-year management of LANL.  CBS contends that the controversy began when the discovery of Lillian Anaya's apparent purchase of a Mustang using a government purchase card triggered an External Review Team audit of LANL's purchase-card program.  See Motion at 8, Undisputed Fact No. 40; Exhibit 1 to Tab C of CBS' Memorandum in Support of its Initial Motion for Summary Judgment, filed May 13, 2008 (Doc. 151)("CBS' Memo."), August 20, 2002 LANL Press Release at 1 (dated August 20, 2002)("Aug. 20 Press Release").  Lillian Anaya clarifies the actual language of the LANL Press Release, upon which CBS relies.  The document states that LANL placed one of its employees and a subcontract worker on leave "in connection with apparent irregularities in the use of the Laboratory-issued purchase cards.  The two individuals are holders of the cards associated with these apparent irregularities." Aug. 20 Press Release at 1.  "The irregularities triggered a more comprehensive examination of all purchase card transactions for the past two years."  Id.  The dispute about the origin of the controversy is not material, and the Court understands that both Lillian Anaya and CBS agree that the public became aware of the purchase card irregularities with the August 20, 2002 press release, and that Lillian Anaya was one of the individuals placed on leave.  See Deposition of Lillian Anaya at 80:12-20 (taken April 22,

2008)(Tab I to CBS' Memo.)("April 22 Anaya Depo.").[1]

### 1.       Lillian Anaya's Position at LANL.

Lillian Anaya began working at LANL in 1970.  See Exhibit C to Declaration of Michael

L. Goldberg in Support of Plaintiffs' Memorandum Opposing CBS' Initial Motion for Summary

Judgment (executed July 8, 2008)("Goldberg Decl."), Deposition of Lillian Patricia Anaya at 10:10-

14 (taken February 8, 2008)("Feb. 8 Anaya Depo.").  Over the course of her thirty-two year career

at LANL, Lillian Anaya gained increasing responsibility until she ultimately attained the position

of procurement assistant in 1990.  See First Amended Complaint for Defamation, Negligence,

Intentional Infliction of Emotional Distress, False Light Invasion of Privacy, Appropriation of Name

and Likeness, Fraud[,] Prima Facie Tort, and Loss of Consortium ¶ 11, at 3, filed August 23, 2006

(Doc. 18-1)("FAC").  Lillian Anaya describes her work responsibilities as including responsibility

"for procurement and purchases," "solicitation, negotiation, award, contract administration,

negotiation of administration of change orders, modifications, claims, problem resolution, and

purchase order close out."  Exhibit 6 to April 22 Anaya Depo., Resume of Lillian P. Anaya at 1 (not

dated)("Resume").  Lillian Anaya awarded and administered purchase orders and purchase-order

terminations according to "Laboratory, UC [University of California] and DOE acquisition

---

[1]       Q.     The Lab issued a press release telling the public that you were
               put on investigative leave, correct?

         A.     That a person was put on investigative leave.

         Q.     And that person was you, right?

         A.     Yes.

April 22 Anaya Depo. at 80:14-18.

regulations and policies and procedures."  Resume at 1.

To facilitate her responsibilities, Lillian Anaya possessed a purchase card with a transaction limit of $25,000.  See Exhibit 13 to April 22 Anaya Depo., Letter from Bank One at 1.  Aside from the $25,000 transaction limit, Lillian Anaya also had a monthly spending limit of $900,000.00.  See id.  On at least one occasion, she processed a single purchase-order transaction valued at five million dollars.  See April 22 Anaya Depo. at 24:16-20.  Thus, Lillian Anaya had substantial spending capability at LANL, and from October 1998 to June 2002, she was the most active cardholder at LANL, accounting for approximately 13% of LANL's purchase-card volume.  See id. at 22:6-23:4.  The purchase card that Lillian Anaya used at LANL functioned like a credit card, and the United States paid the bill.  See id. at 23:5-14.  Thus, the expenditures made on the purchase card were paid with taxpayer money.  Id.

Aside from those facts, which do not appear to be disputed, the parties have some disagreement over the extent of Lillian Anaya's work responsibilities and the amount of discretion and/or supervisory authority that she was able to exercise.  The Court observes some tension between Lillian Anaya's deposition testimony and her declaration.  At the April 22, 2008 deposition, Anaya read from her resume – which she testified was accurate – that she was "responsible for procurement for purchase cards and purchases up to 1.5 million. [She was] responsible for solicitation, negotiation, award, contract administration of change orders, modifications, claims, problem resolution, and purchase order closeout."  April 22 Anaya Depo. at 32:15-19.  She also testified that she would "award and administer purchase orders in compliance with the Laboratory, [University of California ("UC")], and [Department of Energy ("DOE")][2] policies, procedures, and

---

[2] The United States Department of Energy owns LANL.

regulations. [She] develop[ed] solicitations, determin[ed] method of subcontracting, identif[ied] the appropriate type of order, and specific solicitation/purchase order language and clauses." Id. at 32:21-25.   She "served as a point-of contact on procurement matters with private industry representatives, vendors, manufacturers, technical offices, management officials of technical divisions, and transportation specialists." Id. at 33:9-12. She would also "coordinate a wide range of administrative actions to ensure compliance.  In addition, [she] ma[de] decisions, anticipat[ed] problems, and solve[d] issues related to office administration and procurements. [She] ha[s] mentored and trained four junior members of the ESA Procurement Team," and served as a "primary contact for small/streamline purchases." Id. at 19-25.

Moreover, Lillian Anaya testified at the deposition that she "demonstrated a high degree of judgment in determining sources of supply and analyzing purchasing requirements, including price trends, economic factors, and transportation costs." Id. at 51:23-52:3.  She testified that she was a member of a "self-directed work team" in which she "actively participate[d] in the decision on procurement team [sic] and provide[d] leadership." Id. at 52:15-25.  CBS maintains that this deposition testimony, and other similar deposition testimony and documentary evidence, establish that, in addition to having significant spending authority, Lillian Anaya had substantial supervisory authority and discretion in performing her job.  She also testified, however, that, although she had the ability to carry out large purchases with the purchase card or through purchase orders, she could not do so without the approval of the requestor or of the requestor's manager and a financial representative.  See April 22 Anaya Depo. at 16:4-25.

Lillian Anaya submitted a Declaration as part of her response in which she appears to downplay her authority and discretion.  In that Declaration, Anaya states: "At no point during my employment in the purchasing department did I hold a policy or supervisory position of any sort,

nor did I hold a position that gave me any discretionary authority over the expenditure of funds."
Declaration of Lillian P. Anaya in Opposition to CBS' Initial Motion for Summary Judgment ¶ 4,
at 2 (executed July 8, 2008)("Anaya Decl."). She further states, in her Declaration, that "[t]here
were at least four layers of management above me . . . . There was no one below me and no one to
whom I gave direction or acted in any way as a supervisor." Id. ¶ 5, at 2. According to the
Declaration: "My job . . . was to purchase equipment and supplies for the Engineering Science and
Applications (ESA) Division, at the direction of persons within that division." Id. ¶ 7, at 2. "There
was one 'buyer' . . . who specialized in purchase orders. These typically were purchases for larger
amounts of money than the types of purchases for which I was responsible and involved different
paperwork, procedures and were more complex." Id. ¶ 7, at 2-3.

The Declaration addresses other specific aspects of the deposition testimony. For example,
in the Declaration, Lillian Anaya admits that, while she did not have explicit supervisory authority
over any other members of her procurement team, she often served in an unofficial mentoring and
training capacity for other less experienced members of her team, and many members of the team
appear to have deferred to her judgment in various matters. See Anaya Decl. ¶¶ 4-6, at 2. In the
Declaration, she also notes that "[a]ny discretionary authority [she] had was only in special
circumstances and was limited." Id. ¶ 15, at 6. To illustrate what she meant by "discretion," Lillian
Anaya explained:

> I once was asked by an employee of the ESA division to purchase underwear for lab
> workers working in a remote site. The workers needed a change of clothes because
> they were working with contaminants. The requestor specificied the sizes of all of
> the underwear, bras and even the brand that he wanted to have purchased. I had the
> discretion to choose a retailer and I called Wal-Mart and obtained price quotes. I
> took the price quote to the finance department, which approved the request because
> it was within the approved budget. Only then could I go to Wal-Mart and pick up
> these items."

Id.  Such examples, and others like it, appear throughout the Declaration to underscore the lack of discretion and authority that Lillian Anaya exercised.

CBS disputes the contention that Lillian Anaya had no supervisory authority, contending that Anaya was "in charge" and "decided who did what."  Exhibit 41 to Declaration of Sharyl Attkison, Tab L to CBS' Memo. (executed May 8, 2008)("Attkison Decl."), Interview with Sulema Martinez at 1 (dated September 11, 2002).

To address some of the apparent tension between Lillian Anaya's deposition testimony and her declaration, Lillian Anaya conducted a 30(b)(6) deposition of Richard F. Strickler, who was Deputy Group Leader for "BUS-5," LANL's procurement organization.  Exhibit B to Supplement to Plaintiffs' Memorandum in Opposition to Defendant CBS's Motion for Summary Judgment, filed November 19, 2008 (Doc. 196), Video Deposition of Richard F. Strickler at 6:6-12 (taken November 12, 2008)(Doc. 196-3)("Strickler Depo.).  Strickler stated that Lillian Anaya did not have anyone working under her, see Strickler Depo. at 12:7-13, that she did not have a higher status than other purchasing assistants, and that her high purchase limit was related to the fact that the organization she supported was extremely busy and had a high volume of repetitive transactions, see id. at 20:7-21.  According to Strickler, there were several layers of management above Lillian Anaya, including three levels within BUS-5, and an additional five levels of management above BUS-5.  See id. at 13:3-14:17.

Strickler also confirmed that Lillian Anaya could not purchase anything without a request, that she had no role in deciding what ought to be purchased, see id. at 21:24-22:5, and that, in the context of BUS-5's billion-dollar yearly purchases, Lillian Anaya's purchases were "very small," id. at 36:20-37:6.  According to Strickler, Lillian Anaya had "Q" security clearance because of the location of her office, and that there were janitors and grounds-keepers who had the same level of

access as Lillian Anaya, see id. at 38:1-14.

**2.** **Lillian Anaya's Apparent Attempt to Purchase a Souped-Up Mustang and the Ensuing Investigation.**

In August 2002, Lillian Anaya's position at LANL was jeopardized when she became the subject of an FBI and internal investigation into her purchase-card activity.  See Tab T to CBS' Memo., Declaration of Steve Doran ¶ 8, at 3 (executed March 11, 2008)("Doran Decl.").  Part of the basis for the investigation – and the centerpiece of the subsequent CBS news coverage of these events – was the allegation that Lillian Anaya attempted to purchase a customized Mustang using the LANL purchase card.  See id. at ¶¶ 5-12, at 2-4.  Pending the results of the investigation, LANL placed Lillian Anaya on leave and issued a press release indicating that an employee and a contract worker were under investigation for purchase-card irregularities.  See Aug. 20 Press Release at 1.

Glenn Walp, whom the LANL office of security had hired earlier in 2002, and Steve Doran, who was hired days earlier, began the investigation in late July.  See Tab S to CBS' Memo., Declaration of Glenn Walp ¶¶ 10-13, 17-18, at 3-6 (executed February 17, 2008)("Walp Decl.").  The Federal Bureau of Investigation ("FBI") was also investigating the case.  See Doran Decl. ¶ 4, at 2.  During the investigation, FBI Agent Jeff Campbell interviewed Lillian Anaya and former defendant Thomas Thompson of All Mustang Performance, or AMP Performance, of Phoenix Arizona ("All Mustang").  See Exhibits D-F to Goldberg Decl., Campbell's FD-302s[3] for Anaya and Thompson (date of transcription August 13, 2002)("Anaya 302," "Aug. 8 Thompson 302," and "Aug. 9 Thompson 302").  Agent Campbell's report regarding his investigation of Thompson revealed that Thompson "acknowledged that he had mislead [sic] over the past two weeks

---

[3] FD-302s are FBI forms that agents prepare to summarize the contents of interviews they conduct.

concerning the attempted sale of the vehicle to Anaya," but that he told the truth in his August 8, 2002 interview with Campbell.   August 8 Thompson 302 at 4.   Because of the purchasing irregularities, LANL also underwent an external audit, which PricewaterhouseCoopers ("PwC") conducted.   See Exhibit 4 to Tab C of CBS' Memo., December 19 LANL Press Release at 1.

On August 20, 2002, LANL issued the press release in which it announced that an employee and a subcontractor were placed on leave pending the investigation of purchasing irregularities in the use of LANL purchasing cards.   See LANL Press Release at 1.   Although the Press Release did not name Lillian Anaya, she was the suspended employee of which it spoke.   See April 22 Anaya Depo. at 80:12-20.   Between August and November 2002, and before CBS made any of the broadcasts at issue in this case, the media began to report on the investigation of the   alleged Mustang purchase and other irregularities.   Although Lillian Anaya's name does not appear in these reports, and the alleged Mustang purchase is seldom the focus of the articles, there is frequent mention of the apparent Mustang purchase.[4]   The media also picked up on the fact that, in late

---

[4] See, e.g., Exhibit 1 to Tab A to CBS' Memo., Two Workers Placed on Leave; Lab Probes Credit Card Use, THE ASSOCIATED PRESS, August 20, 2002 (reporting that two LANL workers were suspended for misuse of government purchase cards but not naming Lillian Anaya or mentioning the Mustang); Exhibit 2 to Tab A of CBS' Memo., Two Placed on Leave for LANL Purchase Card Irregularities, LOS ALAMOS MONITOR, August 20, 2002 (discussing irregularities in the use of government purchase cards but not naming Lillian Anaya or mentioning the Mustang); Exhibit 3 to Tab A to CBS' Memo., Lab Probes Misuse of Credit Cards, ALBUQUERQUE JOURNAL, August 21, 2002 (mentioning two individuals involved in improper purchases, but not mentioning Lillian Anaya's name or the Mustang); Exhibit 4 to Tab A to CBS' Memo., Adam Rankin, LANL Confirms Credit Card Probe, ALBUQUERQUE JOURNAL, November 1, 2002 (noting that two LANL workers were being investigated for alleged misuse of purchase cards, but not mentioning Lillian Anaya's name or the Mustang); Exhibit 5 to Tab T to CBS' Memo., Roger Snodgrass, Document Alleges Fraud and Theft at LANL, LOS ALAMOS MONITOR, November 5, 2002 (mentioning that a LANL purchase card was allegedly used to purchase an automobile, but not mentioning that it was a Mustang, or that the worker involved was Lillian Anaya); Exhibit 11 to Tab A to CBS' Memo., Noah Shachtman, Los Alamos on Hot Seat Again, WIRED, http://www.wired.com/print/politics/law/news/2002/11/56270 (mentioning the alleged purchase of a $30,000.00 Mustang, but not naming Lillian Anaya); Exhibit 12 to Tab A to CBS' Memo., Notra

November 2002, LANL fired Walp and Doran, the two internal investigators who had taken on the role of whistle-blowers in the controversy.  See Walp Dec. ¶ 35, at 9-10.  Moreover, before CBS made its first broadcast on the topic, Project on Government Oversight ("POGO"), a non-profit government-watchdog group, issued press releases and circulated documents regarding the purchasing and property control controversy at LANL, including the charges for the Mustang.  See, e.g., Exhibit 3 to Declaration of Danielle Brian (executed May 9, 2008)(Tab U to CBS' Memo.), The POGO ALERT: Leaked Document: Mishandling Lost and Stolen Computers at Los Alamos, attachment B at 7 (dated November 19, 2002)(Attachment B shows the records of the All Mustang

---

Trulock, III, New Los Alamos Scandal, ACCURACY IN MEDIA, Weekly Column, November 14, 2002 (reporting on various unallowable purchases at LANL, and discussing whistle-blower report of employee attempting to obtain $30,000 Mustang with purchase card; Lillian Anaya not named); Exhibit 13 to Tab A to CBS' Memo., Adam Ranking, $3 Million in Lab Items 'Lost', ALBUQUERQUE JOURNAL, November 17, 2002 (reporting on an attempted partial payment on a $30,000 Mustang, but not naming Lillian Anaya); Exhibit 14 to Tab A to CBS' Memo., Wren Propp, DOE Team Arrives to Probe Lab Problems, ALBUQUERQUE JOURNAL, Nov. 19, 2002 (stating that two LANL workers placed on leave, one for alleged use of purchase card at casino, another for attempt to use card to purchase Mustang; Lillian Anaya not named); Exhibit 17 to Tab A to CBS' Memo., Mark Oswald, Lab Staff Lax on Purchase Reports, ALBUQUERQUE JOURNAL, November 22, 2002 (stating that two LANL workers placed on leave, one for alleged use of purchase card at casino, another for attempt to use card to purchase Mustang; Lillian Anaya not named); Exhibit 18 to Tab A to CBS' Memo., Mark Oswald, LANL Operator Says it Won't 'Tolerate' Thievery, ALBUQUERQUE JOURNAL, November 23, 2002 (making reference to allegations of improper use of purchase cards without giving details or naming Lillian Anaya); Exhibit 19 to Tab A to CBS' Memo., Richard Benke, Two Los Alamos Lab Workers Fired After Reporting Theft, THE ASSOCIATED PRESS, November 26, 2002 (reporting three LANL workers on leave and another fired for misuse of purchase cards; Mustang and Lillian Anaya not named);  Exhibit 20 to Tab A to CBS' Memo., Sue Vorenberg, Lab Fires Men Who Explored Allegations, ALBUQUERQUE TRIBUNE, November 26, 2002 (mentioning that three LANL workers on paid leave for alleged misuse of purchase cards); Exhibit 23 to Tab A to CBS' Memo., Noah Schachtman, Atomic Lab Cops Do Job, Get Fired, WIRED, http://www.wired.com/print/politics/law/news/2002/11/56596, November 27, 2002 (mentioning a LANL worker on investigative leave in connection with an attempt to purchase a $30,000.00 Mustang; Lillian Anaya not named); Exhibit 24 to Tab A to CBS' Memo., Two Los Alamos Lab Workers Fired After Reporting Theft, THE ASSOCIATED PRESS, November 27, 2002 (mentioning three LANL workers on leave, but not discussing the Mustang or mentioning Lillian Anaya's name).

Charges, and the dates upon which those charges were disputed).  Thus, before CBS began broadcasting the story, Lillian Anaya's alleged attempt to charge a $30,000.00 Mustang to a government-paid purchase card had attracted some attention from both the media and from a government-watchdog group.

After CBS began broadcasting about Lillian Anaya and the Mustang, more media coverage ensued discussing Anaya and/or the Mustang controversy.  Some of the stories made only tangential reference to Lillian Anaya or the Mustang purchase,[5] while others either named Lillian Anaya or

_____

[5] See, e.g., Exhibit 35 to Tab A to CBS' Memo., Editorial: LANL Again Swirling in Bad Publicity Storm, ALBUQUERQUE JOURNAL at A8, December 2, 2002 (opining that LANL is more interested in "keeping misdeeds under wraps" than in "punishing perpetrators," discussing the firing of Walp and Doran, and noting that there has been credit card abuse, "with one employee even trying to use the lab card for a down payment on a car"); Exhibit 39 to Tab A to CBS' Memo., Dan Morgan, Los Alamos Probed for Misuse of Funds; Nuclear Lab Fires 2 Whistleblowers, THE WASHINGTON POST at A19 (reporting on House investigators' requests for documents relating to allegations of illegal procurement practices, and mentioning investigations into whether one LANL employee placed on leave may have tried to use the government credit card to purchase an automobile); Exhibit 45 to Tab A to CBS' Memo.; Michael Coleman, U.S. Senator Sets Sights on LANL with Credit Card Inquiry, ALBUQUERQUE JOURNAL at A1, December 12, 2002 (discussing Senator Charles Grassley's request that the Senate Finance Committee review documents related to allegations of purchase card misuse and LANL, mentioning POGO's activities in tracking allegations of stolen government property, and noting that allegations of "widespread theft of property and misuse of government purchase cards at Los Alamos are garnering increasing attention from Congress and the media.  One LANL employee is accused of using a lab credit card to make payments on a car, another allegedly used a credit card to obtain cash at a casino"); Exhibit 48 to Tab A to CBS' Memo., Robert Gehrke, Congressional Investigators Expand Inquiry into Fraud at Weapons Lab, ASSOCIATED PRESS, December 13, 2002 (discussing the expanding House inquiry into fraud and credit card abuse at LANL, quoting UC President Richard Atkinson's expressions of frustration regarding "the apparent failure of the University of California and LANL to sufficiently address these issues over the past several years," and mentioning an employee who "may have used her government credit card to buy a Ford Mustang with custom equipment"); Exhibit 50 to Tab A to CBS' Memo., Adam Rankin, Panel Sending Sleuths, ALBUQUERQUE JOURNAL at 1, December 14, 2002 (discussing the scheduled visit of House Energy and Commerce Committee investigators to LANL, mentioning a series of suspect transactions with G & G Industrial Supply – an unapproved vendor, and noting that "[o]ne of the primary purchasers of G &G equipment was the same LANL employee who reportedly attempted to make a partial payment on a $30,000 Ford Mustang using a lab purchase card"); Exhibit 52 to Tab A to CBS' Memo., Leslie Hoffman, Los Alamos Releases Audit of Lab Credit Card Program, ASSOCIATED PRESS, December 18, 2002 (discussing release of

-11-

gave more than passing attention to the allegation.[6]  It appears, however, that CBS was first to name

Lillian Anaya, although other members of the media had access to documents that named her.  See

Declaration of Patricia Gingrich at 9 (executed July 8, 2008)("Gingrich Decl.").

3.    **The Three Pre-Wrong-Number Explanation Broadcasts.**

Picking up on the Mustang controversy and the firing of the whistle-blowers, CBS aired

five separate broadcasts on the topic between November 2002 and April 2004, and posted stories

on its website.  Defendant Sharyl Attkison conducted the investigation and interviews underlying

the broadcasts.  The three broadcasts that preceded the release of the internal report that exonerated

Lillian Anaya aired on November 27, 2002, December 20, 2002, February 26, 2003.  The last two,

which aired on October 8, 2003, and April 27, 2004, came after LANL had released the results of

the exonerating report.

i.    **The November 27, 2002 Broadcast.**

The November 27, 2002 broadcast focused on the firing of Doran and Walp, and aired clips

of an interview that Sharyl Attkison conducted with them.  Walp expressed his view that they were

---

PwC independent audit, noting that the report "detailed the accounts of several employees who
allegedly used the lab credit cards to try to purchase goods unrelated to their work, including a Ford
Mustang").

    [6] See, e.g., Exhibit 132 to Tab A to CBS' Memo., Leslie Hoffman, Los Alamos Exonerates
Employee Accused of Charging Car to Lab Credit Card, ASSOCIATED PRESS, June 27, 2003 (naming
Lillian Anaya, discussing in detail the allegations regarding the Mustang and LANL's Internal
Investigation, which exonerated her, and stating Lillian Anaya's case evolved into a "symbolic
example of widespread financial problems at the lab that prompted federal probes and culminated
in Energy Secretary Spencer Abraham's decision to put the University of California's 60-year lab
management contract up for competitive bid"); Exhibit 130 to Tab A to CBS' Memo., Noah
Shachtman, Los Alamos Clears Fraud Suspect, WIRED, http://www.wired.com/print/politics/l
aw/news/2003/06/59413, June 27, 2003 (discussing LANL's report exonerating Lillian Anaya and
the allegations in detail, and stating: "Anaya became a central figure in series of scandals that
ultimately brought down the leadership of Los Alamos").

dealing with a "major criminal investigation concerning major thefts at the lab."  Exhibit 17 to

Attkison Decl., CBS Evening News Broadcast DVD at 1:35-1:44 (" Broadcast DVD").  Attkison

reported on the investigation, and stated that it "uncovered millions of dollars in stolen and missing

items," and that LANL workers were "using government credit cards like personal blank checks."

Id. at 1:45-2:08.  In the broadcast, Doran recounted discovering "thousands of items that had been

purchased that had been unauthorized."  Id. at 2:08-2:15.  Immediately after Doran was shown

discussing the thousands of unauthorized purchases, the broadcast cut to Walp, and then back to

Doran as they recited a list of such items: "A diamond necklace, diamond earrings, a diamond

bracelet . . . ," and "refrigerators, VCRs, television sets." Id. at 2:15-2:21.  In this context, Attkison

reported that "one worker, who had a million-dollar-a-month credit line, charged a custom Mustang

vehicle to the taxpayers on her government credit card." Id. at 2:23-2:34.  The rest of the broadcast

focused on Walp's and Doran's allegations that "the more that [they] uncovered, the more they say

lab managers tried to cover up – worried more about keeping the security problems quiet" Id. at

2:51-3:56.  After discussing the manner in which LANL fired Walp and Doran – because they were

not "a good fit" – and the ongoing FBI and DOE investigations, Attkison closed out by observing

that those investigations go on "without the help of the two investigative insiders who may have

been able to help them uncover the most." Id. 3:20-3:45.

   In preparing the November 27, 2002 broadcast, Attkison relied on the interview she

conducted with Walp and Doran.  The interview lasted approximately one hour and was edited

significantly to fit the short time frame of the broadcast.  In the interview, Walp and Doran

explained, in more complete form, that no Mustang had ever been built or delivered.  See Exhibit

15 to Attkison Decl., Interview DVD, November 26, 2008 Interview with Doran and Walp, at 32:45-

33:50.  Moreover, Walp and Doran explained that their investigation resulted in the Mustang

transaction being stopped before it could be completed.  See id.  The statement that Walp's and
Doran's investigation led to the charges being stopped appears to contradict the working external
investigation report, which showed that the charges had been contested before Walp and Doran
became involved in the investigation.  Attkison had the working external investigation report that
showed that the charges had been contested, and a page of the report was actually displayed as a
graphic in the November 27, 2008 broadcast.  See Broadcast DVD at 2:23-2:34.  An astute observer
could have seen the misspelled word "disbuted" above the list of charges for All Mustang as the
page from the PwC external review working report was flashed on the screen during the broadcast.
The date listed for the dispute of the charges was June 18, 2002 – nearly a month before Walp and
Doran joined the investigation.  See id. (showing the background image that appeared when the
price of the Mustang is superimposed over it).  See also Walp Decl. ¶¶ 10-13, 17-18, at 3-6 (stating
that Walp and Doran were brought into the investigation in July 2002).

### ii.      The December 20, 2002 Broadcast.

In the opening headlines for the CBS Evening News on December 20, 2002, Dan Rather
stated that there are "new allegations of a cover-up of massive credit card abuse by employees at a
vital defense lab."  Broadcast DVD at 4:08-4:17.  As the portion on LANL opened, Attkison stated:
"Los Alamos Weapons Lab holds some of the Nation's most sensitive nuclear secrets and will play
a critical role in the new homeland security plan.  So critics say reports of major mismanagement
and fraud at the lab are deeply disturbing."  Id. at 5:04-5:17.  Attkisson proceeded to discuss the
external audit, which PwC conducted, and described the report as showing evidence of a "staggering
amount" – $ 153 million dollars worth –  of questionable transactions.  Id. at 5:20-5:50.  Attkisson's
report noted that, while LANL found that very few of those transactions turned out the be improper,
LANL's speedy conclusions in that regard had attracted criticism.  See id.

In that context, Attkisson named Lillian Anaya for the first time.  See id. at 6:17-6:26.
Attkisson characterized Lillian Anaya as "the biggest spender.  She allegedly charged a $30,000
Mustang to her government card."  Id.  Attkisson also noted: "It's unclear whether anyone has sifted
through her other purchases: $15 million in less than four years. She didn't return our repeated
calls."  Id. at 6:27-6:37.  Doran also appeared in the report, expressing his view that there was a
"complete lack of control" at LANL.  Id. at 6:38-45.

Attisson had the PwC audit documents before the December 20, 2002 broadcast.  See
Attkisson Decl. ¶¶ 83, 89-92, at 26, 28-29.  Attkisson states: "With my access to the non-public
External Audit reports, I was able to compare them critically to the version released to the public
by the lab . . . .  As I read the public version of the report, I noticed that many facts and findings that
were contained in the nonpublic update reports were ignored in the public version."  Id. ¶ 89, at 28.

### iii.    The February 26, 2003 Broadcast.

The February 26, 2003 broadcast focused on Walp and Doran, the two whistle blowers who
had provided interviews and information for the previous reports.  See Broadcast DVD at 8:22-8:30.
Attkisson began the report explaining that, "[a]s Los Alamos struggles to rescue its reputation as
steward of America's nuclear weapons, two whistle blowers who first spoke to CBS News testified
before Congress today."  Id. at 8:52-8:37.  The report focused mainly on Walp's and Doran's
testimony before Congress, and on the two whistle blowers' contentions that LANL had chosen to
cover up, rather than pursue prosecutions for the mismanagement occurring within its ranks.  See
id. at 8:52-10:34.  The only portion of the broadcast that alluded to Lillian Anaya was a clip from
an interview Attkisson conducted with Doran and Walp.  See id. at 9:20-9:40.  Attkisson asked
whether there had been any prosecutions or indictments, and when the whistle blowers answered
negatively, she responded: "Not even the employee whom the lab gave a $1 million-a-month credit

line and got caught charging a custom Mustang at taxpayer expense?"  Id. at 9:28-9:40.  Doran

replied: "As far as we know, she's still on the payroll and has not yet been terminated."  Id.  Aside

from this brief discussion, Attkisson did not further discuss the allegations against Lillian Anaya,

nor did Attkisson name Lillian Anaya at any point in the broadcast.

       **4.**     **The Wrong-Number Theory.**

In June 2003, after CBS had made three broadcasts about the Mustang controversy, LANL

exonerated Lillian Anaya and publicized its version of the manner in which the alleged Mustang

charges came into being.  LANL released the results of its investigation in a report and a press

release that purported to exonerate Lillian Anaya.  Lillian Anaya's version conforms to the official

line that LANL has taken– what CBS has styled the wrong-number theory.  See CBS' Memo. at 29.

According to LANL, and Lillian Anaya, on May 1, 2002, Lillian Anaya received instructions

to process an approved order for five pressure transducers, to be purchased from the approved

vendor, Fluid Conditioning, located in Phoenix, Arizona.  See Exhibit N to Goldberg Decl., LANL

Mustang Purchase Investigation at 4 (dated June 25, 2003)("Purchase Investigation").  Fluid

Conditioning's main telephone number, as listed in LANL's purchase-order database, was 602-437-

1325.  See id. at 5 n.2.  Although Lillian Anaya does not specifically remember calling that

telephone number on May 1, 2002, her customary practice would have been to retrieve Fluid

Conditioning's telephone number from a directory on LANL's computer system.  See April 22

Anaya Depo. at 114:6-115:15.

Unbeknownst to Lillian Anaya, Fluid Conditioning had recently relocated its offices from

Phoenix to Tempe, Arizona and had acquired a new telephone number.  See Exhibit 6 to Tab F to

CBS' Memo., Letter from Bruce B. Darling and attached LANL Mustang Purchase Investigation

at 5 (dated June 25, 2003)("Darling Letter").  According to the report, Fluid Conditioning had a

great deal of difficulty receiving communication from its customers as a result of its move to Tempe. It received reports from customers that, when they called the former number, they were greeted with curses and told that Fluid Conditioning had gone out of business.  See id.

Fluid Conditioning's old telephone number had become an unlisted "back line" at a Phoenix hot-rod shop called All Mustang, which dealt in performance Mustang automobiles and parts.  See Exhibit M to Goldberg Decl., Investigation Finds Laboratory Employee Innocent in Mustang Case, LOS ALAMOS NATIONAL LABORATORIES NEWS AND PUBLIC AFFAIRS at 1 (dated June 26, 2003)("News and Public Affairs").  LANL's telephone records show six telephone calls between All Mustang and LANL numbers on May 1, 2002 – one of those calls being from Lillian Anaya's telephone to the former Fluid Conditioning number that had become All Mustang's back line.  See Exhibit 1 to Tab G to CBS' Memo., External Review of the Purchase Card Program, Documents Produced to the Committee on Energy Commerce, attached phone record at 1 (report dated December 20, 2002)("External Review Report Documents").  The next call, which came five minutes later, was from Lillian Anaya's facsimile-transmission number to All Mustang's facsimile-transmission number.  See id.  The facsimile-transmission contained the order for pressure transducers, addressed to Fluid Conditioning, but was sent to All Mustang's facsimile-transmission number.  See Purchase Investigation at 5 ("A fax confirmation document shows that Ms. Anaya faxed the Purchase Card Order Form, addressed to Fluid Conditioning, to All Mustang's fax number, as a confirmation of the phone order for transducers . . . .  LANL staff believe this is the fax recorded on phone record 10:04 . . . .").

Lillian Anaya received her May 2002 purchase-card statement on-line and noticed seven charges by "All Mustang" totaling nearly $ 30,000.00.  See Feb. 8 Anaya Depo. at 55:15-56:2. Lillian Anaya warned All Mustang that the charges were being made to a government credit card

-17-

and demanded that All Mustang reverse the charges.  See id.

CBS has been critical of LANL's report and the wrong-number theory that LANL put forth.
See CBS' Memo. at 30.  CBS points out what it considers to be significant holes in the story.  For
example, the original legal memorandum setting forth the explanation characterizes the wrong-
number story as a "reasonable hypothesis," whereas the LANL press release immediately following
appears to be a declaration of Lillian Anaya's innocence.  See Purchase Investigation at 1-8; News
and Public Affairs at 1.  CBS also points to an electronic mail from LANL lawyer Bruce Herr, in
which Herr states that the investigative team found that Lillian Anaya's purchase-card database,
where Lillian Anaya would have obtained the telephone number, contained the correct number to
Fluid Conditioning.  See Exhibit 47 to Tab K to CBS' Memo., Electronic Mail from Bruce Herr at
1 (dated June 19, 2003)("Herr Email").  Nevertheless, the veracity of LANL's official position does
not bear squarely on the issues presented by CBS' Initial Motion for Summary Judgment – namely,
whether Lillian Anaya is a public figure or public official, and whether, if she is, she has failed to
provide a quantum of evidence to allow a jury to find, but clear and convincing evidence, that the
Defendants acted with malice.  More important are facts bearing on Sharyl Attkisson's state of mind
as she investigated the theory.

In her Declaration, Attkisson discusses her skepticism of the wrong-number theory, and
states that Walp and Doran gave her further information: "Walp and Doran provided me with
documents relating to the Mustang investigation to show how flawed the Lab's wrong-number
theory was.  These included summaries of interviews that had been conducted by Lab investigators
(including Doran) and the FBI."  Anaya Decl. ¶ 160, at 45.  She also asserts that she received
internal LANL documents, which related to Anaya being placed on investigative leave on August
19, 2002.  See id. ¶ 160, at 46.  Anaya also received copies of the FBI 302s, including Lillian

Anaya's.  See Anaya Decl. ¶ 162, at 46.

**5.**     **Lillian Anaya's Participation in the Media Before LANL's Wrong-Number Explanation.**

Lillian Anaya states that, before the Mustang controversy surfaced, the media did not know who she was and that she was never involved with the media.  See Anaya Decl. ¶ 22, at 8.  She notes that, according to her recollection, the only time her name had appeared in the news before the CBS broadcasts was as a "survivor" in her uncle's obituary.  Id.  After CBS started running the stories, she avoided media contact and refused interviews.  See id.  She shunned the media on the advice of her criminal defense attorney, Dan Cron.  See id.  The attention she received "humiliated, saddened, and frightened" her, and as a result of the attention, she "stayed at home and kept her blinds drawn to avoid contact with the people [she] knew in her community and any media members. [She] stayed at home and wept."  Id.

**6.**     **Post-Wrong-Number Broadcasts.**

After LANL announced the wrong-number theory, and after Lillian Anaya entered into the media arena to combat the bad publicity, CBS issued two more broadcasts.  Unlike the prior broadcasts, the two post-wrong-number theory broadcasts focused on Lillian Anaya and the Mustang purchase.  The two broadcasts also dismissed the wrong-number explanation that LANL had issued.  In the two broadcasts, Attkisson characterized the wrong-number theory as a cover-up, rather than a legitimate explanation for the All Mustang charges on Lillian Anaya's purchase card.

**i.**     **The October 8, 2003 Broadcast.**

Unlike the previous three broadcasts, which focused more generally on mismanagement and fraud at LANL, the October 2003 broadcast centered mainly on Lillian Anaya and her alleged Mustang purchase.  It opened with Rather announcing the headline: "Hey, nice car!  She bought it

and charged it to you, the taxpayer.  The Inside Story, tonight."  Broadcast DVD at 11:07-11:13.

As Rather read the headline, a photograph of an attractive-looking, black Mustang flashed on the

screen.  See id.  Rather announced that, "[u]nder fire, the Lab recently made changes.  So things

have changed for the better, right?  Hold your horses 'til you hear about the Mustang."  Id. at 11:57-

12:08.  Attkisson noted that the Mustang was the "most sensational of all the suspect purchases."

Id. at 12:10-12:20.  Again, the photograph of the Mustang appeared, and Attkisson mentioned that

one "like this" was "charged" by Lillian Anaya.  Id. 12:20-12:28.  As Attkisson was reporting,

Lillian Anaya's photograph was displayed prominently on the screen.

    Attkisson then reported, based on the 302 that FBI agent Campbell prepared after

interviewing Lillian Anaya, that Lillian Anaya "could not offer any explanation, reasonable or not"

for the calls and facsimile transmissions recorded between her office and All Mustang.  Id. at 12:56-

13:00.  Again, Anaya's photograph was displayed, next to a photograph of the black Mustang, with

the text "Could not offer any explanation, reasonable or not[]" in quotation in a box below the two

photographs.  Id.  So, according to Attkisson, "one was concocted for her by the University of

California"  Id. at 12:59-13:06.  Attkisson then reported on LANL's official exoneration of Lillian

Anaya, which included the wrong-number theory.  Id. at 13:10-13:25.  According to Attkisson's

description of LANL's explanation, an internal legal memorandum discussed a "reasonable

hypothesis" that "Anaya was trying to buy lab equipment called transducers but dialed a wrong

number and did not realize she was actually speaking to the Mustang company, which then tricked

her into ordering a car."  Id. at 13:15-13:25.  Attkisson added: "[T]he lab announced that's what

happened, as if it were a fact, not just a theory."  Id.  at 13:26-13:31.  Nevertheless, Attkisson stated:

"Documents obtained by CBS News cast serious doubt on [the Lab's] story.  Before turning the

investigation over to the lab, the FBI questioned Anaya.  FBI documents show she 'denied any

knowledge or involvement' with the car, and said she 'never heard of' the car company."  Id. at

12:20-12:25.

Attkisson interviewed Thompson of All Mustang – whom she styled "the man who sold the

Mustang" – who denied that anything had happened other than Lillian Anaya ordering a car.  See

id. at 14:02-14:16.  Thompson recalled: "She wanted a late-model Mustang, black convertible, with,

like, black leather interior.  She wanted it loaded up with all the options, and then she wanted to

make it go fast."  Id.  As Thompson described the specifications that he allegedly received from

Lillian Anaya, footage of a late-model black Mustang appeared, with cuts to different sides of the

car and its interior.  See id.  Attkisson pointed to the fact that "lab auditors flagged thousands more

suspect purchases Anaya made as 'attractive for personal use' or 'unallowed.'  Yet the lab declared

her innocent and warmly welcomed her back to the Los Alamos team."  Id. at 14:18-14:33.

Attkisson finished the report by observing: "Congress now wants the Energy Department to explain

why it swallowed the wrong number defense."  Id. at 14:39-14:44.

It is evident from the broadcast that Sharyl Attkisson had the FBI 302 report on Lillian

Anaya by the time CBS aired the October 8, 2003 story.  Attkisson quoted part of the 302.  Lillian

Anaya's 302 provides, in part:

> Anaya is unaware of how the various May 2002 credit card charges to All
> Performance Mustang (AMP) appeared on her LANL credit card.  Anaya clearly
> denied any knowledge or involvement related to the referenced credit card charges
> . . . .  Prior to reviewing her May 2002 credit card bill via her LANL computer in
> June 2002, she had never heard of AMP or Allmustang.com.  When she first
> reviewed her May 2002 credit card bill in June 2002, she immediately questioned the
> credit card charges to AMP and telephoned AMP to inquire what type of
> merchandise they sell.  She recalled speaking to a Tom (LNU) from AMP regarding
> the suspicious credit card charges.
> . . . .
> Anaya was presented with May 2002 telephone records by the interviewing agents
> that were obtained from her office telephone number . . . and her office facsimile
> machine . . . .  Anaya could not offer any explanation, reasonable or not, of how the

-21-

> telephone and fax records could show the referenced contacts to AMP in early May
> and June 2002.

Anaya's 302 at 2.  Aside from the 302, Attkisson had access LANL's report, which presented the

wrong-number hypothesis.

### ii.  The April 27, 2004 Broadcast.

The final broadcast relevant to this case also focuses primarily on Lillian Anaya.  In the

headline, Rather announced: "She's at it again.  A government worker using your tax dollars for

more questionable purchases.  We'll give you the Inside Story."  Broadcast DVD at 15:09-17.  As

Rather made this assertion, Lillian Anaya's photograph appeared, accompanied by the words

"Spending Spree" followed by footage of the black Mustang.  Id.  Attkisson stated: "For months,

the Energy Department has focused on one single government employee in New Mexico and her

spending habits with the company credit card using your tax dollars.  Her name is Lillian Anaya.

She was a purchasing specialist at Los Alamos Nuclear Weapons Lab."  Id. at 16:24-16:42.  Lillian

Anaya's photo was displayed as her name is given.  See id.  "CBS News was first to report the lab's

own auditors flagged $100 million in questionable purchases at the lab, including thousands of

charges by Anaya, most notably a custom black Mustang, like this one."  Id. at 16:46-17:01.  At that

point in the broadcast, a photograph of a black late-model Mustang – the same photograph that was

shown previously – appeared in the background.  See id.  Attkisson then continued: "Lab managers

claimed there was no widespread fraud and insisted Anaya got tricked into ordering the car over the

phone, something the Mustang dealer denies."  Id. at 17:01-17:10.  Thompson, of All Mustang, then

appears, saying: "There's no doubt she wanted a black Mustang convertible, black leather."  Id. at

17:12-17:16.

The discussion of the Mustang served as background to the new story: that Congress asked

the Energy inspector to dig deeper, given its doubts about LANL's explanation of the allegations. See id. at 17:17-17:22.  "The results were not released to the public, but CBS News has learned a small sampling found taxpayers footed the bill for more suspicious items: car parts, a mini utility service vehicle, gas grill, refrigerator, five expensive bicycles and computers nobody at the lab can seem to find to this day."  Id. at 17:22-17:42.  Attkisson reported that the "inspector general says 'Anaya's employment status should be re-evaluated, given the findings of this and prior reports." Id. 17:53-18:05.  Attkisson also gave LANL's response: "Ms. Anaya has suffered enough as a result of the allegations surrounding the Mustang and the purchase card problems and should be left alone." Id. 18:05-18:15.  Lillian Anaya's photograph was displayed multiple times throughout the broadcast.

To prepare the April 2004 broadcasts, Attkisson relied on – and alluded in the broadcast to – the United States Department of Energy Inspector General's Report.  The Report stated: "Weaknesses highlighted by the University during its review of Ms. Anaya's transactions prompted us to conduct an independent review to determine whether her transactions, as a Laboratory procurement official, were in compliance with the Laboratory's policies and whether corrective actions had been initiated to resolve questionable transactions." Exhibit P to Goldberg Decl., United States Department of Energy, Office of Inspector General, Special Report to Management, Cover Memorandum at 1 (dated April 12, 2004)(faxed to Attkisson April 15, 2004)("DOE IG Report"). The report discussed a review of approximately 11,000 transactions entered into over a forty-five month period.  See id.  Of those 11,000 transactions, the reviewers examined a pool of transactions consisting of both randomly selected individual transactions and other that were judgmentally selected.  See id.  Of this pool of 254 selected transactions, the reviewers identified twenty-one purchases that "did not follow established procedures."  DOE IG Report at 1.  Seventeen of the

transactions were for items that were purchased even though LANL protocols established that such items should not be procured with purchase cards.  See id.  Ultimately, a number of these transactions proved to have a legitimate business purpose.  See id.  Four of the transactions, however, could not be shown as having a business purpose, including the purchase of five bicycles – one of which could not be located.  See id. at 2.  The DOE IG Report also noted that certain property that Lillian Anaya had ordered, including a computer, could not be located.  See id. at 3.

The report also evaluated the earlier review conducted by a committee which UC chartered. This review involved sixty-seven transactions by Lillian Anaya, all of which the review demonstrated to be allowable.  See id.  The DOE IG Report recommended  "[r]evew[ing] specific transactions in this report for cost allowability," directing LANL to continue looking for missing inventory identified in the report, and determining "what administrative action, if any, should be taken against Ms. Anaya, given the findings of this and previous reviews."  Id. at 4.  Finally, the report made clear that Lillian Anaya did not have access to her office, and did not engage in any purchasing or procurement activity after she was put on leave in the summer of 2002.  Id., Cover Memorandum at 1.  Thus, all of the transactions referenced in the report, questionable or not, were from the period before Lillian Anaya was placed on leave.

Although Lillian Anaya avoided contact with the media, it is undisputed that, when LANL was preparing to release the report setting forth the wrong-number explanation, Lillian Anaya and Mr. Cron expressed a desire for the exoneration to be equally as public as the condemnation.  See Tab J to CBS' Memo, Deposition of Dan Cron at 63:21-24 (taken March 20, 2008)("Cron Depo."). Regarding that desire for public exoneration, Mr. Cron testified: "Once I knew that a press release from the lab was going to be a reality, I regarded it as my job to try to get them to agree to put things to Lillian in the most favorable light in the context of what I told you earlier about trying to get

information out to the public if there ever was going to be a news story."  Id. at 64:21-25.

Lillian Anaya received a draft of the press release before it was published, and was given the opportunity to make comments about it before its release.  See id. at 66:12-67:22.  Mr.  Cron's billing statements for Lillian Anaya also reflected that he billed her for "conferences . . . regarding media," "public relations," and "prepar[ation] for media contact; phone conferences with several newspapers reports."  Exhibit 2 to Cron Depo., Billing Statement for July 7, 2003 ("July Billing Statement").  After that point, Mr. Cron appeared in the press, speaking on Lillian Anaya's behalf.  For example, Mr. Cron was quoted in an Associated Press story as stating: "When you stand back and look at this, it's nonsensical that she would have ever tried to have bought such a thing."  Exhibit 8 to Cron Depo., Leslie Hoffman, Los Alamos Exonerates Employee Accused of Charging Car to Lab Credit Card, ASSOCIATED PRESS, June 26, 2003).[7]  In that same article, Mr. Cron was cited as saying that his client was well-versed in LANL-procurement rules and would never have attempted such an outlandish purchase.  See id.  He also pointed out that she had a thirty-year record of "stellar performance" at LANL.  Id.

In an article published in the Albuquerque Journal, Mr. Cron also defended Lillian Anaya.  See Exhibit 15 to Cron Depo., Adam Rankin, Senator Questions LANL About Mustang, ALBUQUERQUE JOURNAL at 2, October 18, 2003.  In the article, Mr. Cron insisted that the evidence clearly points to Lillian Anaya's innocence.  See id.  In response to Senator Grassley's skepticism at the report that formed the basis for Lillian Anaya's exoneration, Mr. Cron stated: "It's clear to me . . . that Senator Grassley's office doesn't know what the facts are," and "[i]t looks to me there are

---

[7] This same article is also cited in this Memorandum Opinion and Order in footnote 4 on page 9 as Exhibit 132 to Tab A to CBS' Memo.  The Court cites the article as an Exhibit to the Cron Depo. here to maintain clarity regarding the context of its use at this point.

too many uninformed people filtering the information to the Senator." Id. Thus, in conjunction with LANL's press release advancing the wrong-number explanation, Lillian Anaya, through her lawyer, began to speak out in her defense.

## PROCEDURAL BACKGROUND

Lillian Anaya brings various claims arising out of the five CBS Evening News Broadcasts and stories that CBS published. See FAC ¶¶ 33-45, at 8-12. According to the Lillian Anaya, the broadcasts and stories[8] contained defamatory statements and were defamatory because they "accused Ms. Anaya, either by name or by inference that it was she, of committing a felony, of being dishonest, and of cheating her employer and the Public." Id. ¶ 45, at 12. "Due to the method by which [CBS] published the communication, those persons watching the broadcasts would have understood them to be defamatory." Id. ¶ 45, at 12.

CBS argues that Lillian Anaya is required to prove malice under federal constitutional law because she is either a public official, a limited purpose public figure, or both. See CBS' Memo. at 36-53. CBS maintains that Lillian Anaya does not meet the rigorous requirements for a showing

---

[8] In their arguments, the parties focus mainly on the five stories that CBS ran on November 27, 2002, December 20, 2002, Februrary 26, 2003, October 8, 2003, and April 27, 2004. The First Amendment Complaint, however, catalogues various other broadcasts and publications that allegedly contained defamatory statements. See FAC ¶¶ 33-70, at 8-21. These broadcasts and publications include: (i) a January 7, 2003, CBS Evening News story that made reference to "a customized car charged to a government credit card," id. ¶ 41, at 11; (ii) a January 30, 2003 CBS story that stated: "Glenn Walp and Steven Doran were fired after they reported . . . the misuse of lab-issued charge cards – including one employee who tried to use a lab charge card to buy a souped-up Ford Mustang," id. ¶ 42, at 11; (iii) an April 30, 2003 CBS broadcast that stated: "Another [LANL employee] used a lab charge card to try to purchase a customized Ford Mustang," id. ¶ 44, at 12; (iv) an October 10, 2003 radio interview in which Attkisson "stated that Ms. Anaya had charged a Mustang automobile with her LANL Purchase Card" and again "denigrated" LANL's exoneration of Lillian Anaya, id. ¶ 64, at 21; (v) a series of follow-up stories on the internet that "repeated and revived" the statements about Lillian Anaya, id. ¶ 66, at 21; (vi) January 1, 2004 and February 27, 2004 CBS broadcasts in which Attkisson repeated: "Another used a lab charge card to try to purchase a customized Ford Mustang," id. ¶¶ 67-68, at 22.

of malice that the First Amendment demands in defamation suits brought by plaintiffs who are public officials or public figures.  See id. at 53.

1.    **Arguments Regarding Lillian Anaya's Status as a Public Official.**

In arguing that Lillian Anaya is a public official, CBS contends that "'even relatively low-level [governmental] employees' can be deemed public officials, and this is 'especially true when the employee exercises unsupervised discretion in the expenditure of funds.'" Id. at 37 (quoting Harris v. City of Seattle, 315 F.Supp. 2d 1105, 1110 (W.D. Wash. 2004)).  CBS also points out numerous cases in which courts have found government purchasers to be public officials, particularly where those purchasers had independent supervisory authority.  See CBS' Memo. at 37-39.  In light of the case law it cites – none of which is controlling authority – CBS maintains that it is "clear that Anaya, a supervisor in the Lab's purchasing division, with a top secret clearance and a million-dollar monthly credit limit, is a public official."  Id. at 39.  Under regulations governing employees such as her, Lillian Anaya was to "'deliver on a timely basis the best value product or service to the customer, while maintaining the public's trust and fulfilling public policy objectives.'" Id. at 42 (quoting 48 C.F.R. § 1.102)(emphasis in CBS' brief).  CBS points to Lillian Anaya's high transaction and monthly spending limits, as well as her "considerable responsibility regarding how lab purchases were made."  Id. at 40.

In contrast, Lillian Anaya maintains that she is not a public official because she "had no policy authority, no budget, and no discretion.  She merely placed orders for material and supplies requested by others, and was told what to buy, from whom, at what price, and under what shipping conditions."  Response at 44 & 46-47.  Lillian Anaya also argues that, according to Supreme Court precedent, an employee's position must be one "'which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrut[iny] and discussion occasioned by the

particular charges in the controversy.'"  Id. at 45 (quoting Rosenblatt v. Baer, 383 U.S. 75, 86 n.13)(emphasis in Response).  Lillian Anaya emphasizes that she had no workers under her, and that she had four layers of management above her.  See id. at 47.  "[She] merely placed orders for materials that other employees of LANL determined that they needed for their particular operations, and for which these other employees secured approval from their supervisors to make the expenditures out of their budgets."  Id. (emphasis in original).

Ultimately, in Lillian Anaya's view,  she "had no supervisory authority or policy role.  She was a non-exempt, hourly employee like hundreds of thousands of other government employees. She developed no training protocols," and "because of her experience, [her junior colleagues] would sometimes look to her for advice and guidance . . . [.  A]ny assistance she provided was of the informal, work-place helping hand sort, which any employee would give to a more junior colleague."  Id. at 49.

### 2.    Arguments Regarding Lillian Anaya as a Limited-Purpose Public Figure.

In its arguments regarding Lillian Anaya's status as a limited-purpose public figure, CBS argues that a limited-purpose public figure is one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." CBS' Memo. at 44 (citing Gertz v. Robert Welch, Inc., 418 U.S. at 351).  CBS contends that Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1296-98 (D.C. Cir. 1980), represents the prevailing test for determining whether a defamation plaintiff is a limited purpose public figure. CBS presents the test from Waldbaum v. Fairchild Publications, Inc. as requiring a court to evaluate: (i) "the existence of a public controversy that has received public attention because its ramifications will be felt by persons who are not direct participants;" (ii) the plaintiff must have more than a trivial or tangential role in the controversy[;]" and (iii) "the alleged defamation was germane to the

plaintiff's participation in the controversy." CBS' Memo. at 45 (citing <u>Waldbaum v. Fairchild</u> <u>Publications, Inc.</u>, 627 F.2d at 1296-98). CBS contends that, under the test from <u>Waldbaum v.</u> <u>Fairchild Publications, Inc.</u>, Lillian Anaya is a limited-purpose public figure. <u>See</u> CBS' Memo. at 49.

CBS also emphasizes the notion that Anaya might be treated as a public figure even if she did not voluntarily seek to inject herself into the publicity. There is language in <u>Gertz v. Robert</u> <u>Welch, Inc.</u> to the effect that a limited-purpose public figure is one who "voluntarily injects himself or <u>is drawn into a particular public controversy</u>." 418 U.S. at 351 (emphasis added). CBS points out that, in February 2003, Lillian Anaya was seeking to have her name cleared through the media. Thus, she was voluntarily injecting herself into the fray by that point. <u>See</u> CBS' Memo. at 50; CBS' Reply in Support of Initial Motion for Summary Judgment at 33, filed August 8, 2008 (Doc. 172)("Reply")(noting there is ample evidence that by June 2003, Lillian Anaya began actively courting press attention). CBS also contends that, even if the Court rejects the <u>Waldbaum v.</u> <u>Fairchilds, Inc.</u> standard, Lillian Anaya still satisfies the general standards that the Supreme Court has set forth for such a finding. <u>See</u> Reply at 23.

Lillian Anaya suggests that the "illusory" possibility of an involuntary limited-purpose public figure has never played out in Supreme Court jurisprudence, and that the Supreme Court has in fact retreated from it. <u>See</u> Response at 55. In her Response, Lillian Anaya observes that, in the three subsequent cases in which the Supreme Court dealt with the issue of public figures, it declined to find such status where there was not some evidence that the plaintiff invited media attention. <u>See</u> <u>id.</u> at 58.

According to Lillian Anaya, she did not thrust herself into the vortex of this matter. She did not thrust herself to the forefront or assume any role in the resolution of the controversies in which

Lab management was embroiled.  See id. at 54.  Instead, Lillian Anaya states that, when CBS began its broadcasts in which she was mentioned, she withdrew to her home, drew her blinds, and wept. See id.; Anaya Decl. ¶ 22, at 8.  Lillian Anaya also disputes the charge that she was actively seeking press coverage.  See Response at 58.  Rather, she had no regular access to the media until after she had been dragged into the Mustang matter by CBS' publicity and by CBS' attempts to get her to comment.  See id. at 59.  In other words, rather than injecting herself into the controversy, which would arguably make her a public figure, Attkisson and CBS dragged her into it, naming her before other media report had done so.  See id.; Gingrich Decl. ¶ 8, at 9.

Finally, Lillian Anaya maintains that, even if the Court were to adopt the Waldbaum v. Fairchilds, Inc. test, the Court should find that the test is not met in this case.  See Response at 61. Regarding the first aspect of the test, Lillian Anaya contends that her name was not widely reported by anyone other than CBS, and that the public's interest in how federal money is being spent is far too generalized an interest to, by itself, convert her and the allegations against her into matters of public controversy.  See id. at 61.  Lillian Anaya also argues that there is no authority for the proposition that Congressional attention leverages something into a matter of public controversy – it certainly did not in Hutchinson v. Proxmire, 443 U.S. 111 (1979) .  See Response at 62.

In its Reply, CBS is critical of Lillian Anaya's suggestion that the test from Waldbaum v. Fairchilds, Inc. is the subject of a circuit split.  See Reply at 23.  CBS points out that other courts have characterized Waldbaum v. Fairchilds, Inc. as laying down a "generally accepted test to determine limited-purpose public-figure status."   Reply at 23 (quoting WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 572 (Tex. 1998) and citing Trotter v. Jack Anderson Enterprises, Inc., 818 F.2d 431, 433-34 (5th Cir. 1987)(noting that the test from Waldbaum v. Fairchilds, Inc is "sensible")).  "The circuit split," CBS adds, "involves another D.C. Circuit case, Dameron v.

Washington Magazine, Inc., 779 F.2d 736 (D.C. Cir. 1985), and it concerns only whether a private figure can become a limited-purpose public figure by bad luck alone." Reply at 23. CBS also maintains that it is incorrect to say that one must actively court publicity to become a limited-purpose public figure. See Reply at 23.

### 3. **Arguments Regarding Whether there is Evidence of Malice.**

As a general matter, CBS argues that it did not intend any of the defamatory meanings that Lillian Anaya ascribes to the broadcasts. See CBS' Memo. at 56. Moreover, the undisputed evidence shows that CBS and Attkisson personally believed what Lillian Anaya accuses them of reporting: that the allegations regarding the Mustang were true and that LANL's theory exonerating Lillian Anaya was false. See id.

CBS maintains that Attkisson followed the purchasing and property-control controversy for weeks before reporting on it, by reviewing press reports and investigative memoranda on the various allegations that were coming to light. After whistleblowers Walp and Doran were terminated in late November 2002, Attkisson had extensive discussions with them and considered them to be highly credible sources. See id. at 57. Furthermore, Attkisson reviewed and analyzed numerous investigative documents, including audit reports that LANL had not publicly acknowledged. See id. at 57-58.

After LANL released the wrong-number defense, Attkisson "carefully evaluated" it and investigated it for weeks before the October 8, 2003 broadcast. Id. at 58. Walp, Doran, and "veteran Senate investigator" Charles Murphy told Attkisson that LANL's defense was implausible. Thus, after considering the theory and its criticisms, Attkisson was convinced that LANL's defense was not reliable. See id. In April 2004, Attkisson received a copy of the confidential April 2004 report on Anaya by the DOE Inspector General. She read the report as providing validation for her earlier

conclusions about Lillian Anaya and the allegations surrounding the Mustang.  See id.

In her Response, Lillian Anaya sharply criticizes Attkisson's Declaration.  See Response at 73.  Lillian Anaya asserts that she has provided sufficient evidence that CBS manipulated documents and had actual knowledge that there never was a Mustang.   She also maintains that she had contested the charges as soon as they came to her attention, had actual knowledge of Thompson's lies, had actual knowledge that Lillian Anaya passed a polygraph, and withheld exculpatory evidence that Attkisson had in hand.  See id. at 73.

CBS notes that, before LANL released the wrong-number theory, nearly everyone believed the allegations about the Mustang, including Doran and Walp, the DOE Inspector General, and POGO.  See Reply at 44-47.  As late as February of 2003 – when the third CBS broadcast occurred – LANL and UC officials "left no doubt that they were operating on the assumption that Anaya had attempted to buy the car, even while pointing to some of the plaintiffs' so-called 'exculpatory evidence.'"  Id. at 48.  CBS maintains that, after the wrong-number theory came out in June 2003, Attkisson had good reason to doubt its veracity.  Id. at 57.  The theory was "controversial from the beginning."  Id.

CBS also argues that Lillian Anaya's extended attacks on Thompson's credibility are irrelevant, because Attkisson did not rely solely on him for her stories, and she included him only briefly in the reports to allow him to tell "his side of the story."  Id. at 59.  CBS also maintains that its editorial decisions to cut or characterize certain information is not evidence of actual malice.  See id. at 60.

To further support her arguments regarding actual malice, Lillian Anaya submitted a second supplemental brief to which she attached excerpts of the deposition of Kevin Roark, LANL's Media Relations Team Leader.  See Plaintiffs' Second Supplement to their Response in Opposition to

CBS's Motion for Summary Judgment at 1, filed November 26, 2008)(Doc. 199)("Second Supp. Brief").  Lillian Anaya points out that Roark sent CBS a copy of the June 2003 Press Release, but that CBS delayed reporting on it for several months.  See id. at 3 (citing Exhibit A to Second Supp. Brief, Deposition of Kevin N. Roark at 18:20-19:24 (taken November 17, 2008)(Doc. 199-2)("Roark Depo.").  Lillian Anaya also refers to a conversation between Roark and Attkisson in which Attkisson admitted that a story about how Lillian Anaya "did it" would be more interesting than a story about how Lillian Anaya "didn't do it."  Second Supp. Brief at 4 (citing Roark Depo. at 38:1-14).

CBS asserts that Roark's deposition testimony did not support Lillian Anaya's arguments. See CBS's Supplemental Brief on Deposition of Kevin Roark at 15, filed November 28, 2008 (Doc. 200).  CBS contends that the testimony contradicted any suggestion that CBS could have obtained additional important information or an on-camera interview with a LANL official before making its October 8, 2003 broadcast, and that Roark's testimony demonstrates that CBS did not create the controversy about misconduct at LANL and did not place Lillian Anaya at the center of that controversy.  See id. at 2-12.

### 4.    The September 19, 2008 Hearing.

At the hearing, CBS argued that government purchasing agents that dole out money, sign contracts, solicit bids, communicate with the public, sign payroll, and write the checks qualify as public officials.  See Transcript of Hearing at 9:17-10:19 (taken September 19, 2008)(Raiff, the Court)("Tr.").[9]  CBS contended that Lillian Anaya easily qualified because of the sheer volume of her spending authority, and because of her discretion and security clearance.  See id. at 10:20-22

---

[9] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

(Raiff); 8:1-14.  CBS also argued that, as a matter of policy, the standard in New York Times Co.

v. Sullivan, 376 U.S. 254 (1964),  informs this case, given that the media should be encouraged to

report on government officials and government expenditures.  See id. at 15:4-9 (Raiff).  CBS pointed

out that Lillian Anaya's deposition testimony contained enough evidence to establish that she was

a public official.  Id. at 14:10-23.

During the arguments regarding public officials, the Court questioned CBS about footnote

13 from Rosenblatt v. Baer.[10]  See Tr. at 17:4-9 (the Court).  CBS responded: "[W]hen someone has

authority to spend $15 million of the Government's money over a span of four years," the press and

the public have an interest in that person's qualifications for his or her job.  Id. at 17:10-14 (Raiff).

Moreover, CBS pointed out that status as a public official does not turn on whether the person has

received press beforehand, but on the person's function and authority, and whether the public has

an interest in the function and authority.  See id. at 17:17-21 (Raiff).

Lillian Anaya, on the other hand, asserted that her deposition testimony should read in

harmony with the Declaration that she submitted later.  See id. at 22:20-25 (Boyd).  She notes that

much of the deposition testimony dealing with her work responsibilities was drawn from her resume,

which was a self-promotional document that she wrote in 1999 while trying to get a better job.  See

_____

[10] Footnote 13 states:

It is suggested that this test might apply to a night watchman accused of stealing state
secrets. But a conclusion that the New York Times malice standards apply could not
be reached merely because a statement defamatory of some person in government
employ catches the public's interest; that conclusion would virtually disregard
society's interest in protecting reputation. The employee's position must be one
which would invite public scrutiny and discussion of the person holding it, entirely
apart from the scrutiny and discussion occasioned by the particular charges in
controversy.

Rosenblatt v. Baer, 383 U.S. at 86 n.13.

id. at 22:15-19 (Boyd).  Thus, the Declaration establishes that she was a low-level employee, with no one working under her, with multiple layers of management above her, and no discretion in how LANL spends money, except, under narrow circumstances where sometimes she gets to choose from whom requested items are bought.  See id. at 23:6-12 (Boyd).

Lillian Anaya also contended that, while she had spending authority, her limit was at the low end for LANL, and that her contribution to spending amounted to one half of one percent of the LANL budget.  See id. at 26:18-23 (Boyd).  Finally, she mentioned that if the Court sees a genuine tension between her deposition and her Declaration, perhaps, pursuant to the rule 56(f) motion, more evidence might be needed by way of deposition testimony or an evidentiary hearing.  See Tr. at 34:18-22 (Boyd).

In its oral argument regarding Lillian Anaya's public figure-status, CBS clarified that it is not arguing that she is a general public figure, but rather that she is a limited-purpose public figure. See id. at 39:24-25 (Raiff).  In response to the Court's inquiry about the importance of defining the scope of the controversy, CBS argued that it did not see the scope of the controversy as a significant dispute because of the many layers of controversy surrounding LANL.  See Tr. at 43:9-16 (Court, Raiff).

CBS argued that, even assuming that Lillian Anaya did not attempt to purchase the Mustang – something which it disputes – she still was "right dab in the middle of this controversy" as the biggest credit card spender.  Tr. at 46:6-15 (Raiff).  Thus, "when a person is engaged in conduct or in a job that's at the heart of a public controversy, that person's a limited purpose public figure and it doesn't matter [whether] or not that person's out there seeking publicity because you can imagine in many many cases the last thing a person wants to do is if there's a controversy is seek out publicity."  Tr. at 46:23-47:3 (Raiff).

-35-

Lillian Anaya asserted at the oral argument – in reference to the fact that, as of June 2003, she began to use the press to defend her reputation -- that a person does not become a limited-purpose public figure simply by defending herself against a charge in the press.  See Tr. at 55:16-18 (Boyd).  She argued that the Supreme Court decision in Hutchinson v. Proxmire supports this contention.  See id. at 58:1-19 (Boyd).

Following argument on public-official and public-figure status, the Court heard argument on what aspects of the individual broadcasts were defamatory, and whether there was evidence of malice in any or all of the five CBS broadcasts that discussed the alleged Mustang purchase.  These arguments substantially followed the argument from the briefing.

Regarding the November 2002 broadcast, CBS urged the Court to look at the broader context of the report and its focus on the allegations of a broader controversy, highlighting LANL's firing of the whistle-blowers.  See Tr. at 86:1-17 (Fuller).  Further, CBS argued that the sources upon which Attkisson relied for her report contained, not merely an allegation that an attempt had occurred, but evidence that an actual attempt had occurred.  See id. at 88:10-21 (Fuller).

Lillian Anaya counters that Attkisson knew, by the time of the broadcast, that no car was built, and that the charges were stopped before any loss occurred to the government.  See id. at 89:13-17 (Boyd).  Further, Attkisson had access to the document that listed the All Mustang charges as disputed before the November 2002 broadcast.  See id. at 90:7-14 (Boyd).

Regarding the December 20, 2002 broadcast, Lillian Anaya found it to be defamatory because, among other things, its graphics and narrative combined to give the viewer an impression that she was the biggest fraudulent spender at LANL.  See Tr. at 119:14-21 (Boyd).  She also pointed out the graphic in the broadcast in which a Mustang was portrayed with the text "purchased by Lillian Anaya" below it.  Id. at 120:16-25.  Lillian Anaya argued that CBS knew this information

to be false when it ran the story on December 20, 2002.  See id. (Boyd).  She also pointed out that there is a difference between "purchasing" and "allegedly charging," and that the fact that the headline stated one, while the text stated another, is evidence that CBS knew that it was falsely reporting that Lillian Anaya "purchased" the car.  Id. at 129:21-25 (Boyd).

CBS argued that Lillian Anaya has taken certain segments of the broadcast out of context and that a viewing of a recording of the broadcast reveals that Attkisson reported the Mustang purchase as an allegation.  See id. at 125:1-4 (Fuller).  CBS further maintained that Attkisson had resolved in her own mind, after careful research, that the sources upon which she relied were credible.  See id. at 134:14-20 (Fuller).

Lillian Anaya contended at the hearing that the February broadcast was defamatory, first, because it aired Doran stating that there had been "no arrests, prosecutions, or indictments," followed by the question: "Not even for the employee whom the Lab gave a million dollar a month credit line and got caught charging a custom Mustang at taxpayer expense?"  Id. at 138:17-19, 139:5-8 (Boyd).  Lillian Anaya pointed out that CBS continued to broadcast that she charged a Mustang, when the evidence that CBS had in hand proved that she never did such a thing.  See id. (Boyd).

CBS noted that the taxpayers paid the bill for Lillian Anaya's purchase card, and the report states that she was caught.  Had the transaction gone through, the taxpayers would have been out the price of the purchase.  See id. at 150:1-9 (Fuller).  CBS therefore maintained that its report in February, viewed as a whole, was accurate.

Lillian Anaya argued that the October 2003 broadcast was defamatory in various respects.  First, the broadcast began with a picture of a Mustang, with Rather stating: "Hey, nice car!  She bought it and charged it to you the taxpayer."  Id. at 151:20-25 (Boyd).  Second, Rather stated:

"Prepare to be outraged.  She bought a Mustang with your tax dollars and her bosses still claim she's the victim."  Id. at 152:5-9 (Boyd).  Next, Attkisson came on and referred to the Mustang as "the most sensational of all the suspect purchases."  Id. at 152:16-19 (Boyd).  Finally, after further discussion of Lillian Anaya's FBI questioning and her lack of an explanation, CBS noted: "So one was concocted for her."  Id. at 154:1-3 (Boyd).  Thus, according to Lillian Anaya, CBS falsified the Mustang story again, falsified or misleadingly quoted from her FBI 302, and misrepresented the exonerating wrong-number theory in such a way that it would strike the average viewer as ridiculous.

CBS maintained that, after careful analysis, Attkisson had good reason to doubt the wrong-number theory that LANL was propounding.  See id. at 169:1-25 (Fuller).  To support the contention that Attkisson was not acting maliciously, CBS' Counsel pointed to her extensive Declaration.  See id. at 169:20-170:16 (Fuller).  CBS also contended that the broadcasts contained a fair summary of the wrong-number theory.  See id. at 181:16-17 (Fuller).

Regarding the April 2004 broadcast, CBS' contended that the broadcast went through the basic context of the Mustang allegation and noted that news report catalogued additional suspect purchases.  The reference "she's at it again," therefore, should not be understood as a temporal reference implying that Lillian Anaya was still making purchases, but only that there was new evidence that Lillian Anaya had been involved in questionable purchasing activity.  See id. at 186:3-23 (Fuller).

The final issue raised at the hearing was the rule 56(f) motion to allow for more evidence on the issue of public official status.  The Court indicated that it was inclined to allow the two extra depositions requested, but that it would not slow down its work on the motion for summary judgment or wait for the additional evidence.  See id. at 192:14-15 (the Court).

-38-

## LAW REGARDING DEFAMATION

More than forty years ago, in <u>New York Times v. Sullivan</u>, 376 U.S. 254 (1964), the Supreme Court of the United States declared that state-law defamation claims must be measured by standards that satisfy the First Amendment, which permits no law "abridg[ing] the freedom of speech, and of the press."  376 U.S. at 269.  That holding is grounded in "a profound national commitment to the principle that debate on public issues should be unlimited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  <u>Id.</u> at 270.  The protection of speech on issues of public concern extends even to false speech, so that the First Amendment's "freedom of expression . . . ha[s] the 'breathing space'" it needs to survive.  <u>Id.</u> at 271-72.  <u>See</u> <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. at 341 ("The First Amendment requires that we protect some falsehood in order to protect speech that matters.").

In light of these constitutional values, the Supreme Court established that, while private plaintiffs in defamation suits would still be governed by the standards of the common law, public officials would face the more stringent requirement of showing actual malice.  <u>See</u> <u>New York Times Co. v. Sullivan</u>, 376 U.S. at 279-80 ("The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice . . . .'").  Under the "actual malice" standard, a plaintiff must prove that a defamatory statement was published "with knowledge that it was false or with reckless disregard of whether it was false."  <u>Id.</u> at 280.  Such a plaintiff must prove actual malice by clear-and-convincing evidence, <u>see</u> <u>Rosenbloom v. Metromedia, Inc.</u>, 403 U.S. 29, 52 (1971), <u>abrogated</u> <u>on other</u> <u>grounds</u> by <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. at 323.  Moreover, while a plaintiff who is neither a public official nor a limited-

purpose public figure may recover actual damages by a showing of simple negligence, he or she may

not recover punitive damages unless he or she proves actual malice.  See Gertz v. Robert Welch,

Inc., 418 U.S. at 349.

> **1.     Law Regarding Public Officials.**

The Supreme Court has declined to establish a bright-line definition of "public official."

Kassel v. Gannett Co., Inc., 875 F.2d 935, 939 (1st Cir. 1989)(observing that public official status

is a "recurring question").  Any analysis, however, must be rooted in the underlying rationale for

the rule in New York Times v. Sullivan:

> There is, first, a strong interest in debate on public issues, and, second, a strong
> interest in debate about those persons who are in a position significantly to influence
> the resolution of those issues.  Criticism of government is at the very center of the
> constitutionally protected area of free discussion.  Criticism of those responsible for
> government operations must be free, lest criticism of government itself be penalized.
> It is clear, therefore, that the "public official" designation applies at the very least to
> those among the hierarchy of government employees who have, or appear to the
> public to have, substantial responsibility for or control over the conduct of
> governmental affairs.

Rosenblatt v. Baer, 383 U.S. at 85.

In Rosenblatt v. Baer, the Supreme Court suggested that a public official plaintiff must hold

"a position in government [that] has such apparent importance that the public has an independent

interest in the qualifications and performance of the person who holds it, beyond the general public

interest in the qualifications and performance of all government employees . . . ."  Id. at 86.

Nevertheless, the Supreme Court has recognized that the paramount importance of preserving public

debate about matters of public concerns is in tension with another important interest: the public's

interest in preserving the reputational interests of citizens.  Facing the suggestion that a night

watchman charged with stealing state secrets might be a public figure under the Supreme Court's

analysis, the Supreme Court in Rosenblatt v. Baer retorted:

> It is suggested that this test might apply to a night watchman accused of stealing state secrets. But a conclusion that the New York Times malice standards apply could not be reached merely because a statement defamatory of some person in government employ catches the public's interest; that conclusion would virtually disregard society's interest in protecting reputation. The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scruting [sic] and discussion occasioned by the particular charges in controversy.

383 U.S. at 86 n.13.  See Kassel v. Gannett Co., Inc., 875 F.2d 935, 939 (1st Cir. 1989)("Thus, notwithstanding his notoriety and public concerns anent national security, 'a night watchman accused of stealing state secrets' is not a public official.  The inherent attributes of the position, not the occurrence of random events, must signify the line of demarcation.").  According to the Supreme Court, the "'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs."  Rosenblatt v. Baer, 383 U.S. at 85.  A determination that a plaintiff is a public figure rests on at least two important policy considerations: "[F]irst, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues."  Id.

The facts of the leading Supreme Court opinions discussing the issue do not define the attributes of a public official.  Nevertheless, the Supreme Court in New York Times Co. v. Sullivan had no trouble finding public-official status for a plaintiff who was one of three elected Commissioners of the city of Montgomery, Alabama.  See 376 U.S. at 256.  The Supreme Court stated:

> We have no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included. Cf. Barr v. Matteo, 360 U.S. 564, 573-575 . . . .  Nor need we here determine the boundaries of the "official conduct" concept. It is enough for the present case that respondent's position as an elected city commissioner clearly made

-41-

> him a public official, and that the allegations in the advertisement concerned what
> was allegedly his official conduct as Commissioner in charge of the Police
> Department.

New York Times, Inc. v. Sullivan, 376 U.S. at 284 n. 23.  The plaintiff in Rosenblatt v. Baer was

the supervisor of a county-owned recreation facility that was used mainly as a ski resort.  See

Rosenblatt v. Baer, 383 U.S. at 77.  The Supreme Court did not decide whether he was a public

official, but left open the possibility that he might be.  See id. at 676-77.  The Supreme Court has

found candidates for elected office to be public officials.  See Monitor Patriot Co. v. Roy, 401 U.S.

265, 271 (1971).

The United States Court of Appeals for the Tenth Circuit has characterized certain language

from Rosenblatt v. Baer as "the test" for determining whether a person is a public official under the

First Amendment.  Revell v. Hoffman, 309 F.3d 1228, 1232 (2002).  The Tenth Circuit focused on

the phrase in Rosenblatt v. Baer in which the Supreme Court noted that public-official status should

apply "at the very least to those among the hierarchy of government employees who have, or appear

to the public to have, substantial responsibility for or control over the conduct of governmental

affairs."  Id. (internal quotation marks omitted).

The plaintiff in Revell v. Hoffman was a thirty-year veteran of the Federal Bureau of

Investigation who had risen through the ranks to become Associate Deputy Director.  See 309 F.3d

at 1230.  Moreover, the plaintiff had served on the Vice President's Task Force on Terrorism, the

National Foreign Intelligence Board, and the Terrorist Crisis Management and Deputies Committee

of the National Security Council.  See id.  He had also appeared on major national-news programs

such as "60 Minutes," "Face the Nation," and "Nightline."  See id.  The district court found that he

was a public official because he had a " [thirty-year] career in the government, in particular the high

echelons of the FBI where he had an influential role in fundamental issues of this country's national

and foreign policy." Id. at 1232 (citing the district court opinion)(internal quotation marks omitted)(brackets in Tenth Circuit opinion). The Tenth Circuit affirmed, stating: "We have no doubt that Revell's various governmental positions are of 'such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees.'" Id. (quoting Rosenblatt v. Baer, 383 U.S. at 86). The Tenth Circuit also noted that law enforcement officials are "public officials" for purposes of the First Amendment. See Revell v. Hoffman, 309 F.3d at 1232.

The Tenth Circuit also discussed the attributes of a public official for First Amendment purposes in Gray v. Udevitz, 656 F.2d 588 (10th Cir. 1981). In Gray v. Udevitz, the plaintiff had been a "street level police officer" and was suing for defamatory statements made against him. See 656 F. 2d at 589.[11] In finding that the plaintiff was a public official, the court noted that street-level police officers, in addition to those of higher rank, "'have or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs,'" and such officers "ha[v]e such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees . . . ." Id. at 591 (quoting Rosenblatt v. Baer, 383 U.S. at 85). The Tenth Circuit also noted that street-level officers are visible to the public, have authorization to use force, and are in such a position that, if they abuse their authority, they may deprive citizens of their vital constitutional rights. See id. at 591.

---

[11] The libelous statements were germane to the plaintiff's duties as an officer. According to the statements, he allegedly sold drugs from his police car, extorted free sexual favors from a prostitute, and leaked information about vice raids to a prostitute with whom he lived. See Gray v. Udevitz, 656 F.2d at 589.

In Garcia v. Board of Education of Socorro Consolidated School District, the Tenth Circuit found school-board members to be public officials because:

> [T]he governance of a public school system is of the utmost importance to a community, and school board policies are often carefully scrutinized by residents. Members of the local school board, who are elected to make decisions regarding local education, clearly "have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." Rosenblatt [v. Baer], 383 U.S. at 85, 86 S.Ct. at 675. The strong public interest in ensuring open discussion of their job performance warrants the conclusion that school board members are public officials.

777 F.2d 1403, 1409 (10th Cir. 1985).  Given those facts, the Tenth Circuit held that school-board members may be perceived as having substantial control over the conduct of government affairs and should therefore be considered public officials.

The parties have cited numerous cases from lower courts in an effort to clarify how deep into the ranks of government service the appellation "public official" can fairly be applied.  The cases that CBS cites hold a wide range of "government purchasers" to be public officials, including: (i) a maintenance supervisor for county vehicles who had authority to make purchases of up to $500 per transaction,  see Clawson v. Longview Publishing Co., 589 P.2d 1223, 1227 (Wash. 1979); (ii) a civilian employee working as a contract negotiator and procurement agent who had "buying and contracting officer authority" at a Navy purchasing office, and was "authorized to enter into contracts in the name of and on behalf of the United States government," Rusack v. Harsha, 470 F. Supp. 285, 293 & 298 (M.D. Pa. 1978); (iii) a purchasing agent at a state university whose duties included receiving requisition forms from university employees, soliciting bids from outside vendors for the requested items, and completing purchase transactions on behalf of the university, see Davis v. Borskey, 660 So. 2d 17, 21 (La. 1995); (iv) a county purchasing agent who had "substantial responsibility for and control over the conduct of the financial affairs of the County, which is an

-44-

integral part of government," Ferguson v. Union City Daily Messenger, Inc., 845 S.W.2d 162, 162 & 167 (Tenn. 1992); (v) a town clerk with the "primary responsibility for organizing and issuing the payroll for the town" who had "substantial responsibility for, or control over, the conduct of government affairs," Barnett v. Mobile County Personnel Bd., 536 So. 2d 46, 47 & 54 (Ala. 1988); and (vi) a city employee charged with monitoring city construction projects to ensure compliance with labor laws and affirmative-action requirements who was paid by public funds and made decisions that directly affected local workers, see Peterfish v. Frantz, 424 N.W.2d 25 (Mich Ct. App. 1988).

        2.      **Law Regarding Public Figures.**

        In Curtis Publishing Co. v. Butts and Associated Press v. Walker, 388 U.S. 130 (1967),[12] three years after its decision in New York Times v. Sullivan, the Supreme Court extended the actual-malice standard to "public figures."[13]  Butts, a well-known football coach at the University of

_____

        [12] The Supreme Court decided these cases in the same opinion, captioned "Curtis Publishing Co. v. Butts.

        [13] There was no majority opinion in these cases.  Justice Harlan wrote the plurality opinion articulating the reasons why public figures should face similar hurdles as public officials in libel suits.  See Curtis Publ. Co. v. Butts, 388 U.S. at 130.  The plurality would have allowed public figures to go forward with libel suits upon a showing somewhat short of actual malice.  See id. at 155.  According to the plurality, a public figure who is not a public official would be able to recover damages for defamatory falsehood "whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers."  Id.  A majority of Justices maintained that the actual-malice standard should apply equally to public figures and public officials.  Chief Justice Warren noted: "To me, differentiation between 'public figures' and 'public officials' and adoption of separate standards of proof for each have no basis in law, logic, or First Amendment policy.  Increasingly in this country, the distinctions between governmental and private sectors are blurred."  Id. at 163 (Warren, C.J., concurring).  Warren also observed that, "although they are not subject to the restraints of the political process, 'public figures,' like 'public officials,' often play an influential role in ordering society. And surely as a class these 'public figures' have as ready access as 'public officials' to mass media of communication, both to influence policy and to counter criticism of their views and activities."  Id.

Georgia, was accused in an article in the Saturday Evening Post of conspiring to fix a football game between the University of Georgia and the University of Alabama.  See Curtis Publ. Co. v. Butts, 388 U.S. at 136.  Walker, a former army general and outspoken critic of using federal troops to assist racial integration of schools, was accused in a published report of urging violence and rioting in protesting the enrollment of James Meredith at the University of Mississippi.  The plurality opinion did not enunciate a test for determining public-figure status, but explained why Butts and Walker should be considered public figures for First Amendment purposes.  See id. at 154.  "Butts may have attained that status by position alone," given that he was such a prominent figure, while Walker may have become a public figure "by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy."  Id.  Nevertheless, "both commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements."  Id. at 155.

Four years later, a plurality of the Supreme Court expressed its opinion that New York Times, Inc. v. Sullivan should be further extended so that the actual-malice standard would apply to publications about private individuals who become involved in matters of public interest.  See Rosenbloom v. Metromedia, 403 U.S. at 43.  There were five opinions in Rosenbloom v. Metromedia and no majority.  In the plurality opinion authored by Justice Brennan, in which Chief Justice Burger and Justice Blackmun joined, Justice Brenna wrote:

"[I]f a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the

_____

Justice Brennan, joined by Justice White, wrote separately and affirmed support of the actual-malice standard for public figures, see id. at 173 (Brennan, J., concurring in Associated Press v. Walker and dissenting in Curtis Publishing Co. v. Butts), and Justice Black, joined by Justice Douglas, reaffirmed their absolutist position on the First Amendment, see id. at 170 (Black. J., concurring in Associated Press v. Walker and dissenting in Curtis Publishing Co. v. Butts).

individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety."

Id. Thus, under the Justice Brennan's view in Rosenbloom v. Metromedia, constitutional protection would have extended to all discussion involving matters of public or general concern, regardless "whether the persons involved are famous or anonymous." Id. at 44.

###    i.    Gertz v. Robert Welch, Inc. and its Progeny.[14]

Because Justice Brennan, in his plurality opinion in Rosenbloom v. Metromedia, would have extended constitutional protection to "all discussion involving public matters," and would have disregarded the distinction between public and private figures, his approach would have represented a significant expansion of protections afforded to the media. Nevertheless, the degree of protection that Justice Brennan would have afforded to the news media never garnered the support of a majority on the Supreme Court. In Gertz v. Robert Welch, Inc., the Supreme Court repudiated the event-oriented approach that Justice Brennan propounded in Rosenbloom v. Metromedia. See 418 U.S. 323, 343. Gertz was a prominent Chicago lawyer who was representing the family of a murder victim in a civil action against the accused murderer, a police officer. See id. at 325-26. A publication of the John Birch Society accused Gertz of being a criminal, a Communist, and a co-conspirator in a campaign to discredit the police. See id. at 326.

The Supreme Court, in Gertz v. Robert Welch, Inc. focused rather on the status of the defamation plaintiff and set out broadly applicable standards for determining the plaintiff's status.

---

[14] The cases discussed in this section focus primarily on limited-purpose public figures. The Supreme Court cases subsequent to Gertz v. Robert Welch, Inc. deal mainly with limited-purpose public figures. The parties in this case have also limited their arguments to the question of limited public-figure status.

The Supreme Court in <u>Gertz v. Robert Welch, Inc</u>. defined public figures:

> Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

<u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. at 345.  The Supreme Court also stated that, even in situations where these generalities do not apply,

> the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual. He has not accepted public office or assumed an 'influential role in ordering society.' <u>Curtis Publishing Co. v. Butts</u>, 388 U.S., at 164 . . . (Warren, C.J., concurring in result).  He has relinquished no part of his interest in the protection of his own good name, and consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery.

<u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. at 345.  The Supreme Court left open the possibility that, "[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of his own . . . ." <u>Id.</u> at 346.  Nevertheless, the Supreme Court noted: "[T]he instances of truly involuntary public figures must be exceedingly rare." <u>Id.</u>  Under those standards, the Supreme Court declined to treat Gertz as either a public official or a public figure.  The Supreme Court explained:

> Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation. . . . .

> In this context it is plain that petitioner was not a public figure. He played a minimal
> role at the coroner's inquest, and his participation related solely to his representation
> of a private client. He took no part in the criminal prosecution of Officer Nuccio.
> Moreover, he never discussed either the criminal or civil litigation with the press and
> was never quoted as having done so. He plainly did not thrust himself into the vortex
> of this public issue, nor did he engage the public's attention in an attempt to influence
> its outcome.

Gertz v. Welch, Inc., 418 U.S. at 352.

The Supreme Court applied the standard articulated in Gertz v. Welch in three subsequent

cases. The first, Time, Inc. v. Firestone, arose out of allegedly defamatory statements that Time

published regarding the divorce of Russell A. Firestone, heir to a tire fortune, and Mary Alice

Sullivan Firestone. See 424 U.S. 448, 450 (1976).[15] The Supreme Court in Time, Inc. v. Firestone,

quoted the standard from Gertz v. Robert Welch, Inc., and then explained that the plaintiff – Mary

Alice Sullivan – was not a public figure because she "did not assume any role of especial

prominence in the affairs of society, other than perhaps Palm Beach society, and she did not thrust

herself to the forefront of any particular public controversy in order to influence the resolution of

the issues involved in it." Times, Inc. v. Firestone, 424 U.S. at 453. The Supreme Court rejected

the argument that, because the Florida Supreme Court had characterized the divorce as a "cause

---

[15] The statements that Time made were based on the divorce court's final judgment, which
contained allusions to salacious details about the sexual exploits of each party to the divorce. See
Time, Inc. v. Firestone, 424 U.S. at 450. The divorce court, in one part of its order, stated:

> According to certain testimony in behalf of the defendant, extramarital escapades of
> the plaintiff were bizarre and of an amatory nature which would have made Dr.
> Freud's hair curl. Other testimony, in plaintiff's behalf, would indicate that defendant
> was guilty of bounding from one bedpartner to another with the erotic zest of a satyr.
> The court is inclined to discount much of this testimony as unreliable. Nevertheless,
> it is the conclusion and finding of the court that neither party is domesticated, within
> the meaning of that term as used by the Supreme Court of Florida . . . [.]

Id. at 450-51 (internal quotation marks omitted)(ellipses in original).

celebre," it was a public controversy that would make it proper to deem the plaintiff a public figure. Id. at 454. According to the Supreme Court, such a holding would be a return to the doctrine of the Rosenbloom v. Metromedia plurality authored by Justice Brennan, which privileged defamatory falsehood against public or private figures if the statements concerned matters in which the public generally had an interest. Id. Rather than retreating to the doctrine of Rosenbloom v. Metromedia, the Supreme Court reaffirmed the standard from Gertz v. Welch. See Times, Inc. v. Firestone, 424 U.S. at 453.

The next two decisions regarding public-figure status were handed down simultaneously. The Supreme Court announced its decisions in Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157 (1979), and in Hutchinson v. Proxmire, on the same day. Hutchinson had obtained a research grant from the National Science Foundation ("NSF") to study aggressive behavior in primates, and United States Senator William Proxmire awarded the NSF his "Golden Fleece" award to highlight what the senator believed to be particularly egregious examples of wasteful government spending. Proxmire's allegedly defamatory comments about Hutchinson and the grant on the Senate floor were republished in newsletters sent to constituents and in the news media. The district court held that Hutchinson was a public figure because (i) he had applied for federal funds; and (ii) he had access to the media because his response to the Golden Fleece Award was published in some newspapers and wire services. See Hutchinson v. Proxmire, 443 U.S. at 119-120. The district court specifically pointed out that Hutchinson was a public figure because of his "long involvement with publicly-funded research, his active solicitation of federal and state grants, the local press coverage of his research, and the public interest in the expenditure of public funds on the precise activities in which he voluntarily participated." Id. at 120.

The Supreme Court in Hutchinson v. Proxmire rejected the district court's line of reasoning

and listed several reasons why Hutchinson was not a public figure.  First, Hutchison's research and writing only became the subject of public controversy because of the alleged defamation – in his case, the conferral of the Golden Fleece Award.  See id. at 135.  "Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."  Id. (citing Wolston v. Reader's Digest Assn., Inc., 443 U.S. at 167-68).  Second, Hutchinson "did not thrust himself or his views into public controversy to influence others."  Hutchinson v. Proxmire, 443 U.S. at 135.  Third, "Hutchinson at no time assumed any role of public prominence in the broad question of concern about expenditures [the subject of the defamation]."  Id.  Finally, "Hutchinson's access [to the media] was limited to responding to the announcement of the Golden Fleece Award.  He did not have the regular and continuing access to the media that is one of the accouterments of having become a public figure."  Id.  The Supreme Court therefore found that Hutchinson was not a public figure.  See id. at 136.

The plaintiff in Wolston v. Reader's Digest Assn., Inc. had been held in contempt of court for failing to respond to a grand-jury subpoena related to accusations of espionage.  See 443 U.S. at 159-60.  Years later, Reader's Digest published a book in which the plaintiff was named as a Soviet spy who was indicted for espionage.  See id. at 160.  The lower courts held that the plaintiff was a public figure because, by "failing to appear before the grand jury and subjecting himself to a citation for contempt, [he] became involved in a controversy of a decidedly public nature in a way that invited attention and comment, and thereby created in the public an interest in knowing about his connection with espionage."  Id. at 165 (internal quotation marks and citation omitted).

The Supreme Court disagreed with the lower courts' assessment and noted that, rather than voluntarily injecting himself into the forefront of a public controversy, it was "more accurate to say that [he] was dragged unwillingly into the controversy. The Government pursued him in its

investigation. Petitioner did fail to respond to a grand jury subpoena, and this failure, as well as his

subsequent citation for contempt, did attract media attention." Id. at 166-67.  "[T]he mere fact that

petitioner voluntarily chose not to appear before the grand jury, knowing that his action might be

attended by publicity, is not decisive on the question of public-figure status." Id. at 167.  The

Supreme Court also found it important that the plaintiff "never discussed this matter with the press

and limited his involvement to that necessary to defend himself against the contempt charge.  It is

clear that petitioner played only a minor role in whatever public controversy there may have been

concerning the investigation of Soviet espionage." Id. at 167.  He was therefore not a public figure.

See id. at 169.

Hutchinson v. Proxmire and Wolston v. Reader's Digest Association represent the most

recent Supreme Court pronouncements on what constitutes a public figure.  The Supreme Court

issued those opinions in 1979.  In other words, the Supreme Court has not elaborated further on the

public-figure question in nearly thirty years.  The Tenth Circuit, however, has spoken more recently

on public-figure status.

### ii.    Tenth Circuit Cases Dealing with Public-Figure Status.

The Tenth Circuit has not attempted to craft a test that pulls together the Supreme Court case

law into a single framework.  In World Wide Ass'n of Specialty Programs v. Pure, Inc., 450 F.3d

1132, 1136 (10th Cir. 2006), the Tenth Circuit, invoking Gertz v. Robert Welch, Inc., noted two

categories of public figures: (i) those who become "all-purpose" public figures because they

"occupy positions of such persuasive power and influence that they may hold sway on any issue

with which they choose to become involved"; and (ii) "limited-purpose public figures" who

"voluntarily inject[ themselves] into a particular public controversy and thereby become[] public

figure[s] for a limited range of issues." 450 F.3d at 1136.  After articulating this general distinction,

the Tenth Circuit in <u>World Wide Ass'n of Specialty Programs v. Pure, Inc.</u> applied, but did not

necessarily endorse, the Utah state courts' test, which was first to isolate the specific public

controversy related to the remarks, and second, to evaluate the "type and extent of the plaintiff's

participation in that public controversy to determine whether he thrust [himself] to the forefront of

[the] controvers[y] in order to influence the resolution of the issues involved." <u>Id.</u> at 1137 (internal

quotation marks and citations omitted)(brackets in original).   The district court had applied that

standard to find that an association of residential treatment centers for troubled youth was a public

figure. <u>See</u> <u>id.</u>  The association marketed member schools to interested parents, and frequently made

public comments regarding the effectiveness of its member schools' methods – about which

methods there was evidence of numerous news accounts.  <u>See</u> <u>id.</u>  The Tenth Circuit applied the

state-law standard and upheld the district court's determination that the association was a public

figure.  The Tenth Circuit therefore found that there was a public controversy and that the plaintiff

"thrust [itself] to the forefront of [this] public controvers[y] in order to influence the resolution of

the issues involved." <u>Id.</u> (internal quotation marks and citations omitted)(brackets in original).

Similarly, in <u>Schwartz v. American College of Emergency Physicians</u>, 215 F.3d 1140(10th

Cir. 2000) the Tenth Circuit defined a public figure as "a person who voluntarily injects himself or

is drawn into a particular public controversy and thereby becomes a public figure for a limited range

of issues." 215 F.3d at 1145.  In doing so, the Tenth Circuit cited a Supreme Court of New Mexico

opinion, which in turn cited <u>Gertz v. Welch, Inc.</u>, and upheld the district court's finding that a

"nationally-recognized pioneer in the professionalization of the field of Emergency Medicine, . . .

a nationally recognized author in the Emergency Medicine profession who is editor-in-chief of a

leading textbook used in medical schools nationwide, a scholar and researcher in the Emergency

Medicine field," who did not dispute that he had deliberately injected himself in the public

-53-

controversy," was a public figure.   Schwartz v. American College of Emergency Physicians, 215 F.3d 1145.

In Lawrence v. Moss, 639 F.2d 634 (10th Cir. 1981), the plaintiff, who had worked on the successful senatorial campaign of Orrin Hatch, sued Hatch's unsuccessful opponent, Frank Moss, for defamation after Moss called him a "bag man" for former Vice President Spiro Agnew.   See 639 F.2d at 635.   Reversing the district court, the Tenth Circuit found that the plaintiff was not a limited-purpose public figure.   Id. at 637-38.   In so holding the Tenth Circuit discussed the Supreme Court case law – Gertz, Firestone, Wolston, and Hutchinson –  and found that the plaintiff "did not thrust himself into public prominence in Utah," and that his participation in the Hatch campaign "may have made him newsworthy but did not transform him into a public figure."   Lawrence v. Moss, 639 F.2d at 637-38.   The Tenth Circuit emphasized that the "status of the individual claiming to be defamed is the controlling factor, not the nebulous interest of the public in the matter with which he is inconspicuously involved."   Id. at 638.   Thus, the "plaintiff was not a public figure at the time of the alleged defamatory statement."   Id.

### iii.   Other Circuits' Tests for Public-Figure Status.

Recognizing that the Tenth Circuit has not articulated a precise or well-defined test or approach to limited-purpose public-figure questions, CBS urges the Court to adopt the test from the United States Court of Appeals for the District of Columbia.   The D.C. Circuit articulated its test in Waldbaum v. Fairchild Publications, Inc.   Under that test, if a defamation plaintiff is found not to be a general public figure, then a court must first "isolate the public controversy. A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way."   Waldbaum v. Fairchild Publications, Inc., 627 F.2d at 1296.   The second step, after defining the controversy, is

-54-

to analyze the plaintiff's role in that controversy. "Trivial or tangential participation is not enough. The language of <u>Gertz</u> is clear that plaintiffs must have 'thrust themselves to the forefront' of the controversies so as to become factors in their ultimate resolution. They must have achieved a 'special prominence' in the debate." <u>Id.</u> at 1297 (citations omitted). The final step of the inquiry is to assure that "the alleged defamation [was] germane to the plaintiff's participation in the controversy. His talents, education, experience, and motives could have been relevant to the public's decision whether to listen to him. Misstatements wholly unrelated to the controversy, however, do not receive the New York Times protection." <u>Id.</u> at 1298. The United States Courts of Appeals for the Fifth and Eleventh Circuits have explicitly endorsed the test in <u>Waldbaum v. Fairchild Publications, Inc.</u> <u>See</u> <u>Silvester v. American Broadcasting Companies, Inc.</u>, 839 F.2d 1491, 1492-93 (11th Cir. 1988)("The proper standards for determining whether plaintiffs are limited public figures are best set forth in <u>Waldbaum v. Fairchild Publications, Inc.</u> . . .'' ); <u>Trotter v. Jack Anderson Enterprises, Inc.</u>, 818 F.2d 431, 432 (5th Cir. 1987)("In an effort to give shape to what might be a formless inquiry into limited-purpose-public-figure status, the District of Columbia Circuit has developed a three-step test . . . This test appears to be sensible, and we adopt it.").

In <u>Gertz v. Robert Welch, Inc.</u>, the Supreme Court left open the possibility of an "involuntary" public figure, <u>see</u> 418 U.S. at 345, 351, but has never found a plaintiff to be one, and seemed to retreat from the idea after it first mentioned the possibility. Shortly after <u>Waldbaum v. Fairchild Publications, Inc.</u>, the D.C. Circuit made a controversial alteration to its three-part test to account for the possibility of "involuntary" public figures in <u>Dameron v. Washington Magazine, Inc.</u> The D.C. Circuit stated that its three-part "analysis clearly must be modified somewhat to accommodate the possibility of a potentially involuntary limited-purpose public figure that is presented here." 779 F.2d at 736.

The suit in Dameron v. Washington Magazine, Inc. arose out of a report in the Washingtonian about a highly publicized plane crash.  In a short sidebar, the report mentioned a plane crash some years earlier and blamed in on an air-traffic controller.  See id. at 737-38.  On the facts, it was apparent that the plaintiff was the only individual to whom the side bar could be making reference.  See id.  The D.C. Circuit found the plaintiff to be a public figure by noting that there was a public controversy, and the plaintiff "played a central, albeit involuntary, role" in that controversy. Id. at 742.  The D.C. Circuit explained:

> By sheer bad luck, Dameron happened to be the controller on duty at the time of the Mt. Weather crash. As in Gertz, Dameron "assume[d a] special prominence in the resolution of [a] public question[ ]." Gertz at 351, 94 S.Ct. at 3012. He became embroiled, through no desire of his own, in the ensuing controversy over the causes of the accident. He thereby became well known to the public in this one very limited connection. The numerous press reports on the Mt. Weather crash introduced by the defendants in their motion for summary judgment amply demonstrate this. Dameron's name and likeness were often used in these reports. See R.E. at 134-49 (reproducing articles from The Washington Post, The Star-News, UPI and the PATCO Newsletter). It was in that same very limited connection that The Washingtonian's brief and oblique reference to him surfaced years later.

Dameron v. Washington Magazine, Inc., 779 F.2d at 742 (brackets and parentheses in original).

The D.C. Circuit's willingness to embrace the notion of an involuntary limited-purpose public figure and hold someone like the air-traffic controller raised some criticism.  See, e.g., Note, The Revival of Involuntary Limited-Purpose Public Figures-Dameron v. Washington Magazine, Inc., 1987 B.Y.U. L. REV. 313 ("Revival of Involuntary Limited-Purpose Public Figures").  One of the main criticisms of Dameron v. Washington Magazine, Inc. is that it ignores the fact that "the Supreme Court has permitted an intrusion into a person's privacy only when that person intentionally became involved in a public controversy." Id. at 317.  By adopting an approach that appears to focus more on the public's interest in the controversy rather than the plaintiff's voluntary participation, the D.C. Circuit revived Justice Brennan's approach from Rosenbloom v. Metromedia,

Inc. that the Supreme Court expressly repudiated in Gertz v. Welch, Inc.  See Revival of Involuntary Limited-Purpose Public Figures at 317.

Unlike the Fifth, Eleventh, and D.C. Circuit courts, the Second Circuit has adopted a four-step test under which defendant must show that the plaintiff

> (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

Lerman v. Flynt Distributing Co., Inc., 745 F.2d 123, 136-37 (2d Cir. 1984).  The Second Circuit adopted this test based on its analysis of the Supreme Court case law, which, in its view, hinges largely on whether a plaintiff voluntarily injected himself into a controversy, and "'the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.' Gertz v. Robert Welch, Inc., 418 U.S. at 352, 94 S.Ct. at 3013; Wolston v. Reader's Digest Assn., Inc., 443 U.S. at 167 . . . ." Id.

The United States Court of Appeals for the Fourth Circuit applies a five-factor test under which a court must determine whether

> (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation.

Fitzgerald v. Penthouse Intern., Ltd., 691 F.2d 666, 668 (4th Cir. 1982).

**4.      Actual Malice.**

As the Tenth Circuit has recognized, a defamation plaintiff's actual-malice burden is to show "'that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement.'" Hardin v. Santa Fe Reporter, Inc., 745 F.2d 1323, 1326 (10th

-57-

Cir. 1984)(quoting Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 511 n. 30

(1984)).  This showing must be made by clear-and-convincing evidence.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255-56 (1986).

In defamation cases, public figures and public officials are required to show actual malice.

See Gertz v. Robert Welch, Inc., 418 at 342.

> Those who, by reason of the notoriety of their achievements or the vigor and success
> with which they seek the public's attention, are properly classed as public figures and
> those who hold governmental office may recover for injury to reputation only on
> clear and convincing proof that the defamatory falsehood was made with knowledge
> of its falsity or with reckless disregard for the truth.

Id. at 343.  Moreover, "[s]tates may not permit recovery of presumed or punitive damages, at least

when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth."

Id. at 349.  "The [actual-malice] standard is a subjective one."  Harte-Hanks Communications, Inc.

v. Connaughton, 491 U.S. 657, 688 (1989).

The Tenth Circuit has explained:

> The question whether the evidence in the record in a defamation case is of the
> convincing clarity required to strip the utterance of First Amendment protection is
> not merely a question for the trier of fact. Judges, as expositors of the Constitution,
> must independently decide whether the evidence in the record is sufficient to cross
> the constitutional threshold that bars the entry of any judgment that is not supported
> by clear and convincing proof of 'actual malice.'"

Hardin v. Santa Fe Reporter, Inc., 745 F.2d at 1326 (quoting Bose Corporation v. Consumers Union

of United States, Inc., 466 U.S. at 511).  The plaintiff in Hardin v. Santa Fe Reporter, Inc. filed a

libel suit after the Santa Fe Reporter published an interview in which the individual being

interviewed accused the plaintiff of participating in police torture when he was stationed at the

American embassies in Guatemala and Colombia as Chief Public Safety Advisor.  See Hardin v.

Santa Fe Reporter, Inc., 745 F.2d at 1324.

In the bench trial of <u>Hardin v. Santa Fe Reporter, Inc.</u>, the Honorable Juan G. Burciaga, United States District Judge for the District of New Mexico, dismissed the plaintiff's complaint, because the plaintiff, a public official, did not meet the burden of proving, by clear-and-convincing evidence, that the defendant knew the report was false, or acted with reckless disregard for the truth. <u>See</u> <u>id.</u> at 1325.  The Tenth Circuit quoted the  district court's explanation that,

> [g]iven the extremely serious nature of Marquez' allegations, it is clear that the defendants were negligent in failing to investigate Marquez' background . . . .  If the plaintiff were merely required to prove negligence, the Court would have little difficulty finding in his favor.  However, the evidence is clear that Hardin was a public official for purposes of the First Amendment.

<u>Id.</u> at 1325 (ellipses in Tenth Circuit opinion).  Given that the plaintiff was a public official, he was required to prove actual malice.  <u>See</u> <u>id.</u>  "As the trial court found, the actions of defendants did not meet this difficult standard."  <u>Id.</u>

To demonstrate "how close the action of the reporter and the paper was to the reckless disregard of the truth" in <u>Hardin v. Santa Fe Reporter, Inc.</u>, the Tenth Circuit quoted the district court's findings of facts extensively.  <u>Id.</u> at 1324.  According to the district court's findings of fact, the plaintiff "had a long and distinguished career of public service," his colleagues regarded him as "dedicated and reliable," and "his integrity was beyond question."  <u>Id.</u> at 1324-25 (quoting the district court's findings of fact).  "There [was] no credible evidence before the Court supporting the allegations of widespread or systematic torture by agents of the government [whom plaintiff] advised while working with [the Office of Public Safety]."  <u>Id.</u> at 1325 (quoting the district court's findings of fact)(first brackets in the Tenth Circuit opinion).  "It [was] clear that the allegations and suggestions of [plaintiff]'s knowledge of alleged widespread torture were patently false."  <u>Id.</u> (quoting the district court's findings of fact)(brackets in the Tenth Circuit opinion).

Regarding the conduct of the newspaper, the district court in <u>Hardin v. Santa Fe Reporter,</u>

<u>Inc.</u> found that the newspaper's editor did "only minimal editing." <u>Id.</u> (quoting the district court's findings of fact). The district court also found that the subject of the interview made statements that were "misguided," "clearly not based on fact," and "made for the purpose of self-aggrandizement." <u>Id.</u> (quoting the district court's findings of fact).

Given the findings of fact, the district court in <u>Hardin v. Santa Fe Reporter, Inc.</u> concluded that it was "clear that the defendants were negligent." <u>Id.</u> "However, because investigatory failures are insufficient to satisfy the malice requirement, <u>New York Times[Co. v. Sullivan]</u>, [376 U.S.] at 287 . . . , <u>Curtis Publishing Co. v. Butts</u>, 388 U.S. 130, at 153 . . . , the court concluded that defendants' actions, while coming perilously close, did not rise to the level of reckless disregard for the truth." <u>Hardin v. Santa Fe Reporter, Inc.</u>, 745 F.2d at 1324.

The Tenth Circuit affirmed the district court's judgment in <u>Hardin v. Santa Fe Reporter, Inc.</u>, finding: "It is clear that the trial court did indeed consider the cumulative effect of the facts appellant urges constitute malice in finding no 'actual malice existed,' and applied the appropriate law to the case." <u>Id.</u> at 1326 (quoting the district court). The Tenth Circuit also agreed with the concluding portion of the district court's order, which stated: "In a free society, there will always be those who abuse their freedom. Morris and Marquez fall into this category. It is regrettable, yet necessary, that innocent individuals such as Herbert Hardin will from time to time pay a dear price in order that all other Americans may continue to enjoy their freedom." <u>Id.</u>

### LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

According to rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears

the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving

party's case."   Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir.

1991))(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the movant meets this burden, rule 56(e) requires the nonmoving party to designate

specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S.

at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. at 256; Vitkus v. Beatrice Co., 11 F.3d 1535, 1539

(10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth

specific facts showing that there is a genuine issue for trial as to those dispositive matters for which

it carries the burden of proof.")(internal quotation marks omitted); Otteson v. United States, 622

F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion

is made, the opposing party may not rest on the allegations contained in his complaint, but must

respond with specific facts showing the existence of a genuine factual issue to be tried.'")(quoting

Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).  The party opposing a motion for summary

judgment must "set forth specific facts showing that there is a genuine issue for trial as to those

dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First

Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing

party may not rely merely on allegations or denials in its own pleadings; rather, its response must

– by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue

for trial."  Fed. R. Civ. P. 56(e)(2).

It is not enough for the party opposing a properly supported motion for summary judgment

to "rest on mere allegations or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 256(1986).  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir.

1990)("[The p]laintiff merely has alleged two isolated statements, one by [one defendant] and one

by [another defendant]. "The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005 at * 1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross and Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005 at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. The mere existence of a scintilla of evidence will not avoid summary judgment. See Vitkus v. Beatrice Co., 11 F.3d at 1539. There must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill and Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871); Vitkus v. Beatrice Co., 11 F.3d at 1539). "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In defamation lawsuits, the issue whether a plaintiff is a public official or public figure affects the application of the standard for summary judgment. First, the district court must make the legal determination whether the plaintiff is a public official or public figure. See Schwartz v.

American College of Emergency Physicians, 215 F.3d 1140, 1144 (10th Cir. 2000).  "[A] court analyzing whether a given plaintiff is a public figure must look at the facts, taken as a whole, through the eyes of a reasonable person."  Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1293 (D.C. Cir. 1980).  If the court believes that there are factual disputes to resolve, or that it needs additional evidence to make the decision, it can hold a hearing.  See Rebozo v. Washington Post Co., 637 F.2d 375, 379 (5th Cir. 1981)(noting that, where facts are undisputed, summary judgment on "public figure" is appropriate and that, where facts are disputed, an evidentiary hearing may be required, but issue remains for the court and not for the jury).

If the court determines that the plaintiff is not a public official or public figure, the plaintiff must show negligence.  See id.  If, however, the court determines that the plaintiff is a public official or a public figure, then the plaintiff bears the burden of demonstrating, by clear-and-convincing evidence, that the defendant acted with actual malice.  See Schwartz v. American College of Emergency Physicians, 215 F.3d at 1144.  In the context of summary judgment, the Supreme Court has stated that "the judge must view the evidence presented through the prism of the substantive evidentiary burden."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Thus, the Supreme Court has explained:

> When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under New York Times. For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.

Id.

## ANALYSIS

After careful consideration of the parties' briefing and oral presentations, the Court

concludes that Lillian Anaya was not a public official.  Exposure to media attention did not convert her into a public official, and the attributes of her position suggest that she did not have, or appear to have, substantial responsibility for or control over government affairs, nor did her position enjoy such apparent importance that the public would have an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees.  The Court also finds that Lillian Anaya was not a limited-purpose public figure before June 2003 because she did not thrust herself into the vortex of public debate and did not attempt to avail herself of the media to influence the outcome or the public's opinion regarding the allegations against her.  The Court finds, however, that, after she began participating in the media and attempting to ensure the publicity of her exoneration, Lillian Anaya became a limited-purpose public figure.  Thus, the actual-malice standard applies to the October 2003 and April 2004 broadcasts, but not to the previous three broadcasts.  The Court finds that the evidence for malice is insufficient with regard to the first three broadcasts and will grant summary judgment on punitive damages for those broadcasts.  The Court finds, however, that there is evidence of malice for the October 2003 and April 2004 broadcasts, and will accordingly deny summary judgment with regard to both.

## I.  LILLIAN ANAYA WAS NOT A PUBLIC OFFICIAL.

The Tenth Circuit has held that the determination of public-official status turns on two primary policy concerns: whether putative public officials "'have or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs,'" and whether they "ha[v]e such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees . . . ."  Gray v. Udevitz, 656 F.2d at 591 (quoting

Rosenblatt v. Baer, 383 U.S. at 85)(brackets in original).  The Supreme Court has also clarified that a public official occupies a position "which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrut[iny] and discussion occasioned by the particular charges in the controversy."  Rosenblatt v. Baer, 383 U.S. at 86 n.13.  The Court finds that Lillian Anaya's position is not such a position.

### A. LILLIAN ANAYA DID NOT HAVE, OR APPEAR TO THE PUBLIC TO HAVE, SUBSTANTIAL RESPONSIBILITY FOR OR CONTROL OVER THE CONDUCT OF GOVERNMENTAL AFFAIRS.

The Court is aware that there is some dispute about the precise details regarding Lillian Anaya's responsibilities and authority at LANL.  CBS vigorously asserts that Lillian Anaya's admissions on the record in her deposition testimony establish that she had significant spending authority, exercised discretion, and acted in a supervisory capacity.  The Court is not persuaded, however, that Lillian Anaya had the authority or discretion that would make her a public official.

Regarding her spending capabilities, it is undeniable that Lillian Anaya had a government credit card, and that she had authority to enter into transactions involving substantial amounts of money.  This spending authority is, however, ministerial in nature.  Nothing in the record indicates that Lillian Anaya's position involved any decisions regarding what expenditures to make.  Her job was, instead, to process requests from the departments, and, in accordance with strict regulations, to effectuate the requested purchases.  It was the departments, and not Lillian Anaya, who made decisions regarding their needs.  See Strickler Depo. at 21:24-22:5.  Lillian Anaya did not have any say in the budget for LANL or for its different departments.

Given those attributes of her job, it is difficult to conclude – and CBS has not been able to demonstrate – how Lillian Anaya had substantial responsibility for or control over the conduct of government affairs.  Even if the Court disregards Lillian Anaya's Declaration, as CBS urges it to

do, and relies solely on the deposition excerpts that CBS highlights, the Court still sees that, at most, Lillian Anaya had some limited control over which vendors to use, and over the negotiation of prices and some terms.  This limited discretion over some of the details of purchasing does not suggest control over government affairs.

The Court is also unconvinced that Lillian Anaya had supervisory authority sufficient to consider her a public official.  As procurement assistant, Lillian Anaya worked with several layers of management above her, and she was officially supervisor to no one.  See Strickler Depo. at 12:7-13, 13:3-14:17.  Even so, CBS argues that, given her thirty-two-year tenure, the statements of others, and her own admissions, Lillian Anaya ran her procurement team and, as a practical matter, was in charge.  The evidence, however, does not bear out the contention that she had an influence over anything more than low-level procurement activity.

CBS notes that Lillian Anaya once carried out a transaction for a five-million dollar purchase.  Nevertheless, Lillian Anaya's deposition testimony and her Declaration are consistent in clarifying that she had to receive special permission to effect the transaction, and she received that permission because the person who normally had the authority to do it was not present and it was an urgent situation.  See April 22 Anaya Depo. at 24:16-20; Anaya Decl. ¶ 12, at 5.  Thus, Lillian Anaya's job description did not include – and she was not completely qualified – to perform what LANL considered to be larger purchases.  See Strickler Depo. at 36:20-37:6 (explaining that Lillian Anaya's purchasing capabilities were small in the context of the billion-dollar yearly purchasing at LANL).

CBS also disputes Lillian Anaya's characterization of her job as a "Procurement Assistant" or a "purchasing agent."  CBS's Supplemental Brief on the 30(B)(6) Deposition Regarding Lillian Anaya's Status as a Public Official at 5 n.2, filed November 23, 2008 (Doc. 198)("CBS's 30(b)(6)

Brief"). CBS contends that Lillian Anaya was a "Procurement Contract Specialist" whose authority fell directly below "the division's most senior buyers, who had an SSM-1 (Specialist Staff Member) Classification," and who are recognized as having a "professional or administrative specialty and require specialized knowledge." Id. CBS maintains that, not only did Lillian Anaya's position fall directly below that of the senior buyers, but she also "exercised the authority of someone at the SSM-1 Level." Id.

The Court notes that, whatever Lillian Anaya's official title may have been, she was not a senior purchaser at the SSM-1 level. She was, as CBS acknowledges, below such purchasers. The Court is also unconvinced that Lillian Anaya had authority similar to SSM-1 purchasers. While there is some evidence that Lillian Anaya performed an unusually large transaction at one point, and that the large transaction may have been one that SSM-1 purchasers typically carried out, nothing in the record supports the contention that Lillian Anaya generally had authority comparable to SSM-1 purchasers.

The Court need not and does not express an opinion regarding whether having SSM-1 purchasing authority would make Lillian Anaya a public official. The Court emphasizes only that Lillian Anaya's job fell beneath that of such purchasers, and whatever authority those purchasers had, Lillian Anaya did not generally enjoy similar authority.

True, Lillian Anaya had a government credit card on which she could make $25,000.00 transactions, but she had very little, if anything, to do with making decisions regarding what to buy. Moreover, nothing suggests that she played a role in shaping LANL's goals, mission, or purposes – not even those dealing with the budget in her division. While CBS maintains that Lillian Anaya enjoyed a great deal of informal authority because her supervisors gave her "free reign" over the purchasing team to which she belonged, see CBS's 30(b)(6) Brief at 10-11, none of Lillian Anaya's

possible informal authority within her purchasing team is authority that a public official would enjoy.

CBS has also argued that Lillian Anaya's "Q-Level" security clearance suggests that she is a public official. There is evidence in the record, however, that janitors, and sometimes grounds-keepers at LANL receive the same level of clearance, and that Lillian Anaya's clearance was based on the location of her office rather than on her access to any highly classified information. See Strickler Depo. at 38:1-14. Thus, she does not appear to have been influential in LANL affairs and policies, much less in those of the United States government.

> **B.     THE PUBLIC DID NOT HAVE AN INDEPENDENT INTEREST IN THE QUALIFICATIONS AND PERFORMANCE OF LILLIAN ANAYA BEYOND THE GENERAL PUBLIC INTEREST IN THE QUALIFICATIONS AND PERFORMANCE OF ALL GOVERNMENT EMPLOYEES.**

Beyond the normal concerns about the qualifications of all government employees, the public does not have an independent, particularized interest in the qualifications of a procurement assistant at LANL. An independent public interest must usually stem from the fact that the particular office puts its holder in a position to influence policy, to make decisions that impact the public in more than a non-direct way, or to operate in a way that is visible to the public.

The Supreme Court and Tenth Circuit cases discussing public officials illustrate this point. For example, the plaintiff in Revell v. Hoffman was a public official because he had a thirty-year career in the FBI in high-echelon positions. See 309 F.3d at 1230. The school board members in Garcia v. Board of Educ. of Socorro Consol. School Dist. were elected officials who had direct responsibility over the policies which the Tenth Circuit characterized as having "the utmost importance to a community, [with school board policies . . . often [being] carefully scrutinized by residents." 777 F.2d at 1408. In Gray v. Udevitz, a street-level police officers was found to be a

public official because such officers are highly visible, are able to exercise force over citizens, and, if they abuse their authority, may deprive citizens of fundamental constitutional rights. See 656 F.2d at 591. Each of the examples from the Tenth Circuit involves a plaintiff or set of plaintiffs who was elected, or who was involved in law enforcement – which involves direct and visible interaction and the ability to apply the force of government – and/or high echelon, high profile positions. Importantly, those appearing to have comparably modest positions – the street level police officer and the school board members – were either directly involved in policy or in enforcing the law, and were highly visible.

The same cannot be said of Lillian Anaya as procurement assistant. The public obviously has a generalized interest in how tax dollars are spent, and the qualifications of one who wields a government credit card – and there are untold numbers of such employees – should include honesty and competence sufficient and relevant to the position. But those are the qualifications that run with every government job. Nevertheless, the public's interest in how tax dollars are spent is more likely to be directed at those who get to choose how such tax dollars are spent rather than at someone as far down the bureaucratic chain-of-command as a procurement assistant, whose job is to ministerially carry out the nuts-and-bolts aspects of purchases that have already been devised, approved, and budgeted by others. The only reason someone occupying such a job would ever become newsworthy for the manner in which he or she carried out that job is if the person were accused of wrong-doing. And even then, the Court believes that the wrong-doing would have to be of a particularly egregious or interesting nature. Although neither party has offered evidence one way or the other, the Court is confident that government procurement or purchasing employees have slipped-up in the past, and have been fired or reprimanded without creating a ripple in the public consciousness.

What makes Lillian Anaya's case interesting to the public is that the circumstances were so unusual, and that they were viewed as part of a pattern of abuse allegedly going on at LANL. Even then, most of the media reporting on the Mustang controversy did so only as part of a broader inquiry into shortcomings in management control. The public surely had some concern that those abusing government purchase cards would be punished, but more central, and more newsworthy were the allegations that LANL officials and UC were not in control of such matters, and that LANL officials were trying to cover up problems rather than deal with them.

The Supreme Court's statement that a public official's position is one "which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrut[iny] and discussion occasioned by the particular charges in the controversy," Rosenblatt v. Baer, 383 U.S. at 86 n.13, applies to these circumstances. The allegations regarding the Mustang sparked some public interest, and CBS saw the story as worthy of national attention and appears to have ridden the story the longest and the hardest. Even so, that interest by the public is intimately tied to and inseparable from the particular charges in the controversy, and there is no independent reason why Lillian Anaya would be the object of public scrutiny.

CBS attempts to analogize to the facts of Gray v. Udevitz by pointing out that, like the use of force, which, in part, was determinative in finding that a police officer was a public official, government taxing power and expenditure of taxpayer funds is "peculiarly governmental" and highly charged with the public interest. Gray v. Udevitz, 656 F.2d at 591. Moreover, CBS argues that, like the policeman who was a member of the public force that interacted with the public, see id., Lillian Anaya was "a point of contact for those who sold goods to the Lab." Resume at 2.

While these analogies have merit, there are differences between the police officer in Gray v. Udevitz and Lillian Anaya that counsel against treating both as if they were the same. First,

although it is true that taxation and expenditure of public funds, like police force, are highly charged with public interest, Lillian Anaya had nothing to do with taxation, and her involvement with the expenditure of tax funds was in a bureaucratic capacity. Furthermore, her service as a point of contact to vendors did not lend her visibility comparable to a police patrolman, who is ubiquitous, and who interacts with and has authority over members of the public. No one has argued, for example, that Lillian Anaya had authority to compel members of the public to do anything.

CBS cites lower court cases from various jurisdictions as authority for the notion that a purchasing agent is almost always a public official. For example, Rusack v. Harsha, a case to which both parties have given some attention, the United States District Court for the Middle District of Pennsylvania held that a "Supervisory Contract Negotiator," who had the authority to enter into contracts on behalf of the United States and was one of eleven individuals with buying and contracting officer authority at the United States Navy Ships Parts Control Center, was a public official. 470 F. Supp. at 293 & 298. The district court reached such a conclusion because the plaintiff, pursuant to his position, was "intimately involved in the expenditures of public funds, a matter of great importance so that there is an interest in his qualifications and performance beyond the interest which might be associated with any governmental employee." Id. at 298.

The Court agrees that being intimately involved with the expenditure of public funds would likely weigh in favor of finding that a person is a public official. The Court believes, however, that a mere purchaser is not intimately involved with the expenditure of public funds in the sense that would justify a public interest in his or her qualifications beyond those associated with any government employee. Someone truly having an intimate association with spending government funds should have some say regarding on what government funds should be spent, and on budgetary decisions. To the extent that Rusack v. Harsha says otherwise, the Court rejects it. The Court does

not believe that someone like Lillian Anaya, whose job was to order items that others requested, after receiving approval from those with authority over budgetary issues, can be said to be intimately involved in spending.

The Court is not convinced that the other cases CBS cites to show that purchasing agents are public officials can be read to compel a finding that Lillian Anaya is a public official.  First, none of the cases discussing purchasing agents are controlling authority, given that they come from various state courts.  Second, most of the state-court cases are distinguishable.  The maintenance supervisor in Clawson v. Longview Publishing Co. had not only purchasing authority, but also supervisory authority.  See 589 P.2d at 1227.  Nothing in the case suggests that the supervisor was limited in his purchasing authority in the same way as Lillian Anaya, who could process orders only that others placed.  The county purchasing agent in Fergusen v. Union City Daily Messenger, Inc. had "substantial responsibility for and control over the conduct of the financial affairs of the County. . . ."  845 S.W. 2d at 162 & 167.  Unlike that county purchasing agent, Lillian Anaya had no substantial control over LANL financial affairs.  She had no control over financial affairs beyond the ability to process orders from requestors.  In other words, someone else decided on what to spend money, and Lillian Anaya then followed through with the transaction.  The control she exercised was largely over the logistics of the transactions into which she was authorized to enter.  The town clerk in Barnett v. Mobile county Personnel Board had "substantial responsibility for, or control over, the conduct of government."  536 So. 2d at 47 & 54.  Again, there is no realistic argument that Lillian Anaya's procurement job at LANL placed her in a position to influence, much less substantially control, the conduct of government affairs.  Furthermore, Lillian Anaya did not make decisions that directly affected workers.  See Peterfish v. Franz, 424 N.W. 2d at 25.  While some junior colleagues may have, given her many years of experience,  viewed her as a mentor or

an unofficial source of authority, Lillian Anaya did not have authority to supervise anyone.

The Court recognizes that not all of the cases CBS cites can be easily distinguished.  The state university purchasing agent in <u>Davis v. Borskey</u> appears to have had authority similar to that of Lillian Anaya.  <u>See</u> 660 So. 2d at 21.  Nevertheless, the Court does not agree that an individual who can process only requisitions or orders that others prepare, and who has no supervisory or policy role in government, can be considered a public official for purposes of the First Amendment.

Thus, when gauged against the framework which the Supreme Court has provided, and upon which the Tenth Circuit has elaborated, the Court finds that Lillian Anaya was not a public official for purposes of the First Amendment.

## II.   LIILIAN ANAYA WAS NOT A PUBLIC FIGURE BEFORE JUNE 2003, BUT BECAME ONE THEREAFTER.

While there has been some argument about the proper test that the Court should adopt to answer the question whether Lillian Anaya was a limited-purpose public figure, the Court believes it is unnecessary to adopt any of the tests from the other circuits.  Instead, the general principles that the Supreme Court has articulated, and upon which the Tenth Circuit has relied, will suffice to provide guidance in this case.  Under those principles, the Court finds that Lillian Anaya was not a public figure at the time of the November 2002, December 2002, and February 2003 broadcasts.  After Lillian Anaya began, through her lawyer, to court the press in a concerted effort to publicize exonerating evidence, she thrust herself into the fray in such a way that she became a public figure by the time of the October 2003 and April 2004 broadcasts.

### A.   THE TESTS FROM THE OTHER CIRCUITS.

All of the tests that have risen out of the circuit courts constitute attempts to synthesize the holdings of the short list of cases in which the Supreme Court has given guidance on how to

-73-

determine if someone is a public figure.  While such tests may constitute useful analytic frameworks, they sometimes take on a life of their own and become unmoored from the original intent of the Supreme Court cases that they attempt to represent.  More importantly, given that the Tenth Circuit has seen fit to apply the principles from Gertz v. Robert Welch, Inc. – and the refinements expressed in the later cases – without the other circuits' multi-factored tests, the Court will do the same.

### B.    LILLIAN ANAYA'S PUBLIC-FIGURE STATUS UNDER GERTZ v. ROBERT WELCH, INC.

A limited-purpose public figure is someone "who thrust [his or her self] to the forefront of particular public controversies in order to influence the resolution of the issues involved." Gertz v. Welch, Inc., 418 U.S. at 345.  In determining a plaintiff's status, the Supreme Court stated: "[I]t is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." Gertz v. Welch, Inc., 418 U.S. at 352. The Court will therefore analyze Lillian Anaya's participation in the public controversy, and the extent to which she subsequently attempted to thrust herself to the forefront and influence the resolution of the controversy.

### 1.    Before June 2003.

Before June 2003, CBS ran three broadcasts in which Lillian Anaya or the allegations regarding the Mustang were mentioned.  By the time of the first broadcast, which appeared on November 22, 2002, the press had already been covering LANL's "property control" controversy – as CBS has called it.  Besides New Mexico papers, such as the Albuquerque Journal and Los Alamos Monitor, which arguably have a limited reach, LANL's problems were being reported in the Associated Press and in on-line publications.  Although it may not have been the most prominent

story, it was receiving attention and was the subject of debate. Moreover, although Lillian Anaya was not named in the early press, her role in the controversy was being discussed in the numerous references to the attempted purchase of a Mustang using a government purchase card. Admittedly, the controversy was not defined as whether Lillian Anaya bought a Mustang on a government credit card, but is probably more fairly characterized as a controversy about LANL management not having control over misuse of resources, including purchasing cards.

The parties have dedicated considerable effort to arguing what the proper scope of the controversy is, and have defined it either very broadly or very narrowly, depending on their interests. For the most part, Lillian Anaya has sought to cast the controversy in narrow terms, which works in favor of her argument that she is not a public figure. CBS characterizes the controversy as multilayered, or generally in more broad terms because it believes that such a characterization bolsters its contention that Lillian Anaya is a public figure. As the months slipped by, and more information came to light, the controversy came to involve accusations that LANL was instigating a cover-up by firing its internal investigators, as well as DOE investigations, and Congressional attention. Nevertheless, the Court agrees with CBS' argument, in that regard, that what is important to this case is that there was a controversy that had many layers, but that it all revolved around fraud and mismanagement at LANL.

The main focus of the public-figure inquiry is not on the nature of the public controversy. See Gertz v. Robert Welch, Inc., 418 U.S. at 346 ("The 'public or general interest' test for determining the applicability of the New York Times standard to private defamation actions inadequately serves both of the competing values at stake."). Nevertheless, in Time, Inc. v. Firestone, the Supreme Court noted: "dissolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in Gertz, even though the marital difficulties of extremely

wealthy individuals may be of interest to some portion of the reading public."  424 U.S. at 454.

Thus, apparently, the Supreme Court recognizes that, while in Gertz v. Robert Welch, Inc., limited-purpose public figures are those that "thrust" themselves to the forefront of "particular public controversies," 418 U.S. at 345, not every controversy counts as a public controversy.  Even so, the Court finds no difficulty in finding that a controversy about purchase-card misuse and mismanagement at a major government facility is the "sort of 'public controversy' referred to in Gertz."  Time, Inc. v. Firestone, 424 U.S. at 454.  Allegations of fraud at LANL are much different than tabloid-style reporting about the essentially private disputes of wealthy or highly visible members of the entertainment community.

Having determined that this story is the brand of "public controversy" that the Supreme Court meant in Gertz v. Robert Welch, Inc., the Court now turns to what it believes to be the more central question: did Lillian Anaya thrust herself into the forefront of the public controversy in an effort to affect the outcome?  The Court determines that, before June 2003, she did not.

It appears undisputed that, before June 2003, Lillian Anaya avoided the press.  CBS attempted to contact her and interview her, but, upon the advice of her criminal defense lawyer, and also out of sadness or shame, she chose to decline CBS' requests and to avoid contact with the media in general.  The debate about the problems at LANL therefore raged on, with accounts of whistle blowers, cover-ups, fraud, and suspicious or unmonitored use of government credit cards. High-ranking officials were involved, and many newspapers spoke out – and sometimes critically – about what was going on at LANL.  The story of the Mustang was woven into many of the news reports, and, perhaps, the Mustang became somewhat of a symbol of corruption or a lack of control. Moreover, there was a sharp debate between LANL officials and its most outspoken critics – Doran and Walp, who had been fired, they say, for doing too good a job uncovering fraud and

incompetence.

Yet throughout all of that controversy, and even after she was named and a detailed story about her alleged misdeeds was run on the air, Lillian Anaya played no part in the public resolution of the controversy. She did not attempt to take a side in the debate about what was wrong at LANL, and, although she was a purchase-card holder, she did not express an opinion either in defense of or critical of any important constituents in the public debate. Furthermore – if the Court is going to define the controversy more narrowly to whether she was making corrupt purchases – Lillian Anaya did not even attempt to exonerate herself or come out to influence a public determination whether she used her position of trust in the government to commit fraud. Under those circumstances, it is not possible to say that Lillian Anaya thrust herself to the forefront of the public controversy. Rather, she stayed out of the debate – however broadly or narrowly that debate is defined – entirely.

The Court believes that, at least until June 2003, this case presents circumstances similar to those in Gertz v. Welch, Inc.: "[Gertz] never discussed either the criminal or civil litigation with the press and was never quoted as having done so. He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence the outcome." 418 U.S. at 353. Like Gertz, Lillian Anaya declined to participate in the media's discussion of the controversy. She did not go on record, grant interviews, make appearances in the media, or give her opinion or version of the story. Nor did Mr. Cron, her criminal defense attorney. Thus, it would be unfair and against common sense to say that she "thrust herself into the vortex." In fact, if her testimony is to be believed, and the Court should assume so for the purposes of this motion, she desired to avoid the media, and instead withdrew herself from their reach.

Nevertheless, CBS argues that a plaintiff need not court the media to become a limited-

purpose public figure.  See Reply at 28.  To bolster this argument, CBS cites case law for the proposition that it is enough for a plaintiff to have "voluntarily engaged in a course that was bound to invite attention and comment."  Reply at 31 (quoting Rosanova v. Playboy Enters., Inc., 580 F.2d 859, 861 (5th Cir. 1978)).  For example, in Lohrenz v. Donnelly, 350 F.3d 1272 (D.C. Cir. 2003), the plaintiff was one of the first women to serve in the United States Armed Forces as a combat pilot.  She sued for defamation regarding statements that had been made about her competence as a pilot.  The D.C. Circuit held that her decision to become a combat pilot gave her special prominence in the controversy about women in combat.  See id. at 1282.  The voluntary act of becoming a combat pilot, and not the act of seeking press attention, was what made her a "voluntary" public figure.  Id.

As another example, a plaintiff who was the director of the judicial affairs of a university sued for defamation arising out of statements regarding his past legal difficulties.  See Fiacco v. Sigma Alpha Epsilon Fraternity, 484 F. Supp.2d 158, 164-65 (D. Me. 2007), aff'd, 528 F.3d 94 (1st Cir. 2008).  The United States District Court for the District of Maine found sufficient voluntariness in the plaintiff's acceptance of his employment.  See 484 F. Supp.2d at 172.

While CBS characterizes the approach taken by these cases as a "middle ground" between Dameron v. Washington Magazine, Inc. and Lillian Anaya's contention that publicity-seeking is required for limited-purpose public-figure status, the Court reads them as straying from the original intentions articulated in Gertz v. Robert Welch, Inc. and its progeny.  Gertz v. Robert Welch, Inc. and the Supreme Court cases interpreting it concentrated on whether the plaintiffs attempted to use the same tools of media coverage that were being used against them to influence the outcome of the controversy.  Any job could, under the right circumstances, become the center of media attention, even if the job itself is non-illustrious or uninteresting.  To find that merely accepting the job is

-78-

enough to constitute "voluntary" entrance into the vortex in the event that the employee becomes accused of something in which the media decides to take interest would take the public-figure doctrine to a place that the Supreme Court did not intend it.  The Court believes that more must be shown to prove voluntary entrance into the fray, and, unless someone accepts a high-profile job, or some other position that, by its nature, perhaps acts as a lightning rod to controversy, the Court finds that defendants must usually show that the plaintiff has sought to influence public debate by seeking publicity.

The facts of this case illustrate the problem of a finding that Lillian Anaya became a limited-purpose public figure by voluntarily accepting her job.  CBS notes that she "pursued a course of conduct that was likely to invite attention."  Reply at 32.  Such an argument, however, assumes the truth of CBS' version of events.  CBS argues that Lillian Anaya played a direct role in procurement and purchasing at LANL, and that she had "considerable authority as one of the Lab's senior purchasers and its most active purchase cardholder."  Id.  Moreover, according to CBS, her controversial conduct – her purchasing authority and her making of purchases that were bound to invite scrutiny aside from the alleged Mustang – suggest that she could have expected to become the focus of controversy.  See id.

First, this argument exaggerates Lillian Anaya's importance at LANL.  The only reason the public would likely care about her would be if she engaged in major wrongdoing.  Independent of the accusations against her in this case, it is doubtful that anyone – her included –  would consider the position of procurement assistant at LANL a job that was bursting with potential for public controversy.

Second, and more important, the argument verges on presupposing that Lillian Anaya acted wrongfully or in a controversial manner.  In other words, it assumes the public accusations regarding

her improper purchasing behavior are true.  On this motion for summary judgment, the Court will make all reasonable inferences in Lillian Anaya's favor.  Thus, the Court will not assume that Lillian Anaya engaged in wrongdoing or controversial practices, given that those issues are in dispute, and given that Lillian Anaya has marshaled evidence to support her contentions.  The most the Court can say is that Lillian Anaya accepted the job, and after years of eventless carrying out of her limited functions, she was accused of a particularly egregious brand of fraud.  That accusation, alone, is not enough to find that she thrust herself into the vortex voluntarily.

If the Court were to accept CBS' arguments, and the case law that it cites for the proposition that Lillian Anaya's participation in her job, coupled with purchases that became the subject of public scrutiny and debate, represent her thrusting herself to the forefront and  voluntarily inviting public debate, it would do so in the face of contrary Supreme Court authority.  In Hutchinson v. Proxmire, the district court had found that the plaintiff was a public figure because of his "long involvement with publicly-funded research, his active solicitation of federal and state grants, the local press coverage of his research, and the public interest in the expenditure of public funds on the precise activities in which he voluntarily participated."  Hutchinson v. Proxmire, 443 U.S. at 120. In other words, according to the district court, independent of the defamation, he had invited public debate, because he voluntarily solicited grants and performed researched that invited press coverage.

The Supreme Court in Huchinson v. Proxmire rejected the lower court's approach and held that the plaintiff was not a public figure.  First, Hutchinson's research and writing only became the subject of public controversy because of the alleged defamation – in his case, the conferral of the Golden Fleece Award.  See id. at 135.  "Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."  Id. (citing Wolston v. Reader's Digest Assn., Inc., 443 U.S. at 167-68).  Second, Hutchinson "did not thrust himself or his

views into public controversy to influence others." Hutchinson v. Proxmire, 443 U.S. at 135.  Third, "Hutchinson at no time assumed any role of public prominence in the broad question of concern about expenditures [the subject of the defamation]." Id.

The Court believes that Lillian Anaya, like Hutchinson, cannot be considered a public figure merely because of her voluntary participation in government spending or even participating in controversial purchases.  That would lead to the bootstrapping problem identified in Hutchinson v. Proxmire.  It is true that part of the rationale under Gertz v. Robert Welch, Inc. is that public figures assume certain risk of having to face public scrutiny and criticism, but it is also clear from the case law that they do so – at least in the context of limited-purpose public-figure status – by joining the scuffle of public debate, and using the tools of communication to make their view known and persuade the public to believe it.  Imbuing otherwise private figures with public-figure status just because they took a job or undertook an activity that, at some point, either because of misbehavior or because of the whim of the public or the media, becomes a hot topic or a matter of public debate, does not further that rationale.  Rather, CBS' position allows the media to stir a controversy about people, possibly defame them, then create its own defense by arguing that the plaintiffs should have known their conduct would draw a media debate.  And the evidence that the media offers for that proposition is the fact that they were drawn to the conduct and felt it important to debate it.  That is bootstrapping, and the Court rejects CBS' arguments on that issue.

By so holding, the Court does not imply any judgment about what is or is not worthy of media attention or public debate.  The Court recognizes that part of the overall point of Gertz v. Robert Welch, Inc. is that the Court should not, and most likely cannot, make that call.  Nonetheless, the overall command of Gertz v. Robert Welch, Inc. is that a court must scrutinize the plaintiff's behavior to determine whether the plaintiff, in response to debate surrounding a controversy in

which the plaintiff is a participant or notable figure, attempts to jump to the fore and influence public opinion in favor of his or her view.

Time, Inc. v. Firestone and Wolston v. Reader's Digest Ass'n, Inc. are also instructive.  In both, the plaintiffs engaged in voluntary conduct that was bound to invite public debate or scrutiny. In Time, Inc. v. Firestone, a wealthy heiress to the tire fortune sought a divorce and traded voluminous salacious accusations with her soon-to-be ex-husband in the process.  Moreover, she held press conferences "in an attempt to satisfy inquiring reporters."  424 U.S. at 455 n.3.  These press conferences did not make her a public figure, because her participation in those press conferences had "no effect upon the merits of the legal dispute between respondent and her husband or the outcome of that trial," and "there [was] no indication that she sought to use the press conferences as a vehicle by which to thrust herself to the forefront of some unrelated controversy in order to influence its resolution."  Id.  Lillian Anaya's job, and her potentially controversial expenditures, aside from the Mustang, would be no more predictable media draws than an ugly celebrity divorce.  Furthermore, Lillian Anaya did not hold press conferences.  She therefore took fewer voluntary steps to the fore than Ms. Firestone-Sullivan did.

Likewise, given that failure to answer a grand-jury subpoena related to charges of espionage does not constitute voluntary activity that makes it possible for a court to find that someone has thrust himself to the forefront of a public controversy, see Wolston v. Reader's Digest Assn., Inc., 443 U.S. at 166-67, Lillian Anaya's job and conduct on her job make such a finding less supportable.  Like the plaintiff in Wolston v. Reader's Digest Association, Inc., Lillian Anaya "was dragged unwillingly into the controversy."  Id.

Finally, the Tenth Circuit case law further supports a finding that, before June 2003, Lillian Anaya was not a public figure.  In Lawrence v. Moss, the Tenth Circuit stated: "A private individual

is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. . . .   A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of New York Times [Co.] v. Sullivan."   639 F.2d at 637 (quoting Wolston v. Reader's Digest Assn., Inc., 443 U.S. at 166-67)(ellipsis in original).  The plaintiff in Lawrence v. Moss was a campaign worker for Orrin Hatch, but his activities were in the "background and concerned with administrative organization." Lawrence v. Moss, 639 F.2d at 637.  He did not thrust himself into public prominence in Utah, did not make speeches, radio, or television appearances, and did not write for public consumption.  See id.  He participated "inconspicuously in political activity designed to influence an election."  Id.

Independent of the defamatory accusations made against her, Lillian Anaya's activities were even less calculated – and less likely – to influence the outcome of the public debate.  Like the plaintiff in Lawrence v. Moss, she made no speeches, no media appearances, and exerted no influence over the public debate about the problems at LANL.  She was an administrative functionary, and when she and other purchase-card holders became elements of the debate about fraud and incompetent management at LANL, she chose to remain faceless even as accusations were made against her.  She submitted herself to the investigation against her, then quietly took her administrative leave and allowed the debate about LANL, and, after CBS began publicizing her name, about her, to continue without influence from her.  She was not automatically transformed into a public figure just because she became associated with a matter that attracted public attention.

Examination of the other Tenth Circuit cases supports this result.  In Schwartz v. American College of Emergency Physicians, the Tenth Circuit defined a limited-purpose public figure as "a person who voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."  215 F.3d at 1145.  Applying that definition,

the Tenth Circuit had no trouble holding that a "nationally-recognized pioneer in the professionalization of the field of Emergency Medicine, . . . a nationally recognized author in the Emergency Medicine profession who is editor-in-chief of a leading textbook used in medical schools nationwide, a scholar and researcher in the Emergency Medicine field," who "did not dispute that he had deliberately injected himself in the public controversy," was a public figure.  215 F.3d at 1145.

In World Wide Ass'n of Specialty Programs v. Pure, Inc., the Tenth Circuit similarly defined "limited-purpose public figures" as those who "voluntarily inject [themselves] into a particular public controversy and thereby become[] public figure[s] for a limited range of issues." 450 F.3d at 1136 (citations omitted)(brackets in original).  The plaintiff in World Wide Ass'n of Specialty Programs v. Pure, Inc. was an association of residential treatment centers for troubled youth, which marketed member schools to interested parents and frequently made public comments regarding the effectiveness of its member schools' methods – about which methods there was evidence of numerous news accounts and a healthy public debate.  See id.  Although the Tenth Circuit appeared to be applying a Utah test, it ended up quoting language from Gertz v. Robert Welch, Inc. to state that the association "thrust [itself] to the forefront of [this] public controvers[y] in order to influence the resolution of the issues involved."  Id. (internal quotation marks and citations omitted)(brackets in original).

The Court notes that the Tenth Circuit in Schwartz v. American College of Emergency Physicians quoted language from Gertz v. Robert Welch, Inc. that leaves open the possibility of an "involuntary public figure" in defining such a figure as "a person who voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."  215 F.3d at 1145.  Moreover, CBS has made some argument that the possibility

-84-

of an involuntary limited purpose public figure is well-established, and that Lillian Anaya may qualify for such status because, even if by no fault of her own, she became an emblematic and central figure to a heated and widespread public debate.

There has been a healthy scholarly and legal dialogue concerning whether the involuntary limited-purpose public figure has become a dead letter since Justice Powell originally suggested the existence of such a figure in Gertz v. Robert Welch, Inc.  Compare Mark L. Rosen, Media Lament –The Rise and Fall of Involuntary Public Figures, 54 ST. JOHN'S L. REV. 487, 502-03 (observing that Time, Inc. v. Firestone and Hutchinson v. Proxmire "made all but extinct the concept of 'involuntary' public figures," and that Wolston v. Reader's Digest Association constituted "further, if not conclusive evidence of the demise of the involuntary public figure"); Schultz v. Reader's Digest Ass'n, 468 F.Supp. 551, 559 (D.C. Mich 1979)("The continued vitality of this classification is called into serious question by the opinion in Firestone.")(emphasis added); Revival of Involuntary Limited-Purpose Public Figures, supra at 317-19 ("In light of [Firestone, Hutchinson, and Wolston]) with Dameron v. Washington Magazine, Inc., 779 F.2d at 736 (altering the D.C. Circuit's three-part test for limited-purpose public-figure status to accommodate the possibility of an involuntary public figure).

In addition, the merits of allowing for an involuntary public figure have also been discussed. One author, for example, predicted that the demise of the involuntary public figure would portend "an increase in media self-censorship, an increase in the number of defamation actions and their attendant costs, first amendment forum shopping, and the demise of the use of summary judgment in these actions."  Rosen, supra at 505.  See W. Wat Hopkins, The Involuntary Public Figure: Not So Dead After All, 21 CARDOZO ARTS & ENT. L. J. 1, 46-47 (arguing that the plurality in Rosenbloom v. Metromedia, Inc. had it right because "the discussion of individuals is peripheral to

the discussion . . . of issues of importance to the society" and, given that "we are all public men,"

the notion that some have exposed their lives to public inspection while others have not is a legal

fiction).  On the other hand, it has been argued that the notion of an involuntary public figure, at

least as it is explained in Dameron v. Washington Magazine, Inc., is inconsistent with the policy

underlying the public-figure doctrine.  See Revival of Involuntary Limited-Purpose Public Figures,

supra at 321 ("[U]ntil the Supreme Court changes the balance it has struck between first amendment

protection of public debate and protection of private interests, the lower courts should not attempt

to fit plaintiffs into the illusive category of involuntary public figures, but should concentrate their

analyses on whether the plaintiff has voluntarily assumed the risk of public scrutiny and whether the

plaintiff has access to effective channels of communication.").

       While the parties have engaged in this larger debate about the continuing viability of the

"involuntary" limited purpose public figure in the briefing of this case, the Court does not believe

it is necessary to find that the involuntary public-figure doctrine is dead to find that Lillian Anaya

does not qualify as such a figure.  The Supreme Court, in mentioning the hypothetical involuntary

public figure, did not define such a figure's characteristics besides noting that such figures would

be "exceedingly rare."  Gertz v. Robert Welch, Inc., 418 U.S. at  345.  In the Court's view, if the

plaintiffs in Gertz v. Robert Welch, Inc. and its progeny did not represent the exceedingly rare

involuntary public figure, Lillian Anaya does not.  At least in the cases of Gertz and Ms. Firestone,

both enjoyed at least some prominence in their respective spheres.  One was a lawyer active in his

community, "well known in some circles," and had published books and articles on legal subjects.

Gertz v. Robert Welch, Inc., 418 U.S. at 351-52.  The other was a wealthy member of a social

register in Palm Beach, had her own clipping service to keep track of all of the publicity that she

received, and held press conferences. Even then, the press could not assume that those plaintiffs,

either voluntarily or involuntarily, were public figures. Given the Supreme Court's treatment of the plaintiffs in those cases, an involuntary public figure therefore must likely be someone who, albeit involuntarily, gains such public notoriety and/or fame that it no longer makes sense to treat him or her as a private figure. See Note, An Analysis of the Distinction Between Public Figures and Private Defamation Plaintiffs Applied to Relatives of Public Persons, 49 S. CAL. L. REV. 1131, 1206 ("[S]omething in addition to apparent prominence would seem to be required. Perhaps the Court intends that Plaintiffs become involuntary public figures only if they have attained widespread prominence, albeit involuntary, prior to the publication of defamatory statements."). The Court therefore finds that, before June 2003, Lillian Anaya was not a public figure, voluntary or involuntary.

> **2.** **In June 2003, Lillian Anaya Thrust Herself to the Forefront of the Public Controversy.**

In June 2003, LANL released the results of investigations that tended to exonerate Lillian Anaya. It was at that time that Lillian Anaya changed her approach to the controversy and began injecting herself into the fray in an attempt the influence the outcome. As a result, Lillian Anaya became a public figure before the last two CBS broadcasts.

The touchstone of the limited-purpose public-figure inquiry is "whether a plaintiff has "thrust [herself] to the forefront of particular controversies in order to influence the resolution of the issues involved." Gertz v. Robert Welch, Inc., 418 U.S. at 345. The Court believes that, under this basic definition that the Supreme Court has articulated, Lillian Anaya joined the ranks of public figures in June 2003. The evidence shows that, as LANL was preparing to announce the wrong-number theory, Lillian Anaya and Mr. Cron, her criminal defense attorney, were also preparing to take the offensive in the media and to implement a strategy calculated at publicizing the results in the light

most favorable to her.  Before the exonerating press release was published, Lillian Anaya and Mr.
Cron were allowed to review it and make comments. Moreover, Mr. Cron made clear that the
exoneration should be made equally as public as the humiliating accusations.  More important, Mr.
Cron has testified: "Once I knew that the press release from the lab was going to be a reality, I
regarded it as my job to try to get them to agree to put things to Lillian in the most favorable light
in the context of what I told you earlier about trying to get information out to the public if there ever
was going to be a news story."  Cron Depo. 64:21-25.  Thus, it is evident from the testimony of
Lillian Anaya's criminal defense lawyer that they were poised to enter the debate in an attempt to
push their version of events.

          And, in accordance with their desire to publicly clear Lillian Anaya's name of wrongdoing
and restore her reputation, Mr. Cron began using the media.  He gave numerous interviews and
appeared in articles by the Associated Press, the Albuquerque Journal, and the Oakland Tribune.
Mr. Cron also made radio appearances.  This media exposure was more than "an attempt to satisfy
inquiring reporters." Time, Inc. v. Firestone, 424 U.S. at 455 n.3.  Rather, unlike Ms. Firestone,
whose press conferences had "no effect upon the merits of the . . . dispute," id., Mr. Cron was
exchanging blows with detractors and pushing the story that exonerated Lillian Anaya.

          Lillian Anaya and Mr. Cron's strategy is evident in the nature of the statements that Mr. Cron
made to the media.  He told the Associated Press, for example: "When you stand back and look at
this, it's nonsensical that she would have ever tried to have bought such a thing."  Exhibit 8 to Cron
Depo., Leslie Hoffman, Los Alamos Exonerates Employee Accused of Charging Car to lab credit
Card, ASSOCIATED PRESS, June 26, 2003.  He further explained to the Associated Press that his
client was well-versed in LANL-procurement rules and would never have attempted such an
outlandish purchase.  See id.  He drew attention to the fact that she had a thirty-year "stellar

-88-

performance" at LANL.  Id.

Mr. Cron also took aim at Senator Grassley, who disbelieved the wrong-number theory and was calling for more accountability at LANL.  See Exhibit 15 to Cron Depo., Adam Rankin, Senator Questions LANL About Mustang, ALBUQUERQUE JOURNAL at 2, October 18, 2003.  Mr. Cron stated: "It's clear to me . . . that Senator Grassley's office doesn't know what the facts are," and "[i]t looks to me there are too many uninformed people filtering the information to the Senator."  Id.  All of these statements, and the various others that Mr. Cron made in Lillian Anaya's defense, were calculated at addressing the merits of the Mustang allegations.  Furthermore, as Mr. Cron spoke out in support of LANL's report and its wrong-number theory, he was implicitly endorsing LANL's side of the larger public controversy of whether the problems at LANL were as bad as the whitle blowers portrayed them to be.

Although it is true that Lillian Anaya was not giving interviews, the Court believes that Mr. Cron's media efforts can fairly be imputed to her.  Mr. Cron's billing statements referred to "conferences . . . regarding media," "public relations," and "prepar[ation] for media contact; phone conferences with several newspapers reports."  July Billing Statement at 2-3.  There is no contention that Lillian Anaya disapproved of or refused to pay these bills.  Moreover, Lillian Anaya's deposition testimony makes clear that she authorized Mr. Cron's media work and that he was representing her in the media.  See April 22 Anaya Depo. at 107:20-108:3.

In finding that Lillian Anaya became a public figure after June 2003, the Court does not hold that the mere act of talking to the media is what makes the difference.  The Court recognizes that the Supreme Court rejected such a stark approach in Time, Inc. v. Firestone, see 424 U.S. at 454 n.3 ("Nor do we think the fact that respondent may have held a few press conferences during the divorce proceedings in an attempt to satisfy inquiring reporters converts her into a 'public figure.'").  Lillian

Anaya's use of the press makes her a public figure because it was her vehicle for entering the public debate.  Defamation law reflects a struggle to strike a proper balance between two competing values of paramount importance: vigorous public debate and expression on the one hand, and "[t]he legitimate state interest [in] . . . the compensation of individuals for the harm inflicted on them by defamatory falsehood," which touches upon individual reputation and privacy.  <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. at 341.  Because of that delicate balance, plaintiffs in defamation cases may face a difficult choice: they can redress public injury to their reputation by using the tools of the media – in other words, fighting fire with fire – or they can proceed to court.  The Court believes, however, that when plaintiffs engage in a voluntary, extensive media campaign to counteract adverse publicity, there is a stronger justification for requiring that they show malice if they wish to also recover damages in a defamation suit.

The Supreme Court has stated that the distinction between public and private figures rests, in part, upon a normative concern that "that public figures are less deserving of protection than private persons because public figures, like public officials, have 'voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.'" <u>Wolston v. Reader's Digest Ass'n, Inc.</u>, 443 U.S. at 164 (citation omitted).  The rule serves as a guide to the media that, when they are dealing with someone who is non-public and who has not thrown himself into a public debate in an attempt to influence its outcome, they will not enjoy the protection of the actual-malice standard.  At the same time, when a person has joined the fight, and not only has access to, but uses the weapons of the media, which Lillian Anaya did, the media  has the right to operate under the assumption that First Amendment interests are at their maximum, and that rather than seeking redress in the court of law, the plaintiff seeks redress in the court of public opinion.  The Honorable James Harvey Wilkinson, circuit judge for the United States Court of Appeals for the Fourth Circuit,

has stated: "The [First] Amendment assumes that hard blows may be swapped in the search for just outcomes."  Rueber v. Food Chemical News, Inc., 925 F.2d 703, 711 (4th Cir. 1991).  Under those circumstances, those doing battle in the media should be able to operate on equal footing, and the ability to recover money damages in a defamation suit should be subject to the stricter standard of actual malice.

In light of those consideration, Lillian Anaya, through her lawyer, became a part of the debate and fought to influence the outcome by using the media.  Therefore, she must show actual malice regarding the alleged defamatory statements made in the October 2003 and April 2004 broadcasts.

The Court emphasizes that a plaintiff does not have to abstain from talking to the press to avoid becoming a public figure.  A plaintiff can talk to the press when the story breaks.  A plaintiff cannot be faulted when, as she is walking to her car in the parking lot and a reporter sticks a microphone in her face, she responds to the accusations or denies them.  The Court believes it is an entirely different situation, however, for a plaintiff to not respond to the media for several months, and then to deliberately begin a media campaign to counteract charges, actively seeking out the media.  The Court concludes that the timing, extensiveness, and nature of Lillian Anaya's media efforts, after such a long period of silence, counsel a finding that she voluntarily decided to change her status.

## III.   THERE IS SUFFICIENT EVIDENCE TO SUPPORT A FINDING OF ACTUAL MALICE ON SOME STATEMENTS BUT NOT ON OTHERS .

Lillian Anaya has alleged that many statements over the course of five broadcasts were defamatory.  She has not, however, provided sufficient evidence to permit a jury to find that CBS or Attkisson acted with actual malice in making the statements in the first three broadcasts.  The

Court finds, however, that there is evidence that CBS and Attkisson made some statements in the October 2003 and April 2004 broadcasts that they either knew, or should have known, were false.[16]

A.      NOVEMBER 27, 2002 BROADCAST.

Lillian Anaya complains about a single statement in the November 27, 2002 broadcast and a graph that CBS showed.  The statement was: "One worker, who had a million-dollar-a-month credit line, charged a custom Mustang vehicle to the taxpayers on her government credit card."  First Amended Complaint ¶ 33, at 8.  The graph line had the figure of $29,200.00, showing $20,000 for the Mustang and $10,000 for customized parts.

Attkisson's first broadcast on the purchasing and property-control controversy aired the day after she interviewed Walp and Doran.  See Attkisson Decl. ¶ 54, at 18.  The November 27, 2002 report focused on the termination of Wolp and Doran, and the allegations they were making. Specifically, Attkisson "wanted to tell the story of how Wolp and Doran – two of the Lab's investigators – had been fired while investigating alleged theft, frauds, and other crimes." Attkisson Decl. ¶ 57, at 18.  One of the most prominent allegations was Lillian Anaya's apparent Mustang purchase, and the broadcast reported on that allegation.  See id. ¶ 58, at 18.

Attkisson testified that, in reporting on the Mustang allegations, she attempted to stay as consistent as possible with how Wolp and Doran were describing the alleged incident.  She used a video clip from the Wolp and Doran interview the previous day.  See Attkisson Decl. ¶ 61, at 19. Wolp and Doran have testified that CBS, in this broadcast, reported accurately their statements and that they believed the broadcast was fully accurate.  See Wolp Decl. ¶ 42, at 11 (A2044); Doran

---

[16] The other broadcasts and internet stories to which Lillian Anaya refers in her complaint are repetitions of the allegations and reports made in the five main broadcasts.  The Court's analysis for statements made in specific broadcasts applies to the repetitions of those statements made outside the main broadcasts.

Decl. ¶ 43, at 10.

Attkisson contends that she believed that the facts relating to this allegation were essentially undisputed: Lillian Anaya, a trusted LANL employee, charged a Mustang on her purchase card. Under those circumstances, and given the sources upon which Attkisson relied, the Court cannot reasonably say that she either knew the story was false, or that showed reckless regard for the truth when she made the allegedly defamatory statements. She relied upon sources that were close to the controversy and that were likely to have inside information.

Lillian Anaya has argued that Attkisson violated her own journalistic standards by relying almost exclusively on whistle blowers, whom she should know are naturally going to be biased in their account. This argument overlooks the fact that Attkisson had in her hand a working copy of the external investigation report. The broadcast even featured a background graphic in which a page from the report was shown on screen. See Broadcast DVD at 2:23-34. Thus, Attkisson had a document in hand that was not the work of Doran or Walp, and that document provided corroboration for the Mustang allegations.

While the document lists the charges from All Mustang as "disbuted" on June 18, 2002, which was nearly a month before Doran and Walp became involved in the investigation, the Court is convinced that a journalist such as Attkisson could rightfully allow Doran and Walp to tell their story, and she could mention the Mustang allegations based on the testimony of Doran and Walp and the document listing a trail of charges to a Mustang dealer. While her self-serving testimony – as Lillian Anaya calls it – about her state-of-mind may not alone be conclusive, there is evidence for the conclusion that Attkisson did what journalists are entitled to do: she had what had the appearance of reliable sources, and she reported on them.

There is not sufficient evidence of malice regarding this broadcast, as a whole, or in any part.

Thus, Lillian Anaya will not be able to pursue punitive damages on statements made in the November 2002 broadcast.

### B.    DECEMBER 20, 2002 AND FEBRUARY 26, 2003 BROADCASTS.

Lillian Anaya urges the Court to find that the December 20, 2002 broadcast contained malicious statements because, given the manner in which it was presented and the combination of words and graphics that it contained, it gave the impression that Lillian Anaya was the biggest fraudulent spender of all.  The other allegedly offensive component consisted of footage of a Mustang, with the words "purchased by Lillian Anaya" in front of the footage.  Lillian Anaya maintains that Attkisson acted out of malice because shew knew, or should have known, that Anaya did not "purchase" a Mustang, but rather that one was charged, and the charges were stopped.  While the Court believes the words "purchased by Lillian Anaya" may be different than "allegedly charged," when viewed in context, it cannot reasonably be said that Attkisson was trying to push facts that she knew or should have known were false.  The bulk of the report was on the big-picture problem at LANL, and Lillian Anaya's Mustang charges, which appear in the report, were only a part of that overall context.  The manner in which Attkisson prepared the story is illustrative.

Over the several weeks following the first broadcast, Attkisson continued to follow the purchasing and property-control controversy and the various investigations into it – communicating with sources, reviewing documents from Wolp and Doran, and following other news coverage of the controversy. See Attkisson Decl. ¶¶ 74-78, at 24-25.  On December 19, 2002, she learned that LANL had released a report purporting to be an audit by the "External Review Team," which PwC assisted.  See id.  ¶ 81, at 26.  That day, Doran sent Attkisson two electronic mails -- one with LANL's press release about the external review report and the other with a Santa Fe New Mexican article about the report.  See id.  Doran included the following commentary:  "I hope whoever put

this report out or the people who had it put out are held accountable by a Congress, what a joke." Id. ¶ 82, at 26.

Thus, Attkisson continued to rely on Doran and Walp. Moreover, by the time of the December 20, 2002 broadcast, she had the results of the external review. There was no new information that would have tipped Attkisson off that she was wrong or that the allegations that she was reporting were false. The documentary evidence, coupled with the interview of Doran and Walp, gave a fair impression that Lillian Anaya made purchases from All Mustang totaling nearly $30,000.00. The actual-malice standard focuses on the defendant's state-of-mind, and in this case, the evidence that Attkisson provides suggests that she may have been zealous about the story, but that she did not cross journalistic lines, and her report, while obviously slanted against LANL, and to some extent against Lillian Anaya, did not contain anything that Attkisson knew, should have known, or believed, to be false.

Lillian Anaya again states that Attkisson's Declaration is self-serving, and should be discounted. Even with careful parsing and analysis of the December 20, 2002 broadcast, however, Lillian Anaya has not provided evidence that suggests Attkisson acted with malice. Without some evidence of that nature, given the clear-and-convincing-evidence standard, and the fact that it applies in a determination of summary judgment, the Court cannot permit the issue of malice to go to a jury. Because adequate evidence of actual malice has not been shown for the December 20, 2002 broadcast to put the issue to a jury, the Court will not allow Lillian Anaya to pursue punitive damages on the utterances in that broadcast.

The only change in circumstances between the December 20, 2002 broadcast and the February 26, 2003 broadcast is not one that will change the analysis. The focus of the February 26, 2003 broadcast is that Walp and Doran testified before Congress that day about the security and

fraud problems at LANL, and about the failure on LANL's part to investigate fully or bring charges against guilty individuals.  In other words, while no information came out to call into doubt the facts that Attkisson was reporting, her two main sources of information, Walp and Doran, were testifying under oath before Congress about the same accusations about which she had been reporting for months.  Again, Lillian Anaya does little more than point to some possible inaccuracies in the statement that she had a "million-dollar-a-month credit line and got caught charging a Mustang at taxpayer expense."  Broadcast DVD 9:28-9:40.  The Court does not believe that Lillian Anaya has offered evidence that Attkisson knew or should have know that this statement was false.  The reference to a "million-dollar-a-month credit line" was a shorthand that, at most, slightly exaggerated Anaya's spending capability at LANL.  Moreover, the statement that she "charged" the Mustang was supported by the documents that Attkisson had.  Those documents showed that charges were made to All Mustang.  Even if Attkisson had actual knowledge that the charges were cancelled later, that subsequent development does not bear on the truth or falsity of the statement.  Consequently, the cancellation is not relevant to Attkisson's state of mind regarding the veracity of the statement.

The February 26, 2003 broadcast was, like the previous two, based on uncontradicted sources.  Attkisson, as a reporter, did not need to censor herself and refrain from reporting until she had proven the truth of her story.  She was entitled to rely on the credible evidence she had.   There is not sufficient evidence in the record for a jury to find that Attkisson acted with reckless disregard whether she was reporting falsehood.  Thus, Lillian Anaya cannot pursue punitive damages on statements made in the February 26, 2003 broadcast.

### C.    INVESTIGATING THE WRONG-NUMBER THEORY.

Attkisson first learned about the wrong-number theory after LANL went public with it in

June 2003.  See Attkisson Decl. ¶ 147, at 42.  She reviewed the June 25, 2003 Legal Memo as well as the Press Release from the next day.  See Attkisson Decl. ¶ 150, at 42-43.  Although these documents did not convince her, she was intrigued with the theory and decided to investigate it.

Attkisson's investigation was extensive.  She consulted Wolp and Doran, who had been rehired and were working as investigators for UC.  See id. ¶¶ 157-61, at 44-46.  Wolp and Doran each gave her many additional investigation documents, including summaries of interviews that LANL investigators and the FBI had conducted.  See id. ¶¶ 161, at 45.

The new documents that Attkisson received, including LANL's report, the press release based on it, and the FBI 302s, contained information that cut decidedly against Attkisson's story about the Mustang, and raised doubts about its validity.  Even so, Attkisson found many flaws in its narrative and holes in the data.  She was therefore disinclined to believe it.

The Court believes that, after the wrong-number theory came out, and after LANL officially exonerated Lillian Anaya, Attkisson should have become more cognizant of the possibility that Lillian Anaya was innocent.  The report underlying the wrong-number theory – to which Attkisson had access – was, on its face, carefully prepared and documented the main evidence in favor of Lillian Anaya.  Nevertheless, actual malice is a stringent standard.  Failure to investigate, on its own, cannot give rise to a finding of actual malice.  See Hardin v. Santa Fe Reporter, Inc., 745 F.2d at 1324. (noting that "investigatory failures are insufficient to satisfy the malice requirement").  Attkisson's investigatory failures after June 2003 would present sufficient evidence of negligence to survive a motion for summary judgment.  It is a much closer question, however, given the actual-malice standard.  There is evidence that, like the defendants in  Hardin v. Santa Fe Reporter, Inc., Attkisson's investigation into the validity of the wrong-number theory was shoddy.  At the same time, however, Attkisson had other sources that supported some of the basic allegations against

Lillian Anaya.

The Court believes that, as a reporter facing documentary evidence that supports competing theories, Attkisson was entitled to pick a side and present LANL's and Anaya's version of the story in a less favorable light.  The actual-malice standard does not require objectivity, a balanced presentation, or even a fair one.  Rather, the standard focuses on the defendant's state-of-mind – whether she knew something to be false when she reported it, or whether she acted with reckless disregard to its falsity.  The Tenth Circuit has stated that actual malice entails "either deliberate falsification or reckless publication 'despite the publisher's awareness of probable falsity.'" Revell v. Hoffman, 309 F.3d at 1233 (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)).

"The [actual-malice] standard is a subjective one." Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. at 688. The Supreme Court has also said, with respect to "reckless disregard," that "defendant must have made the false publication with a 'high degree of awareness of . . . probable falsity,' Garrison v. Louisiana, 379 U.S. 64, 74 . . . (1964), or must have 'entertained serious doubts as to the truth of his publications.'" Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. at 667.  The Supreme Court in Harte-Hanks Communications, Inc. v. Connaughton also explained that, while the standard is subjective, reckless disregard for the truth can be shown where there is "evidence of an intent to avoid the truth," 491 U.S. at 692, such as where "failure to conduct a complete investigation involved a deliberate effort to avoid the truth," id. at 685.

The Court believes that, while actual malice is a subjective standard, CBS cannot end the discussion by pointing to Attkisson's affidavit, in which she states that she believes the subject matter of the reports to be true.  A plaintiff should be able to prove, in spite of a defendant's protestations of good faith in an affidavit, by circumstantial evidence, that the defendant acted with

reckless disregard for the truth.  For example, if a reporter twists the meaning of underlying source documents in relating the contents of those documents, a jury could infer that, despite an affidavit in which the reporter alleges to believe her version, the reporter in fact knew her version was false, or ignored a substantial likelihood that she was reporting a falsehood.  A plaintiff might also be able to show that a defendant has taken aspects of her source documents so out of context as to give rise to an inference that the defendant knew she was suppressing the truth in favor of a lie or a misrepresentation.  If a defendant's affidavit declaring good faith was, on its own, sufficient to foreclose the possibility of proving actual malice, the media would be able to issue such affidavits in every defamation suit and eliminate the ability of defamation plaintiffs to sue them.

In this case, LANL's theory was not airtight, and Attkisson has been able to point to various flaws and unanswered questions that it leaves.  It does not appear to be the case that she received irrefutable proof of Lillian Anaya's innocence, yet insisted on trumpeting a false story.  The First Amendment at least protects reporters' ability to criticize official explanations for events.  Thus, showing that Attkisson had the documents propounding the wrong-number theory in hand is not, on its own, a showing of malice.  Rather, it shows that Attkisson had access to LANL's version.  She was entitled to make legitimate criticisms and present facts based on other, contradictory evidence without losing the New York Times v. Sullivan  privilege.

Thus, the Court does not find that all of Attkisson's arguably slanted reports following the release of the wrong-number theory were malicious, even in light of LANL's official explanation and the results of the internal investigation.  The Court finds, however, that there is evidence that Attkisson made some statements either knowing that they were false or recklessly disregarding their possible falsehood.

D.     THE OCTOBER 8, 2003 BROADCAST.

Attkisson's report on the wrong-number theory aired October 8, 2003.  See Attkisson Decl. ¶ 216, at 66.  She reported on the allegations against Anaya, Anaya's general denial of guilt, her inability to offer any explanation for the All Mustang calls and charges, and LANL's defense of Lillian Anaya.  See Attkisson Decl. ¶ 225-31, at (A1344-46).  All of this information was undisputed.

In describing the Lab's defense of Lillian Anaya, Attkisson reported that LANL had "concocted" the theory.  Attkisson testified that she chose this word carefully, trying to capture her impression that the Legal Memo's authors had formulated an explanation to account for some of the Mustang evidence, using selected pieces of information, theories, and assumptions.  See Attkisson decl. ¶ 229, at 69.  After briefly summarizing that theory, Attkisson reported that the Lab had characterized it as fact in its press release the next day -- an observation about which there is no dispute.

Lillian Anaya finds various aspects of the October broadcast to be defamatory, beginning with Rather's teaser: "Hey, nice car!  She bought it and charged it to you, the tax payer.  The Inside Story, tonight."  Broadcast DVD 11:07-11:13.  As Rather was announcing the headline, footage of a sleek Mustang convertible – the same stock footage used in the other broadcasts – appeared on the screen.  See id.  Lillian Anaya also takes issue with references to the car as "the most sensational of all the suspect purchases," id. at 12:10-12:20; to the statement in which Rather says: "Coming up next here on the CBS EVENING NEWS from Los Angeles, prepare to be outraged.  She bought a Mustang with your tax dollars, and her boss still claims she's the victim.  We'll give you the inside story," id. at 11:34; to a screen shot in which footage of the car is portrayed behind text that says "charged" by Lillian Anaya, id. at 12:20-12:28; and to the repeated references, both graphically and

-100-

as part of the script, that Lillian Anaya "could offer no explanation, reasonable or not[]" for the calls and facsimile transmissions that records show took place between her office and All Mustang. Finally, she finds the description of LANL's explanation as "concocted" to be defamatory.

The Court finds evidence of malice in three of these statements: (i) "Hey nice car!  She bought it with your tax dollars;" "[s]he bought a Mustang with your tax dollars;" and (iii) Attkisson's characterization of the wrong-number theory as involving Lillian Anaya being "tricked" into buying a car.   By October 2003, Attkisson had a mountain of evidence that there was no car and that the evidence against Lillian Anaya supported, at most, an allegation that she attempted to charge a car, and that the attempt was stopped, either by Lillian Anaya or others.  In fact, Attkisson has admitted that she knew there was no car.  The Court believes that there is sufficient evidence for a jury to find that, by showing footage of a customized Mustang convertible and telling the viewer that Lillian Anaya bought it with taxpayer money, CBS acted with malice.

At first blush, there may appear to be inconsistency between the Court's finding that the failure to distinguish between Attkisson having "bought" a car and "charging" a car indicates evidence of malice in the October 2003 broadcast, and the Court's refusal to find malice in the earlier broadcasts.  There are important differences between the October 2003 broadcast and the earlier ones that lead to this result.  First, Attkisson had less information to work with during the earlier broadcasts.  By the time of the October 2003 broadcast, a fairly clear picture had emerged that there was no car.  Second, and more important, the earlier broadcasts gave a more clear contextual understanding that there was not an actual car.  The earlier broadcasts frequently mentioned the allegation that Lillian Anaya "charged" a Mustang, and while some individual sentences might be construed as accusing her of buying a car, those sentences did not override the overall impression that the Mustang was charged.

In contrast, the October broadcast referred to the Mustang almost exclusively as being bought or purchased.  Moreover, in the broadcast, an image of a car was shown while Rather said "she bought it."  Thus, the October 2003 broadcast tells the public Lillian Anaya bought a Mustang without equivocation, whereas the earlier ones report that she charged one, without stating that she got a car.  The evidence upon which Attkisson relied for all of her broadcasts up to October 2003 could not be fairly read as stating Lillian Anaya bought an existing car.  Thus, Attkisson may have proceeded with her broadcast even under serious doubts about the truthfulness of the statements regarding the Mustang.  The Court believes there is sufficient evidence to put the question to the jury.

The Court also believes that Attkisson's characterization of LANL's explanation shows evidence of reckless disregard for the truth.  Attkisson explained: "Anaya was trying to buy lab equipment called transducers but dialed a wrong number and did not realize she was actually speaking to the Mustang company, which then tricked her into ordering a car."  Id. at 13:15-13:25.  A jury could find that such a departure from LANL's explanation – that Thompson obtained Lillian Anaya's purchase card information – evinces knowing falsehood or reckless disregard for the truth.  The version that Attkisson told made the wrong-number story sound ridiculous.  It is difficult to believe that an individual could be tricked into buying a car.  LANL's version is more credible than Attkisson presented it to be.  A jury could find that Attkisson suppressed LANL's version and told her version for that reason, knowing that the facts in front of her did not support her version.

The rest of the broadcast was, at worst, an aggressive portrayal of Attkisson's theory that LANL was covering up the allegations regarding the Mustang.  Attkisson quoted the FBI 302 exactly as she received it, and she did not make any efforts to obscure its context.  The Court believes that the FBI 302 could be read as cutting for or against Lillian Anaya.  Attkisson also had

the results of the investigation, and she legitimately spotted problems with the narrative that the LANL published based on those results.

E.     THE APRIL 27, 2004 CBS EVENING NEWS STORY.

The final CBS broadcast about Lillian Anaya and the Mustang case was on April 27, 2004. In the broadcast, Attkisson reported on the DOI Inspector General's Report, which noted various questionable expenditures traceable to Lillian Anaya and recommended that Lillian Anaya's employment status be reevaluated.  The Court believes that the April 27, 2004 broadcast, when judged against the sources upon which Attkisson relied for its preparation, evinces a reckless disregard for the truth. The story, as announced by the opening teaser, "she's at it again," conveys the message that Lillian Anaya, the government employee who bought a Mustang on a government credit card and who was later exonerated as the result of LANL's desire to cover up the incident, went back to her wayward behavior after having her slate wiped clean.  The story is presented to create the impression that Lillian Anaya made a series of illegal purchases after being caught for buying a Mustang.

Attkisson had the DOI IG Report, which made clear and corroborated the other documentary evidence surrounding Lillian Anaya's suspension, and that Lillian Anaya did not have access to her office and did not engage in any procurement or purchase activity after she was placed on leave in the summer of 2002.  See DOI Report , Cover Memo., at 4.  Thus, CBS and Attkisson had no reason to believe that Lillian Anaya was "at it again" – making new, questionable purchases after getting off the hook for the Mustang allegation.  It was clear that the DOI was reviewing past transactions, the bulk of which preceded the charges from All Mustang.  Moreover, the DOI Report, for the most part, confirms Lillian Anaya's exoneration.  A jury could, upon reviewing the DOI Report and the other sources Attkisson had for the story, find that Attkisson intentionally took that report out of

context and used her version to level allegations that the report itself did not make – i.e., that Lillian Anaya was "at it again" and that she went on a "spending spree" on her government credit card.

This evidence that Attkisson told a story that was unsupported by her sources, and refuted in parts of the source documents, is sufficient for a jury to find, by clear-and-convincing-evidence, that CBS and Attkisson knew, or should have known that the broadcast, beginning with "she's at it again," was false.

Lillian Anaya has demonstrated that the DOI IG Report contains significant exonerating information and that CBS created a false impression by not reporting it. The Court reiterates that the media does not have a duty to present a balanced version of a dispute. At the same time, the Court believes that, where Lillian Anaya can show that portions of the report were taken out of context and reported in an arguably false manner, the inconsistency between the contents of the report and the contents of the broadcast based on that report constitute evidence of actual malice.

Lillian Anaya has also taken umbrage to Attkisson's reliance on Thompson – Of All Mustang – as a source in her stories. To that end, Lillian Anaya has offered evidence that Thompson lied, and that Attkisson knew that he was a liar. Thompson's behavior was admittedly questionable, and he may not have been the best source. Nevertheless, Attkisson did not exclusively rely on him. She quoted him and aired a portion of an interview with him, but she based her broadcasts on other evidence. The Court agrees with Attkisson's statement that she was allowing Thompson to tell his side – especially where the implication of Lillian Anaya's story is that Thompson committed credit-card fraud upon her.

Thus, in light of the evidence and arguments that the parties have presented, the Court finds that Lillian Anaya has offered sufficient evidence of malice for three statements from the October 8, 2003 broadcast and for all parts of the April 27, 2004 broadcast that spoke about her. The

statements from the October 8, 2003 broadcast for which there is evidence of actual malice are:  (i) "Hey, nice car!  She bought it and charged it to you, the taxpayer;" (ii) "She bought a Mustang with your tax dollars;" and (iii)  the characterization of the wrong-number theory in which Attkisson represented that Lillian Anaya was "tricked" into buying a car.  The Court will deny summary judgment with respect to those utterances.  Given that Lillian Anaya was not a public official, and did not become a public figure until after the first three broadcasts, which aired on November 27, 2002, December 20, 2002, and February 26, 2003, the Court will deny summary judgment and allow Lillian Anaya to proceed to the jury on those claims.  The Court will grant summary judgment with respect to punitive damages for the November 2002, December 2002, and February 2003, broadcasts because Lillian Anaya has not offered evidence sufficient for a finding of actual malice on any of the statements made in those broadcasts.

**IT IS ORDERED** that CBS's Initial Motion for Summary Judgment is granted in part and denied in part.  The Court denies summary judgment on statements made in the November 27, 2002, December 20, 2002, and February 26, 2003 broadcasts.  The Court grants summary judgment with respect to punitive damages and will therefore not allow the Plaintiffs to seek punitive damages on statements made during the November 27, 2002, December 20, 2002, and February 26, 2003 broadcasts.  The  Court, finding evidence of actual malice, denies summary judgment on the following statements made during the October 8, 2003 broadcast: (i) "Hey, nice car!  She bought it and charged it to you, the taxpayer;" (ii) "She bought a Mustang with your tax dollars;" and (iii) the characterization of the wrong-number theory in which Attkisson represented that Lillian Anaya was "tricked" into buying a car.  The Court also denies summary judgment on the contents of April 27, 2004 broadcast related to Lillian Anaya.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Todd M. Lopez
Julie Sakura
Lopez & Sakura LLP
Santa Fe, New Mexico

-- and--

Jesse A. Boyd
  Attorney at Law
Santa Fe, New Mexico

-- and --

John W. Boyd
Michael Lee Goldberg
Freedman Boyd Hollander Goldberg & Ives
Albuquerque, New Mexico

       *Attorneys for the Plaintiffs*

John B. Pound
Nancy Long
Long, Pound & Komer, P.A.
Santa Fe, New Mexico

-- and --

Michael L. Raiff
Thomas S. Leatherbury
Marc A. Fuller
Vinson & Elkins L.L.P.
Dallas, Texas

       *Attorneys for Defendants CBS Broadcasting Inc.,*
        *Sharyl Attkisson, and Emmis Communications, Corp.*

-106-

Frederick G. Gamble
  Attorney at Law
Tempe, Arizona

-- and --

Kirk R. Allen
Matthew S. Rappaport
Miller Stratvert P.A.
Albuquerque, New Mexico

 *Attorneys for Defendants Thomas Thompson and*
  *Tri-City Auto Sales, Inc. d/b/a AMP Parts and Performance or*
  *All Mustang Performance*

James P. Bieg
Rodey, Dickason, Sloan, Akin
  & Robb, P.A.
Santa Fe, New Mexico

-- and --

Bruce Hall
Theresa W. Parrish
Rodey, Dickason, Sloan, Akin
  & Robb, P.A.
Albuquerque, New Mexico

 *Attorneys for Los Alamos National Laboratory and the*
  *Regents of the University of California at Berkley*